**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| SAM PARTY OF NEW YORK and MICHAEL J. VOLPE,<br><br>                          Plaintiffs,<br><br>        vs.<br><br>ANDREW CUOMO, as the Governor of the State of New York; ANDREA STEWART-COUSINS, as the Temporary President and Majority Leader of the New York State Senate; JOHN J. FLANAGAN, as the Minority Leader of the New York State Senate; CARL E. HEASTIE, as the Speaker of the New York State Assembly; BRIAN KOLB, as the Minority Leader of the New York State Assembly; PETER S. KOSINSKI, as the Co-Chair of the New York State Board of Elections; DOUGLAS A. KELLNER, as the Co-Chair of the New York State Board of Elections; ANDREW J. SPANO, as a Commissioner of the New York State Board of Elections; TODD D. VALENTINE, as Co-Executive Director of the New York State Board of Elections; and ROBERT A. BREHM, as Co-Executive Director of the New York State Board of Elections,<br><br>                          Defendants. | Civil Action No. 20 CIV ____-<br><br>**COMPLAINT** |

**INTRODUCTION**

1.     New York has changed its electoral laws to bar small political parties from the ballot unless they choose to nominate a candidate for President of the United States. That requirement is repugnant to the Constitution and the laws of the United States.

2.     Plaintiff SAM Party of New York is a recognized political "party" under New York law that focuses on nominating candidates for village, town, county, and statewide office.  SAM believes that our electoral system is broken and that the two main political parties are focused solely on defeating each other, rather than serving the people.

SAM, an abbreviation for the "Serve America Movement," wants to offer New York voters a better choice:  a party that prizes accountability, transparency, electoral reform, and data-driven decision-making.  The SAM Party of New York has already achieved considerable success in its short history, earning "party" status for four years under the then-existing laws by getting more than 50,000 votes for governor in the 2018 election. It then nominated more than 100 candidates for local offices in 2019, with 51 of those candidates winning their elections.

3.     Because of the change to the ballot-access laws, the SAM Party of New York will lose its "party" status after the November 2020 election, solely because it will not run a candidate for President in that race.  It brings this action to declare New York's presidential-vote requirement unconstitutional as applied to the SAM Party of New York and to enjoin its enforcement against the SAM Party of New York.

## THE PARTIES

4.     Plaintiff SAM Party of New York is a recognized political "party" under New York law.  As a result, it is entitled to be on the ballot in New York for a four-year period beginning with the 2018 gubernatorial election and to enjoy the benefits and the campaign-finance rights available to a recognized "party."

5.     Plaintiff Michael J. Volpe is the Chairman and a registered member of Plaintiff SAM Party of New York, and was its candidate for Lieutenant Governor of New York in 2018.  He is a registered voter in the State of New York, and resides in Westchester County.

6.     Defendant Andrew Cuomo is the Governor of the State of New York.  He is sued in his official capacity.

7.      Defendant Andrea Stewart-Cousins is the Temporary President and Majority Leader of the New York State Senate.  She is sued in her official capacity.

8.      Defendant John J. Flanagan is the Minority Leader of the New York State Senate.  He is sued in his official capacity.

9.      Defendant Carl E. Heastie is the Speaker of the New York State Assembly.  He is sued in his official capacity.

10.      Defendant Brian Kolb was, until he announced his resignation on January 3, 2020, the Minority Leader of the New York State Assembly.  He is sued in his official capacity and Plaintiffs anticipate amending their complaint to replace Defendant Kolb once a new Minority Leader is appointed.

11.      Defendant Peter S. Kosinski is a Co-Chair of the New York State Board of Elections.  He is sued in his official capacity.  The New York State Board of Elections is an agency within the Executive Department of the State and is responsible for administering and enforcing all laws relating to elections in New York State.

12.      Defendant Douglas A. Kellner is a Co-Chair of the New York State Board of Elections.  He is sued in his official capacity.

13.      Defendant Andrew J. Spano is a Commissioner of the New York State Board of Elections.  He is sued in his official capacity.

14.      The position of the third Commissioner of the New York State Board of Elections is currently vacant.  Plaintiffs anticipate amending their complaint to name the third Commissioner if one is appointed, and anticipate suing that person in his or her official capacity.

15.     Defendant Todd D. Valentine is a Co-Executive Director of the New York State Board of Elections.  He is sued in his official capacity.

16.     Defendant Robert A. Brehm is a Co-Executive Director of the New York State Board of Elections.  He is sued in his official capacity.

## JURISDICTION AND VENUE

17.     This case arises under the Constitution and the laws of the United States. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343.  This Court is empowered to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

18.     This Court has personal jurisdiction over each Defendant.  Each of the Defendants is sued in his or her official capacity as an officer or agent of the government of the State of New York.  Furthermore, on information and belief, each of the Defendants resides in the State of New York.

19.     Venue properly lies in this Court under 28 U.S.C. §§ 1391(b)(1) because at least one Defendant resides in this district—*e.g.*, Governor Cuomo maintains an office at 633 Third Avenue in Manhattan—and, on information and belief, all Defendants are residents of New York.

20.     In the alternative, venue properly lies in this Court under 28 U.S.C. § 1391(b)(2) because the New York State Campaign Finance Review Commission held four public hearings and meetings within this district, and therefore a substantial part of the events giving rise to the claims occurred in this district.

## STATEMENT OF FACTS

21.     The SAM Party of New York believes that the American political system today is driven by ideology and party loyalty, at the expense of compromise and problem

solving, and fails to respond to the will and needs of the people.  It believes that

adherence to a rigid ideological spectrum will not produce the common-sense, consensus-

driven solutions that are necessary to solve the problems of the twenty-first century and

that fully reflect America's rich diversity of beliefs and opinions.

22.     Studies report that two-thirds of Americans agree that neither major

political party represents their needs or interests.  Americans have been told to think of

politics on a single axis from left to right, blue to red, liberal to conservative.  The SAM

Party of New York believes that this mode of thinking divides Americans, fosters

tribalism, and precludes real, practical change from being enacted.

23.     The SAM Party of New York represents a different model for a political

party.  It is a candidate-oriented political party, not an issue-oriented party.  It empowers

leaders to solve problems without requiring adherence to ideology.  *Process* is the SAM

Party of New York platform.

24.      The SAM Party of New York believes that candidates and elected

officials should commit themselves to objectively verifiable standards of transparency

and accountability, to the support of fundamental electoral reforms that will increase

electoral competition and voter participation, and to the support of forging consensus-

driven, common-sense solutions to the problems that matter the most to the most people.

25.     To that end, the SAM Party of New York assesses politicians on four axes,

or "pillars":  transparency, accountability, electoral reform, and problem solving, and has

developed a scorecard so that voters can make that assessment for themselves.

26.     For example, in assessing transparency the SAM Party of New York

asks—and proposes that voters ask—whether the candidate, if elected, will "disclose

online all calendars of the elected official and senior staff and the occurrence of and participants in all non-personal meetings or calls related to the official's duties." *Our Platform*, SAM, https://joinsam.org/our-platform (last visited Jan. 4, 2020).  Likewise, it asks whether, once elected, the official will "disclose online all personal business and professional conflict of interests for the elected official or for any member of his/her immediate family."  *Id*.

27.     In assessing accountability, the SAM Party of New York asks whether, once elected, the official will (a) "hold regular constituent engagement sessions through scheduled office hours, town halls and candidate availability sessions" no fewer than four times a month, (b) "disclose online and explain all substantive votes via timely, consistent reports," and (c) pledge a self-imposed five-year prohibition on becoming a lobbyist, as only some examples.  *Id*.

28.     In assessing a candidate's commitment to electoral reform, the SAM Party of New York asks whether the official will actively support (a) primaries open to all voters regardless of policy affiliation, (b) ranked-choice voting, and (c) the lowering or elimination of legal barriers for minor party and independent candidates to get their names and candidacies on the ballot.  *Id*.

29.     In assessing a candidate's commitment to problem solving, the SAM Party of New York asks, among other things, whether the candidate has renounced ideological policy pledges and inflexible litmus tests, whether the candidate has sought out opposing views regardless of party affiliation, has sought common-ground policy solutions, and has an objectively demonstrable record of cross-partisan cooperation.  *Id*.

30.    The SAM Party of New York will support and nominate a candidate based on commitment to these four pillars.  It does not have and will not have a policy-oriented platform.  The SAM Party of New York is in favor of good government, of elected officials loyal to governing and serving, not to party or ideology.

31.    Plaintiff SAM Party of New York seeks to grow and succeed in New York as an autonomous, state-focused political party.  It will vet and nominate like-minded candidates for state and local political office.  It is only through that bottom-up process that Plaintiff SAM Party of New York can successfully build a recognized brand as a New York-focused party.

**The SAM Party of New York Earned "Party" Status in the 2018 Election**

32.    Under New York election law as it existed in 2018, a political organization could become a "party" by getting 50,000 or more votes for its candidate in the preceding New York gubernatorial election.  *See* N.Y. Elec. Law § 1-104(3) (McKinney 2019).  It would retain that "party" status until the next gubernatorial election, in which it would need to get 50,000 or more votes for its candidate in order to re-qualify for another four years.

33.    New York permits "fusion" voting, by which the same person may run as the candidate nominated by more than one political party.  (Governor Cuomo, for example, ran as the candidate of both the Democratic Party and the Working Families Party in the general election in 2018.)  To qualify as a "party," an organization needed to obtain 50,000 votes for its candidate *on that organization's ballot line.*  (To continue the same example, for the Working Families Party to re-qualify as a "party" in 2018, it needed voters to cast 50,000 or more votes for Governor Cuomo on the Working Family Party line, not the Democratic line.)

- 7 -

34.     The benefits of recognized "party" status under New York law are extensive, and indeed critical to a party's success.  Recognized "parties" enjoy significant advantages over non-recognized parties and independent candidates, both in political fundraising and in supporting the election of the candidates they nominate.  *See generally* N.Y. Elec. Law § 14-114 (McKinney 2019).  Further, as the Second Circuit has explained, only a recognized "party" "can automatically place a candidate on the ballot for statewide election without first undertaking the burden of a special petition drive in order to do so."  *Green Party of N.Y. State* v. *N.Y. State Bd. of Elections*, 389 F.3d 411, 415 (2d Cir. 2004) (citing N.Y. Elec. Law §§ 6-104, 6-138(1)).  A "party" may choose its statewide candidate in a closed primary election, which other political organizations may not do.  *Id.* (citing N.Y. Elec. Law § 1-104(9)).  And when voters register to vote in New York, the voter registration form lists and provides check boxes for all of the recognized "parties," allowing the new voter easily to affiliate with a party and saving that party substantial expense in finding new members.  *See* N.Y. Elec. Law §§ 5-300.  The Board of Elections makes the current voter-registration form available on its website.  *See* NEW YORK STATE BOARD OF ELECTIONS, https://www.elections.ny.gov/NYSBOE/download/voting/voteregform-eng-fillable.pdf (last accessed January 4, 2020).

35.     In 2018, the SAM Party of New York successfully completed the arduous process of obtaining signatures to nominate Stephanie Miner as a candidate for Governor and Plaintiff Volpe as a candidate for Lieutenant Governor.  Miner and Volpe ran on a message expressly aimed at what SAM described as the "pay-to-play" culture plaguing New York State politics and embodied by New York state and local politicians and

officials.  They received 55,441 votes on the SAM Party of New York ballot line, thus securing the SAM Party of New York—in its first attempt—four years as a recognized "party" and the concomitant substantial benefits and exemptions under New York campaign-finance and election law.  The current New York State Voter Registration Form lists the SAM Party as a political party in which a new voter may enroll.  *See id*.

**The SAM Party of New York Successfully Ran Candidates for Fifty-One New York Offices in 2019**

36.    The SAM Party of New York capitalized on its status as a recognized "party" and nominated more than one hundred candidates in the March and November 2019 elections for village, town, county and judicial offices across New York State. Consistent with its mission to nominate only candidates committed to the four pillars of transparency, accountability, electoral reform, and problem solving, and without regard to left-right ideology, some of the SAM Party of New York candidates were also nominated by the Democratic Party while others were also nominated by the Republican Party.

37.    The SAM Party of New York was highly successful in its first year.  Fifty-one of its candidates won their elections, to offices in twenty-one counties across New York State.  In fourteen of those races, the SAM Party of New York represented the alternative party of choice, and in seven races it received more votes than at least one of the two traditional parties.

**The Working Families Party and the 2018 Primaries**

38.    In 2018, activist and actress Cynthia Nixon challenged Governor Cuomo for the nominations of both the Democratic and Working Families Parties.  Governor Cuomo withdrew from the Working Families Party primary, which Ms. Nixon was widely expected to win and in which, after the Governor withdrew, she captured 91.5%

of the vote.  That guaranteed her a spot in the general election.  Governor Cuomo

captured 65% of the vote in the Democratic primary to Ms. Nixon's 35%, guaranteeing

him the Democratic nomination.

39.     Thereafter, the Working Families Party agreed to endorse Governor

Cuomo in the general election, and withdrew Ms. Nixon's name from the general-

election ballot.

40.     On information and belief, the Working Family Party's support for

Ms. Nixon angered Governor Cuomo.  Bill Mahoney, *Cuomo Quietly Presses to Weaken

His Working Families Party Nemesis*, POLITICO (Oct. 25, 2019, 5:00 AM),

https://www.politico.com/states/new-york/albany/story/2019/10/25/cuomo-quietly-

presses-to-weaken-his-working-families-party-nemesis-1225974 (seven unnamed people

reporting that the governor or his top staff said that Governor Cuomo "wants to destroy

the party.")

**The Creation of the Commission**

41.     The New York State Campaign Finance Review Commission ("the

Commission") was created as part of a budget and appropriations bill submitted by

Governor Cuomo and approved by the Legislature in 2019.  It has been widely reported

in the press that part of the impetus for the Governor's creation of the Commission was

the Working Families Party's actions in 2018, and that a goal for the Commission was to

raise the requirements for recognized political "party" status to a level that the Working

Families Party and other small parties have no hope to meet.  *See*, *e.g.*, Carl Campanile,

*Cuomo Panel Moves Closer to Keeping Working Families Off the Ballot in NY*, N. Y.

POST (Nov. 25, 2019, 2:52 PM), https://nypost.com/2019/11/25/cuomo-moves-closer-to-

keeping-working-families-off-the-ballot-in-ny/; Bill Mahoney, *Cuomo Quietly Presses to*

*Weaken His Working Families Party Nemesis*, POLITICO (Oct. 25, 2019, 5:00 AM),
https://www.politico.com/states/new-york/albany/story/2019/10/25/cuomo-quietly-
presses-to-weaken-his-working-families-party-nemesis-1225974.  And it has been further
reported that the Commission was tasked with devising changes to the election laws that
would effectively eliminate third parties from the ballot.  *See* Fred Mogul, *Cuomo Ally
Seeks to Block Third Parties from the Ballot*, GOTHAMIST (Oct. 30, 2019, 10:02 AM),
www.gothamist.com/news/cuomo-ally-seeks-block-third-parties-ballot.

42.     Established as part of the FY 2020 Enacted Budget, through newly
enacted Part XXX of the Laws of 2019, Chapter 59, the Commission was created to
"make recommendations for new laws" establishing a system of voluntary public
financing for statewide and state legislative public offices, and to "determine and identify
all details and components reasonably related to administration of a public financing
program," including the catch-all category of "rules and definitions governing . . .
political party qualifications."  The Enacted Budget purported to give the Commission
the "binding power to implement public campaign financing for legislative and statewide
offices, authorizing up to $100 million annually in public funds," and to "determine
specific aspects of the public financing system, including eligibility thresholds, public
financing limits and contribution limits for participating candidates."  *See Governor
Cuomo & Legislative Leaders Announce Members of the Public Campaign Financing
Commission*, GOVERNOR.NY.GOV (Jul. 3, 2019)
https://www.governor.ny.gov/news/governor-cuomo-legislative-leaders-announce-
members-public-campaign-financing-commission (last accessed January 4, 2020).

43.     The FY 2020 Enacted Budget provides no justification for giving the Commission the purported authority to enact rules governing political party qualifications.  *See* Part XXX, §2(j) of Chapter 59 of the Laws of 2019, https://legislation.nysenate.gov/pdf/bills/2019/S1509C (January 18, 2019, last accessed January 4, 2020).

**The Commission's December 1, 2019 Report**

44.     The Commission was established with a requirement that it render its recommendations by December 1, 2019, and with the provision that its recommendations would become binding law on December 23, 2019 unless modified by the Legislature. *See id*. §1(a).

45.     From the outset, it was expected that the Legislature would not interfere with the Commission's recommendations. Indeed, the Legislature was not even expected to be and was not in session between the date the recommendations were published and the date they would become binding law.  *See New York State Legislative Session Calendar*, NYASSEMBLY.GOV https://nyassembly.gov/leg/docs/sessioncalendar_2019.pdf (last accessed January 4, 2020).  Moreover, the Commission's December 1, 2019, Report repeatedly describes its recommendations as "hav[ing] the force of law."  The Commission's Report is attached hereto as Exhibit A, and incorporated herein by reference.

46.     The effect of the foregoing was therefore to give to the Commission the Legislature's power and obligation to consider and pass laws and to relinquish the Governor's power and obligation to consider and sign or veto those laws upon presentment.

47.     In Part I of the Report, the Commission recommended lowering the campaign-contribution limits on how much a candidate for certain state offices may raise in any given election.  For example, the cap on individual donations for statewide office (*e.g.*, Governor, Attorney General) was reduced from $44,000 to $18,000.  The cap for state senator was reduced from $7,500 in the primary election and $11,800 in the general election to a total of $10,000 split evenly between the primary and the general election.  *See* Report at 3.  The proposed limits do not apply to contributions and support from recognized political parties.  *See id.*  In Part II, the Commission recommended the creation of a new voluntary Public Campaign Finance System, by which participating candidates who meet specified private-fundraising thresholds would then be eligible for public-funding "matching" of small-dollar donations.  For example, a gubernatorial candidate who raised at least $500,000 from at least 5,000 in-state donors would be eligible to then receive a maximum of $3.5 million in public funds for a primary election and $3.5 million for a general election. *See id.* at 3-4.  The Commission also recommended the creation of a Public Campaign Finance Board ("PCFB") within the State Board of Elections to administer the program.  *See id*. at 4.  And in Part III the Commission recommended the creation of a New York State Campaign Finance Fund within the State Finance Law, and established how the fund would be financed.  *See id*. at 5.

48.     In Part IV—and as relevant here—the Commission recommended changing the thresholds to become and remain a recognized "party", so that a political organization would need to obtain "at least 2% of the total votes cast for governor, or 130,000 votes, whichever is greater, in a gubernatorial election year <u>and</u> at least 2% of

the total votes cast for president, or 130,000 votes, whichever is greater, in a presidential election year." *Id.* (emphasis added). The Commission stressed that "these two thresholds work independently of one another," and that "this provision takes effect on January 1, 2020, so that all existing parties must requalify at the November 2020 elections." *Id.* at 5. The Commission also raised the signature requirements for candidates seeking to be on the ballot independent of a Party's nomination. *Id.*

49.     In Part V, the Commission recommended that the contribution limits and public-finance campaign not take effect until November 9, 2022—that is, the day <u>after</u> the next election in which Governor Cuomo will be a candidate. *See id.*

50.     Delaying the contribution-limit and public funding rules until after the 2022 election while requiring political parties to re-qualify using the 2020 Presidential election is designed to ensure that Governor Cuomo can run for re-election in 2022 under the old campaign-finance limits (not the new, lower limits), with no risk of an opponent receiving public funding, while at the same time eliminating minor parties from the ballot through the 2020 presidential-election requirement.

51.     In an effort to thwart anticipated challenges to the constitutionality of aspects of the new system, before the Commission even finalized its recommendations, it voted to "package its [then-not-yet-existent] recommendations . . . in a single, non-severable product . . . ." *Id.* at 15. The Commission reiterated in its final Report that "[i]t is the expressly stated intent of this Commission that each of the recommendations made in this report be interpreted as non-severable from any other recommendation," with one exception not relevant here. *Id.*

52.     The SAM Party of New York broadly supports campaign-finance reform and other provisions, including public-finance systems, which make access to the ballot easier.  It does not seek in this lawsuit to invalidate the monetary limits and public-funding recommendations of the Commission.

53.     As described below, all that the SAM Party of New York seeks here is to enjoin enforcement of the requirement that it obtain 130,000 or 2% of the votes cast in <u>presidential</u> elections, in which it will not be running a candidate because to do so would be antithetical to its current goals, mission, and priorities, and to enjoin the Defendants from stripping the SAM Party of New York of its recognized "party" status for failing to meet that requirement.

54.     Notably, the Commission's 139-page report offers not one word of justification for including the presidential election in the party-qualification thresholds.  It contains no assessment of whether the public-finance system would be economically viable, and would remain below the Legislature's $100-million-per election target, without that presidential-election requirement.  To the extent the Legislature and/or the Commission were concerned about the cost of small-party candidates using public funds to match private contributions, the report never explains how an organization's <u>not participating</u> in the presidential election could increase the cost of the public-finance system.  It never explains why a party's participation in or success in the presidential election should determine whether a party should have the ability to nominate a candidate for Governor or other New York offices.  And none of the public matching funds will go to candidates for president.  In sum, there does not appear to be any tether to the presidential-vote requirement at all.

55.     The Report also contains no attempt to explain why a recognized "party" should lose the extensive benefits attendant to that status—from a guaranteed place on the ballot to the ability to hold primaries to voter-registration and campaign-finance advantages—simply because that party declined to participate in the presidential election.

**The Commission's Report Became Law on December 23, 2019**

56.     The Legislature did not even meet to debate the Commission's recommendations.  They became law on December 23, 2019.

57.     The manner in which the Commission thus created the law of New York violated New York's Constitution.  The separation-of-powers doctrine reserves the power to legislate to the Legislature, and the power to veto laws to the Governor.  *See, e.g.*, *Levine* v. *Whalen*, 39 N.Y.2d 510, 515 (1976) (for decades, New York law has recognized that the Legislature may not delegate the "power to make the law" to bodies other than the Legislature itself).  Yet the Enacted Budget directed the Commission to "specifically determine and identify new election laws" in ten specified areas, 2019 N.Y. Sess. Laws Ch. 59, Part XXX, § 2, and provided that each such regulation "shall have the force of law, and shall supersede, where appropriate, inconsistent provisions of the election law," *id.* § 5, without retaining the rights to vote on and approve, or—in the case of Governor Cuomo, to veto—those recommendations.

58.     It does not matter that the Commission's recommendations would not become law if the Legislature were to intervene.  A minority of members in either chamber of the Legislature could prevent that intervention simply by being absent for the vote.  And the Governor abdicated entirely any right to veto the Commission's recommendations, absent the Legislature's somehow altering them.

59.     The Commission used its delegated authority to enact a ballot-access law requiring, for the first time, that a political association must nominate a candidate for President of the United States in order to qualify as a political "party" in New York.  That law is unconstitutional as applied to the SAM Party of New York and Plaintiff Volpe.

**Nominating a Presidential Candidate This Year**
**Will Irreparably Harm the SAM Party of New York**

60.     The SAM Party of New York does not intend to nominate a candidate for President in 2020.  While there may someday be a candidate for President from one of the two major parties who embodies the four pillars that the SAM Party of New York espouses, there is not one today in either party's field.  The purpose of the SAM Party of New York is, for now and the foreseeable future, to act in New York.  Moreover, it would be forced to spend money supporting the candidate as a SAM candidate in order to have any hope of achieving the required vote minimums for the candidate on the SAM line.

61.     The presidential-election requirement leaves the SAM Party of New York with a choice among three bad options.

62.     First, the SAM Party of New York could forego this year's presidential election and, as a result, necessarily lose its status as a recognized "party" by failing to garner the threshold percentage of the vote.

63.     Second, the SAM Party of New York could run what the ballot-access case law recognizes as a "frivolous" candidacy, hoping that its candidate somehow lucks into 130,000 votes or 2% of the votes cast.  That candidate, of course, would have no chance of actually becoming President; he or she would not be running in any other state.

64.     Third, the SAM Party of New York could seek to nominate the winner of the Democratic or Republican presidential primaries under fusion voting, and then hope that candidate (if he or she were willing to accept the nomination) got the threshold number of votes on the SAM Party of New York ballot line rather than the Democratic or Republic ballot line.  But in doing so, it would be perceived as having adopted as its own all of the political positions that its candidate otherwise holds, on issues from abortion to school choice to Social Security to global warming—exactly the issue-and-viewpoint identification that the SAM Party of New York seeks to avoid in hewing to its core mission.

**The SAM Party of New York Will Lose Its**
**"Party" Status After This Year's Election**

65.     Among those unpalatable options, the SAM Party of New York has made its choice:  it does not intend to nominate a candidate for President.  As a result, absent relief from this Court or a change in the law, the Board of Elections and Defendants Kosinski, Kellner, Spano, Valentine, and Brehm will strip the SAM Party of New York of its recognized "party" status under New York law, and all of the benefits attendant to that status, after the November presidential elections.  The SAM Party of New York earned those benefits in 2018.  It would earn them again—or, at least, it would seek to earn them again—in the 2022 gubernatorial election.  But it will lose them two years before that, simply because it chose not to run a candidate in an election in which it did not wish to participate.

**The SAM Party of New York Will Seek**
**Preliminary and Permanent Injunctive Relief**

66.     Once Plaintiffs effect service on the Defendants, Plaintiffs' counsel will confer with Defendants' counsel in an attempt to agree on a schedule for a preliminary injunction motion or expedited proceeding on the merits of Plaintiffs' claims.

### COUNT I

**Violation of the First and Fourteenth Amendments and 28 U.S.C. § 1983 –**
**Freedom of Association**

67.     Plaintiffs repeat and reallege as though fully set forth herein the allegations of Paragraphs 1 through 66 of the Complaint as Paragraph 67 of Count I.

68.     The Supreme Court recognizes "the constitutional right of citizens to create and develop new political parties." *Norman* v. *Reed*, 502 U.S. 279, 288 (1992). "The right derives from the First and Fourteenth Amendments and advances the constitutional interest of like-minded voters to gather in pursuit of common political ends, thus enlarging the opportunities of all voters to express their own political preferences." *Id.* "This First Amendment freedom to gather in association for the purpose of advancing shared beliefs is protected by the Fourteenth Amendment from infringement by any State." *Democratic Party of U.S.* v. *Wisconsin ex rel. La Follette*, 450 U.S. 107, 121 (1981). And because "ballot access restrictions" can "'limit the field of candidates from which voters might choose,'" *Anderson* v. *Celebrezze*, 460 U.S. 780, 786 (1983), courts subject to strict scrutiny those ballot access restrictions that impose a severe or heavy burden on a party or its members.

69.     Requiring the SAM Party of New York to nominate a candidate for President or else lose "party" status imposes a severe burden on the SAM Party of New York and its members and voters, including Plaintiff Volpe.

70.     The SAM Party of New York's opposition to nominating a candidate for President is a political one:  the SAM Party of New York is still establishing itself and its brand, and nominating a presidential candidate other than a frivolous candidacy would cause the public to tag the party with the political views of its candidate even though it does not share or want to be associated with those views and even if that candidate does not share SAM's emphasis on transparency, accountability, electoral reform, and problem solving.  "A burden that falls unequally on new or small political parties or independent candidates impinges, by its very nature, on associational choice protected by the First Amendment."  *Anderson*, 460 U.S. at 793.  And where the SAM Party of New York's "political goals" are to act in New York elections, barring it from the ballot because it will not nominate a candidate for President imposes a severe burden based on those goals.  *Timmons* v. *Twin Cities Area New Party*, 520 U.S. 351, 357 (1997).

71.     The State's purported need for the presidential-election requirement is to ensure that public-finance dollars do not go to marginal candidates and thus drive up the cost of the public-finance system.

72.     That is wrong.  First, the public-finance provisions do not apply to candidates for federal office;  there will be no matching of funds for presidential candidates.

73.     Second, the public-finance provisions do not apply to candidates in either the 2020 or 2022 election cycles, so stripping the SAM Party of New York from the ballots in those elections will not affect public financing at all.

74.     Third, a political party can be a serious participant in New York politics and worthy of public-fund matching without having to participate in the presidential

election.  Including a presidential-vote requirement is a means to drive political parties off of subsequent New York ballots, but is not a means to drive off only fringe or marginal parties.

75.     Fourth, there is no necessary or logical connection between <u>candidate</u> eligibility for public finance and whether the candidate is the nominee of a recognized political "party" under New York law.

76.     Fifth, the requirement under preexisting law that a "party" obtain 50,000 votes in a gubernatorial election already separated out the minor purported "parties."  As the Second Circuit has already explained, any party that can place a statewide candidate on the ballot has "demonstrated a 'modicum of support' sufficient to overcome the state's broad latitude in controlling frivolous party registration of tiny fractional interests." *Green Party of N.Y. State*, 389 F.3d at 422 (quoting *Baer* v. *Meyer*, 728 F.2d 471, 476 (10th Cir. 1984)).  The presidential-election requirement is thus not appropriately tailored to the State's asserted interest.

77.     The SAM Party of New York will have to meet the requalification requirements during the 2022 gubernatorial election.  Those qualifications have been increased to 130,000 votes or 2% of the vote.  There is no valid justification for requiring the SAM Party of New York to participate in and garner the same number of votes in the presidential race.

78.     In imposing that requirement, the Commission's recommendations, now enacted into law, violate the First and Fourteenth Amendments as applied to the SAM Party of New York and its members, including Plaintiff Volpe.

79.     By reason of the foregoing, Defendants, acting under color of state law, have deprived and will continue to deprive Plaintiffs of the rights, privileges, and immunities secured to them by the First and Fourteenth Amendments of the United States Constitution, in violation of 28 U.S.C. § 1983.

## COUNT II

### Violation of the First and Fourteenth Amendments and 28 U.S.C. § 1983 – Compelled Speech

80.     Plaintiffs repeat and reallege as though fully set forth herein the allegations of Paragraphs 1 through 79 of the Complaint as Paragraph 80 of Count II.

81.     "Freedom of association means not only that an individual voter has the right to associate with the political party of her choice, but also that a political party has a right to 'identify the people who constitute the association.'" *Eu* v. *San Francisco Cty. Democratic Cent. Comm.*, 489 U.S. 214, 224 (1989) (quoting *Tashjian* v. *Republican Party of Conn.*, 479 U.S. 208, 214 (1986)) (internal citations omitted).  That right includes the ability "to select 'a standard bearer who best represents the party's ideologies and preferences.'"  *Id.* (quoting *Ripon Soc'y, Inc.* v. *Nat'l Republican Party*, 525 F.2d 567, 601 (D.C. Cir. 1975)).

82.     As the Supreme Court recognized nearly twenty years ago, "a corollary of the right to associate is the right not to associate."  *Cal. Democratic Party* v. *Jones*, 530 U.S. 567, 574 (2000).  The SAM Party of New York does not want to nominate anyone for President.  Were it to nominate the Republican or Democratic nominee—the only way to have any realistic chance at garnering 2% of the vote—the SAM Party of New York would be seen as endorsing the political views of that candidate on issues on which it otherwise would express no policy position.  And, to achieve the required vote

thresholds, it would be required to spend money supporting a candidate it does not wish to support, financially or otherwise.  "In no area is the political association's right to exclude more important than in the process of selecting its nominee."  *Id*. at 575.  "That process often determines the party's positions on the most significant public policy issues of the day, and even when those positions are predetermined it is the nominee who becomes the party's ambassador to the general electorate in winning it over to the party's views."  *Id.*

83.     The body politic views a party's nomination of its candidate as the party's "select[ion of] a standard bearer who best represents the party's ideologies and preferences."  *Eu*, 489 U.S. at 224.  Being "saddled with an unwanted, and possibly antithetical, nominee" could at the very least "severely transform it."  *Cal. Democratic Party*, 530 U.S. at 579.

84.     Requiring a one-state political party to participate in a national election in order to secure ballot access for state-wide and local elections also implicates principles of federalism and States' rights.  The Constitution forbids a State from compelling a political party to participate in a national election and address nationwide issues in order to speak to statewide issues.

85.     By compelling the SAM Party of New York to speak as to who should be the President in order to qualify to nominate candidates for statewide and local office, the Commission's recommendations impose a severe burden on the SAM Party of New York and its members, including Plaintiff Volpe.

86.     The Commission offered no justification at all for this requirement.  The Commission's recommendations, now the law, violate the SAM Party of New York's and Plaintiff Volpe's rights under the First and Fourteenth Amendments.

87.     By reason of the foregoing, Defendants, acting under color of state law, have deprived and will continue to deprive Plaintiffs of the rights, privileges, and immunities secured to them by the First and Fourteenth Amendments of the United States Constitution, in violation of 28 U.S.C. § 1983.

## COUNT III

### Violation of the First and Fourteenth Amendments and 28 U.S.C. § 1983 – <u>Equal Protection</u>

88.     Plaintiffs repeat and reallege as though fully set forth herein the allegations of Paragraphs 1 through 87 of the Complaint as Paragraph 88 of Count III.

89.     Ballot-access laws can affect smaller political parties differently than larger ones.  The Constitution recognizes that "[n]ew parties struggling for their place must have the time and opportunity to organize in order to meet reasonable requirements for ballot position, just as the old parties have had in the past."  *Williams* v. *Rhodes*, 393 U.S. 23, 32 (1968).

90.     By requiring a political organization to nominate candidates for both President and Governor, and to secure 2% of the vote or 130,000 votes for each such candidate on that organization's ballot line, in order to be a recognized "party" under state law, the Commission's recommendations, now the law, disproportionately impact and prejudice smaller and nascent political parties.

91.     The burden on the SAM Party of New York of the presidential-vote requirement is severe, and utterly unjustified by the Commission.

92.     By reason of the foregoing, Defendants, acting under color of state law, have deprived and will continue to deprive Plaintiffs of the rights, privileges, and immunities secured to them by the First and Fourteenth Amendments of the United States Constitution, in violation of 28 U.S.C. § 1983.

### COUNT IV

**Violation of the Fifth and Fourteenth Amendments and 28 U.S.C. § 1983 –
Due Process of Law**

93.     Plaintiffs repeat and reallege as though fully set forth herein the allegations of Paragraphs 1 through 92 of the Complaint as Paragraph 93 of Count IV.

94.     In 2018, the SAM Party of New York met the then-existent ballot-access requirements to qualify as a recognized "party."  That was the result of hard, sustained work, securing the requisite number of signatures to appear on the ballot and walking the streets to secure more than 50,000 votes for Ms. Miner and Plaintiff Volpe.  The SAM Party of New York's reward, under New York law, was four years of recognized "party" status.  While the SAM Party of New York would lose that status if it did not requalify in the 2022 gubernatorial election, it was guaranteed positions on the statewide ballots for the 2019, 2020, 2021, and 2022 elections and the significant campaign-finance-law advantages for itself and its candidates that come with "party" status for that entire period.  And the SAM Party of New York put its campaign-finance-law advantages and its ballot rights to good use in 2019, running 102 candidates, half of them successfully.

95.     The Commission's recommendations, now the law, contracted the SAM Party of New York's period of recognized "party" status to only the 2020 election in violation of Plaintiffs' due process rights under the Fifth and Fourteenth Amendments. That due-process violation is worsened by the fact that the campaign-finance reforms and

public funding recommendations will not have any effect until after the 2022 elections.
Yet—with no rational basis and no link to any financing impact— the SAM Party of New
York will be stripped of its recognized "party" status in 2020 and, as a result,
significantly prejudiced in its ability to meet the heightened thresholds it will be required
to meet in 2022.  And the lack of due process is worsened still further by the manner in
which the presidential-election requirement was adopted:  the Legislature and the
Governor abdicated their obligations under the New York Constitution and vested
unconstitutional power in a Commission that then created the presidential-election
requirement.  That requirement is arbitrary and capricious as applied to the SAM Party of
New York, and serves no legitimate governmental purpose.

96.     By reason of the foregoing, Defendants, acting under color of state law,
have deprived and will continue to deprive Plaintiffs of the rights, privileges, and
immunities secured to them by the Fifth and Fourteenth Amendments of the United
States Constitution, in violation of 28 U.S.C. § 1983.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court issue declaratory and
injunctive relief against Defendants as follows:

A.     Declaring that the requirement that a political organization
nominate a candidate in a presidential election in order to retain "party" status under New
York's Election Law violates the First and Fourteenth Amendments as applied to the
SAM Party of New York and its members, including Plaintiff Volpe;

B.     Declaring that the requirement that all previously-qualified
political "parties" re-qualify by nominating a candidate in a presidential election violates

the Fifth and Fourteenth Amendments as applied to the SAM Party of New York and its members, including Plaintiff Volpe;

     C.     Declaring that Defendants Cuomo, Stewart-Cousins, Flanagan, Heastie, and Kolb, in acting under color of state law in implementing the requirements that (i) a political organization nominate a candidate in a presidential election to obtain "party" status under New York's Election Law; and (ii) all previously-qualified political "parties" must re-qualify by nominating a candidate in a presidential election, violated Plaintiffs' rights under the First, Fifth, and Fourteenth Amendments, in violation of 28 U.S.C. § 1983;

     D.     Preliminarily and permanently enjoining Defendants from declaring that the SAM Party of New York does not have "party" status under New York's Election Law if it chooses not to nominate a candidate in a presidential election and thereby does not garner the greater of 2% of the vote or 130,000 votes in that election;

     E.     Preliminarily and permanently enjoining Defendants from removing the SAM Party of New York from the statewide ballots in subsequent elections solely because the SAM Party of New York chose not to nominate a candidate in the 2020 presidential election and thereby did not garner the greater of 2% of the vote or 130,000 votes in that election;

     F.     Awarding Plaintiffs their reasonable attorneys' fees and costs incurred in this action; and

     G.     Awarding such other legal and equitable relief that the Court deems proper.

January 14, 2020

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP


By: /s/ Eric Alan Stone
                  Eric Alan Stone


Brad S. Karp
Eric Alan Stone
Robert A. Atkins
Brette Tannenbaum
Farrah R. Berse

1285 Avenue of the Americas
New York, NY 10019-6064
(212) 373-3326
estone@paulweiss.com

Kannon Shanmugam (*pro hac vice* forthcoming)

2001 K Street, N.W.
Washington, DC 20006-1047
(202) 223-7325
kshanmugam@paulweiss.com

*Attorneys for Plaintiffs*