**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

SAM PARTY OF NEW YORK
and MICHAEL J. VOLPE,

Plaintiffs,

v.

PETER S. KOSINSKI, as the Co-Chair of the New
York State Board of Elections and a member of the
New York State Public Campaign Finance Board;
DOUGLAS A. KELLNER, as the Co-Chair of the
New York State Board of Elections and a member
of the New York State Public Campaign Finance
Board; ANDREW J. SPANO, as a Commissioner
of the New York State Board of Elections and a
member of the New York State Public Campaign
Finance Board; TODD D. VALENTINE, as Co-
Executive Director of the New York State Board
of Elections; and ROBERT A. BREHM, as Co-
Executive Director of the New York State Board
of Elections,

Defendants.

1:20-cv-00323-JGK

**<u>AMENDED COMPLAINT</u>**

---

**<u>INTRODUCTION</u>**

1.      As part of the budget that the Legislature recently adopted, New York

changed its electoral laws to bar small political parties from the ballot unless they choose

to nominate a candidate for President of the United States.  That requirement is repugnant

to the Constitution and the laws of the United States.

2.      This is the second time New York purported to effect these electoral-law

changes.  The first was by action of a Commission in December 2019 and subsequent

inaction by the Legislature to disturb that Commission's recommendations.  The

Commission's work was the subject of the initial Complaint here.  But then a New York

court struck down the Commission's work under the New York State Constitution.

3.      The Governor and Legislature reacted by passing the same electoral-law changes as part of the FY 2021 Enacted Budget (the "FY 2021 Budget"), and it is those reinstituted laws that are the subject of this Amended Complaint.  As part of that legislative packet, they created the New York State Public Campaign Finance Board ("PCFB").  The Defendants here are the co-chairs, co-executive directors, and a commissioner of the New York State Board of Elections and/or members of the PCFB, sued in their official capacities.

4.      Plaintiff SAM Party of New York is a recognized political "party" under New York law that focuses on nominating candidates for village, town, county, regional, and statewide office.  SAM believes that our electoral system is broken and that the two main political parties are focused solely on defeating each other, rather than serving the people.  SAM, an abbreviation for the "Serve America Movement," wants to offer New York voters a better choice: a party that prizes accountability, transparency, electoral reform, and data-driven decision-making.  The SAM Party of New York has already achieved considerable success in its short history, earning "party" status for four years under the then-existing laws by getting more than 50,000 votes for governor in the 2018 election.  It then nominated more than 100 candidates for local offices in 2019, with more than 50 of those candidates winning their elections.

5.      Because of the change to the ballot-access laws, the SAM Party of New York will lose its "party" status after the November 2020 election, solely because it will not run a candidate for President in that race.  It brings this action to declare New York's Presidential-vote requirement unconstitutional as applied to the SAM Party of New York and to enjoin its enforcement against the SAM Party of New York.

## THE PARTIES

6.      Plaintiff SAM Party of New York is a recognized political "party" under New York law.  As a result, it is entitled to be on the ballot in New York for a four-year period beginning with the 2018 Gubernatorial election and to enjoy the benefits and the campaign-finance rights available to a recognized "party."

7.      Plaintiff Michael J. Volpe is the Chairman and a registered member of Plaintiff SAM Party of New York, and was its candidate for Lieutenant Governor of New York in 2018.  He is a registered voter in the State of New York, and resides in Westchester County.

8.      Defendant Peter S. Kosinski is a Co-Chair of the New York State Board of Elections and a member of the PCFB.  He is sued in his official capacities.  The New York State Board of Elections is an agency within the Executive Department of the State and is responsible for administering and enforcing all laws relating to elections in New York State.  The PCFB, created within the Board of Elections as part of the FY 2021 Budget, is responsible for administering the laws challenged in this Amended Complaint.

9.      Defendant Douglas A. Kellner is a Co-Chair of the New York State Board of Elections and a member of the PCFB.  He is sued in his official capacities.

10.     Defendant Andrew J. Spano is a Commissioner of the New York State Board of Elections and a member of the PCFB.  He is sued in his official capacities.

11.     The position of the fourth Commissioner of the New York State Board of Elections is currently vacant.  Plaintiffs anticipate amending to name the fourth Commissioner if one is appointed, and anticipate suing that person in his or her official capacity as a Commissioner of the New York State Board of Elections and a member of the PCFB.

12.     Defendant Todd D. Valentine is a Co-Executive Director of the New York State Board of Elections.  He is sued in his official capacity.

13.     Defendant Robert A. Brehm is a Co-Executive Director of the New York State Board of Elections.  He is sued in his official capacity.

## JURISDICTION AND VENUE

14.     This case arises under the Constitution and the laws of the United States. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343.  This Court is empowered to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

15.     This Court has personal jurisdiction over each Defendant.  Each of the Defendants is sued in his or her official capacity as an officer or agent of the government of the State of New York.  Furthermore, on information and belief, each of the Defendants resides in the State of New York.

16.     Venue properly lies in this Court under 28 U.S.C. § 1391(b)(2).  The New York State Campaign Finance Review Commission held four public hearings and meetings within this district, and 61 SAM Party of New York candidates ran for offices within this district in the November 2019 election.  If the SAM Party of New York loses its party status, it will feel the impact of that loss in this district in future elections. Therefore, a substantial part of the events giving rise to the claims occurred in this district.

## STATEMENT OF FACTS

17.     The SAM Party of New York believes that the American political system today is driven by ideology and party loyalty, at the expense of compromise and problem solving, and fails to respond to the will and needs of the people.  It believes that

adherence to a rigid ideological spectrum will not produce the common-sense, consensus-driven solutions that are necessary to solve the problems of the 21st century and that fully reflect America's rich diversity of beliefs and opinions.

18.     Studies report that two-thirds of Americans agree that neither major political party represents their needs or interests.  Americans have been told to think of politics on a single axis from left to right, blue to red, liberal to conservative.  The SAM Party of New York believes that this mode of thinking divides Americans, fosters tribalism, and precludes real, practical change from being enacted.

19.     The SAM Party of New York represents a different model for a political party.  It is a candidate-oriented political party, not an issue-oriented party.  It empowers leaders to solve problems without requiring adherence to ideology.  *Process* is the SAM Party of New York platform.

20.      The SAM Party of New York believes that candidates and elected officials should commit themselves to objectively verifiable standards of transparency and accountability, to the support of fundamental electoral reforms that will increase electoral competition and voter participation, and to the support of forging consensus-driven, common-sense solutions to the problems that matter the most to the most people.

21.     To that end, the SAM Party of New York assesses politicians on four axes, or "pillars":  transparency, accountability, electoral reform, and problem solving, and has developed a scorecard so that voters can make that assessment for themselves.

22.     For example, in assessing transparency the SAM Party of New York asks—and proposes that voters ask—whether the candidate, if elected, will "disclose online all calendars of the elected official and senior staff and the occurrence of and

- 5 -

participants in all non-personal meetings or calls related to the official's duties." *Our Platform*, SAM, https://joinsam.org/our-platform (last visited April 16, 2020).  Likewise, it asks whether, once elected, the official will "disclose online all personal business and professional conflict of interests for the elected official or for any member of his/her immediate family."  *Id*.

23.     In assessing accountability, the SAM Party of New York asks whether, once elected, the official will (a) "hold regular constituent engagement sessions through scheduled office hours, town halls and candidate availability sessions" no fewer than four times a month, (b) "disclose online and explain all substantive votes via timely, consistent reports," and (c) pledge a self-imposed five-year prohibition on becoming a lobbyist, as only some examples.  *Id.*

24.     In assessing a candidate's commitment to electoral reform, the SAM Party of New York asks whether the official will actively support (a) primaries open to all voters regardless of policy affiliation, (b) ranked-choice voting, and (c) the lowering or elimination of legal barriers for minor party and independent candidates to get their names and candidacies on the ballot.  *Id*.

25.     In assessing a candidate's commitment to problem solving, the SAM Party of New York asks, among other things, whether the candidate has renounced ideological policy pledges and inflexible litmus tests, whether the candidate has sought out opposing views regardless of party affiliation, has sought common-ground policy solutions, and has an objectively demonstrable record of cross-partisan cooperation.  *Id*.

26.     The SAM Party of New York will support and nominate a candidate based on a commitment to these four pillars.  It does not have and will not have a policy-

oriented platform.  The SAM Party of New York is in favor of good government, of elected officials loyal to governing and serving, not to party or ideology.

27.     Plaintiff SAM Party of New York seeks to grow and succeed in New York as an autonomous, state-focused political party.  It will vet and nominate like-minded candidates for state and local political office.  It is only through that bottom-up process that Plaintiff SAM Party of New York can successfully build a recognized brand as a New York-focused party.

**The SAM Party of New York Earned "Party" Status in the 2018 Election**

28.     Under New York election law as it existed in 2018, a political organization could become a "party" by getting 50,000 or more votes for its candidate in the preceding New York Gubernatorial election.  *See* N.Y. Elec. Law § 1-104(3) (McKinney 2019).  It would retain that "party" status until the next Gubernatorial election, in which it would need to get 50,000 or more votes for its candidate in order to re-qualify for another four years.

29.     New York permits "fusion" voting, by which the same person may run as the candidate nominated by more than one political party.  (Governor Cuomo, for example, ran as the candidate of both the Democratic Party and the Working Families Party in the general election in 2018.)  To qualify as a "party," an organization needed to obtain 50,000 votes for its candidate *on that organization's ballot line.*  (To continue the same example, for the Working Families Party to re-qualify as a "party" in 2018, it needed voters to cast 50,000 or more votes for Governor Cuomo on the Working Families Party line, not the Democratic line.)

30.     The benefits of recognized "party" status under New York law are extensive, and indeed critical to a party's success.  Recognized "parties" enjoy significant

advantages over non-recognized parties and independent candidates, both in political fundraising and in supporting the election of the candidates they nominate. *See generally* N.Y. Elec. Law § 14-114 (McKinney 2019). Further, as the Second Circuit has explained, only a recognized "party" "can automatically place a candidate on the ballot for statewide election without first undertaking the burden of a special petition drive in order to do so." *Green Party of N.Y. State* v. *N.Y. State Bd. of Elections*, 389 F.3d 411, 415 (2d Cir. 2004) (citing N.Y. Elec. Law §§ 6-104, 6-138(1)). A "party" may choose its statewide candidate in a closed primary election, which other political organizations may not. *Id.* (citing N.Y. Elec. Law § 1-104(9)). And when voters register to vote in New York, the voter registration form lists and provides check boxes for all of the recognized "parties," allowing the new voter easily to affiliate with a party and saving that party substantial expense in finding new members. *See* N.Y. Elec. Law § 5-300. The Board of Elections makes the current voter registration form available on its website. *See* NEW YORK STATE BOARD OF ELECTIONS, https://www.elections.ny.gov/NYSBOE/download/voting/voteregform-eng-fillable.pdf (last visited April 16, 2020).

31.     In 2018, the SAM Party of New York successfully completed the arduous process of obtaining the then-required number of signatures to obtain ballot access and nominate Stephanie Miner as a candidate for Governor and Plaintiff Volpe as a candidate for Lieutenant Governor. Miner and Volpe ran on a message expressly aimed at what SAM described as the "pay-to-play" culture plaguing New York State politics and embodied by New York state and local politicians and officials. As a result of the hard, sustained work of the SAM Party of New York, Miner and Volpe received 55,441 votes on the SAM Party of New York ballot line, thus securing the SAM Party of New York—

in its first attempt—four years as a recognized "party" and the concomitant substantial benefits and exemptions under New York campaign-finance and election law.  The current New York State Voter Registration Form lists the SAM Party as a political party in which a new voter may enroll.  *See id.*

**The SAM Party of New York Successfully Ran**
**Candidates for More Than 50 New York Offices in 2019**

32.     The SAM Party of New York capitalized on its guaranteed status as a recognized "party" and its guaranteed positions on the statewide ballot and nominated more than one hundred candidates in the March and November 2019 elections for village, town, county, and judicial offices across New York State.  Sixty-one of those candidates ran in jurisdictions within the Southern District of New York.  Consistent with its mission to nominate only candidates committed to the four pillars of transparency, accountability, electoral reform, and problem solving, and without regard to left-right ideology, some of the SAM Party of New York candidates were also nominated by the Democratic Party while others were also nominated by the Republican Party.

33.     The SAM Party of New York was highly successful in its first year.  More than 50 of its candidates won their elections, to offices in 21 counties across New York State.  In 14 of those races, the SAM Party of New York represented the alternative party of choice, and in seven races it received more votes than at least one of the two traditional parties.

**The Working Families Party and the 2018 Primaries**

34.     In 2018, activist and actress Cynthia Nixon challenged Governor Cuomo for the nominations of both the Democratic and Working Families Parties.  Governor Cuomo withdrew from the Working Families Party primary, which Ms. Nixon was

widely expected to win and in which, after the Governor withdrew, she captured 91.5% of the vote.  That guaranteed her a spot in the general election.  Governor Cuomo captured 65% of the vote in the Democratic primary to Ms. Nixon's 35%, guaranteeing him the Democratic nomination.

35.     Thereafter, the Working Families Party agreed to endorse Governor Cuomo in the general election, and withdrew Ms. Nixon's name from the general-election ballot.

36.     On information and belief, the Working Families Party's support for Ms. Nixon angered Governor Cuomo.  Bill Mahoney, *Cuomo Quietly Presses to Weaken His Working Families Party Nemesis*, POLITICO (Oct. 25, 2019, 5:00 AM), https://www.politico.com/states/new-york/albany/story/2019/10/25/cuomo-quietly-presses-to-weaken-his-working-families-party-nemesis-1225974 (seven unnamed people reporting that the Governor or his top staff said that Governor Cuomo "wants to destroy the party.")

**The Creation of the Commission**

37.     The first iteration of the laws challenged here—as described in the original Complaint—were written by The New York State Campaign Finance Review Commission ("the Commission"), which itself was created as part of a budget and appropriations bill submitted by Governor Cuomo and approved by the Legislature in 2019.  It has been widely reported in the press that part of the impetus for the Governor's creation of the Commission was the Working Families Party's actions in 2018, and that a goal for the Commission was to raise the requirements for recognized political "party" status to a level that the Working Families Party and other small parties have no hope to meet.  *See*, *e.g.*, Carl Campanile, *Cuomo Panel Moves Closer to Keeping Working*

*Families Off the Ballot in NY*, N.Y. POST (Nov. 25, 2019, 2:52 PM), https://nypost.com/2019/11/25/cuomo-moves-closer-to-keeping-working-families-off-the-ballot-in-ny/; Bill Mahoney, *Cuomo Quietly Presses to Weaken His Working Families Party Nemesis*, POLITICO (Oct. 25, 2019, 5:00 AM), https://www.politico.com/states/new-york/albany/story/2019/10/25/cuomo-quietly-presses-to-weaken-his-working-families-party-nemesis-1225974.  And it has been further reported that the Commission was tasked with devising changes to the election laws that would effectively eliminate third parties from the ballot. *See* Fred Mogul, *Cuomo Ally Seeks to Block Third Parties from the Ballot*, GOTHAMIST (Oct. 30, 2019, 10:02 AM), www.gothamist.com/news/cuomo-ally-seeks-block-third-parties-ballot.

38.     Established as part of the FY 2020 Enacted Budget (the "FY 2020 Budget"), through newly enacted Part XXX of the Laws of 2019, Chapter 59, the Commission was created to "make recommendations for new laws" establishing a system of voluntary public financing for statewide and state legislative public offices, and to "determine and identify all details and components reasonably related to administration of a public financing program," including the catch-all category of "rules and definitions governing . . . political party qualifications."  The FY 2020 Budget purported to give the Commission the "binding power to implement public campaign financing for legislative and statewide offices, authorizing up to $100 million annually in public funds," and to "determine specific aspects of the public financing system, including eligibility thresholds, public financing limits and contribution limits for participating candidates." *See Governor Cuomo & Legislative Leaders Announce Members of the Public Campaign Financing Commission*, GOVERNOR.NY.GOV (Jul. 3, 2019) https://www.governor.ny.gov/

news/governor-cuomo-legislative-leaders-announce-members-public-campaign-finan
cing-commission (last visited April 16, 2020).

39.     The FY 2020 Budget provides no justification for giving the Commission
the purported authority to enact rules governing political party qualifications.  *See* Part
XXX, §2(j) of Chapter 59 of the Laws of 2019, https://legislation.nysenate.gov/pdf/bills/
2019/S1509C (January 18, 2019, last visited April 16, 2020).

**The Commission's December 1, 2019 Report**

40.     The Commission was established with a requirement that it render its
recommendations by December 1, 2019, with the provision that its recommendations
would become binding law on December 23, 2019 unless modified by the Legislature.
*See id*. §1(a).

41.     From the outset, it was expected that the Legislature would not interfere
with the Commission's recommendations.  Indeed, the Legislature was not even expected
to be and was not in session between the date the recommendations were published and
the date they would become binding law.  *See New York State Legislative Session
Calendar*, NYASSEMBLY.GOV https://nyassembly.gov/leg/docs/sessioncalendar_2019.pdf
(last visited April 16, 2020).  Moreover, the Commission's December 1, 2019, Report
repeatedly describes its recommendations as "hav[ing] the force of law."  The
Commission's Report is attached hereto as Exhibit A, and incorporated herein by
reference.

42.     The effect of the foregoing was therefore to give to the Commission the
Legislature's power and obligation to consider and pass laws and to relinquish the
Governor's power and obligation to consider and sign or veto those laws upon
presentment.

43.     In Part I of the Report, the Commission recommended lowering the campaign-contribution limits on how much a candidate for certain state offices may raise in any given election.  For example, the cap on individual donations for statewide office (*e.g.*, Governor, Attorney General) was reduced from $44,000 to $18,000.  The cap for state senator was reduced from $7,500 in the primary election and $11,800 in the general election to a total of $10,000 split evenly between the primary and the general election.  *See* Report at 3.  The proposed limits did not apply to contributions and support from recognized political parties.  *See id.*  In Part II, the Commission recommended the creation of a new voluntary Public Campaign Finance System, by which participating candidates who meet specified private-fundraising thresholds would then be eligible for public-funding "matching" of small-dollar donations.  For example, a Gubernatorial candidate who raised at least $500,000 from at least 5,000 in-state donors would be eligible to then receive a maximum of $3.5 million in public funds for a primary election and $3.5 million for a general election.  *See id.* at 3-4.  The Commission also recommended the creation of a Public Campaign Finance Board within the State Board of Elections to administer the program.  *See id*. at 4.  And in Part III the Commission recommended the creation of a New York State Campaign Finance Fund within the State Finance Law, and established how the fund would be financed.  *See id*. at 5.

44.     In Part IV—and as relevant here—the Commission recommended changing the thresholds to become and remain a recognized "party," so that a political organization would need to obtain "at least 2% of the total votes cast for governor, or 130,000 votes, whichever is greater, in a gubernatorial election year and at least 2% of the total votes cast for president, or 130,000 votes, whichever is greater, in a presidential

election year." *Id.* (emphasis added).  The Commission stressed that "these two thresholds work independently of one another," and that "this provision takes effect on January 1, 2020, so that all existing parties must requalify at the November 2020 elections." *Id.* at 5.  The Commission also raised the signature requirements for candidates seeking to be on the ballot independent of a Party's nomination. *Id.*

45.    In Part V, the Commission recommended that the contribution limits and public-finance system not take effect until November 9, 2022—that is, the day <u>after</u> the next election in which Governor Cuomo will be a candidate. *See id.*

46.    Delaying the contribution-limit and public funding rules until after the 2022 election while requiring political parties to re-qualify using the 2020 Presidential election is designed to ensure that Governor Cuomo can run for re-election in 2022 under the old campaign-finance limits (not the new, lower limits), with no risk of an opponent receiving public funding, while at the same time eliminating minor parties from the ballot through the 2020 Presidential-election requirement.

47.    In an effort to thwart anticipated challenges to the constitutionality of aspects of the new system, before the Commission even finalized its recommendations, it voted to "package its [then-not-yet-existent] recommendations . . . in a single, non-severable product . . . ." *Id.* at 15.  The Commission reiterated in its final Report that "[i]t is the expressly stated intent of this Commission that each of the recommendations made in this report be interpreted as non-severable from any other recommendation," with one exception not relevant here. *Id.*

48.    Notably, the Commission's 139-page report offered not one word of justification for including the Presidential election in the party-qualification thresholds.  It

contained no assessment of whether the public-finance system would be economically

viable, and would remain below the Legislature's $100-million-per election target,

without that Presidential-election requirement.  To the extent the Legislature and/or the

Commission were concerned about the cost of small-party candidates using public funds

to match private contributions, the report never explained how an organization's <u>not</u>

<u>participating</u> in the Presidential election could increase the cost of the public-finance

system.  It never explained why a party's participation in or success in the Presidential

election should determine whether a party should have the ability to nominate a candidate

for Governor or other New York offices.  And none of the public matching funds would

have gone to candidates for President.  In sum, there did not appear to be any tether to the

Presidential-vote requirement at all.

     49.     The Report also contained no attempt to explain why a recognized "party"

should lose the extensive benefits attendant to that status—from a guaranteed place on

the ballot to the ability to hold primaries to voter-registration and campaign-finance

advantages—simply because that party declined to participate in the Presidential election.

**<u>The Commission's Report Became Law on December 23, 2019</u>**

     50.     The Legislature did not even meet to debate the Commission's

recommendations.  They became law on December 23, 2019.

     51.     The manner in which the Commission thus created the law of New York

violated New York's Constitution.  The separation-of-powers doctrine reserves the power

to legislate to the Legislature, and the power to veto laws to the Governor.  *See, e.g.*,

*Levine* v. *Whalen*, 39 N.Y.2d 510, 515 (1976) (for decades, New York law has

recognized that the Legislature may not delegate the "power to make the law" to bodies

other than the Legislature itself).  Yet the FY 2020 Budget directed the Commission to

"specifically determine and identify new election laws" in ten specified areas, 2019 N.Y. Sess. Laws Ch. 59, Part XXX, § 2, and provided that each such regulation "shall have the force of law, and shall supersede, where appropriate, inconsistent provisions of the election law," *id.* § 5, without retaining the rights to vote on and approve, or—in the case of Governor Cuomo, to veto—those recommendations.

52.    It does not matter that the Commission's recommendations would not become law if the Legislature were to intervene.  A minority of members in either chamber of the Legislature could prevent that intervention simply by being absent for the vote.  And the Governor abdicated entirely any right to veto the Commission's recommendations, absent the Legislature's somehow altering them.

53.    The Commission used its delegated authority to enact a ballot-access law requiring, for the first time, that a political association must nominate a candidate for President of the United States in order to qualify as a political "party" in New York.  That law is unconstitutional as applied to the SAM Party of New York and Plaintiff Volpe.

**The New York State Supreme Court Invalidated the Commission and Its Report**

54.    On March 12, 2020, the New York State Supreme Court, Niagara County Division, issued a Decision & Order granting summary judgment to plaintiffs in *Hurley, et al.* v. *The Public Campaign Financing and Election Commission, et al.*, No. E169547/2019.  That Decision & Order is attached hereto as Exhibit B, and incorporated herein by reference.

55.    The State Supreme Court held that the Legislature had improperly delegated its law making powers to the Commission in violation of the New York State Constitution, by empowering the Commission to make recommendations that would

- 16 -

automatically become binding and final law without further action by the Legislature.

The State Supreme Court specifically "note[d] that the fact that the Legislature reserved

the right to modify or abrogate by statute the recommendations of the Commission does

not validate the process." *Id*. at 7.

56.     As a result of the State Supreme Court's Decision & Order, the

Commission's recommendations were struck down in their entirety.

**The Commission's Recommended Changes to Party**
**Thresholds and Ballot Access Requirements Were**
**Reenacted as Part of the New York State FY 2021 Budget Bill**

57.     In March 2020, Governor Cuomo proposed, for the first time, a new

version of the New York State Fiscal Year 2021 Executive Budget that included the same

public-finance provisions—and heightened party threshold and ballot access

requirements—that the State Supreme Court struck down in *Hurley*.  Denis Slattery,

*Cuomo Floats Public Financing in N.Y. State Budget Despite Judge Scuttling*

*Controversial Commission*, N.Y. DAILY NEWS (Mar. 27, 2020),

https://www.nydailynews.com/news/politics/ny-cuomo-public-financing-budget-after-

judge-blocked-20200327-46cqzvxdufdchmangut6kzcuzq-story.html.

58.     Specifically, Part ZZZ, Section 10 of the FY 2021 Budget amends

Subdivision 3 of section 1-104 of the election laws to require that a political organization

receive at least 2% of total votes cast for President, or 130,000 votes, whichever is

greater, in order to qualify as a "party" in the following Gubernatorial election.

Similarly, a political organization must receive 2% of the total votes cast for governor, or

130,000 votes, in order to qualify as a "party" for the following Presidential election.

New York Gubernatorial elections are held on midterm years, so that every two years in

New York there is either a Presidential or a Gubernatorial election.  Part ZZZ, Section 12

of the FY 2021 Budget provides that these provisions shall take effect immediately, while

the public-finance provisions in Sections 2, 3, and 4 shall not take effect until November

9, 2022—<u>after</u> the 2022 Gubernatorial election—and shall apply to participants in the

primary and general elections to be held in 2024.

59.     Like the Commission's now-invalid recommendations, Part ZZZ, Section

11 of the FY 2021 Budget also includes a severability provision that prevents the party

threshold and ballot access requirements from being invalidated without also invalidating

the public-finance provisions.

60.     The New York State budget approval process prohibits the legislature

from "alter[ing]" the budget bill submitted by Governor Cuomo.  *See* N.Y. Const. Art.

VII, § 4.  Legislators may only "strike out" or "add" individual line items to the budget

bill, and may not otherwise alter, amend, or substitute any of the Governor's proposed

appropriations.  *Id*.  On information and belief, the Legislature did not deliberate or

debate the merits of the new ballot access requirements before voting on the FY 2021

Budget.

61.     On April 2, 2020, the Assembly passed S07508 by an 81 to 60 vote.  It

was signed by Governor Cuomo on April 3.  *See* S07508B Summary, N.Y. St. Assembly,

https://nyassembly.gov/leg/?default_fld=&leg_video=&bn=S07508&term=2019&Summ

ary=Y&Actions=Y&Floor%26nbspVotes=Y (last visited April 16, 2020).  The FY 2021

Budget is incorporated by reference herein.  *See* N.Y. Senate-Assembly Bill S7508B,

A9508B, https://legislation.nysenate.gov/pdf/bills/2020/S7508-B (last visited April 16,

2020).

62.     The SAM Party of New York broadly supports campaign-finance reform and other provisions, including public-finance systems, which make access to the ballot easier.  It does not seek in this lawsuit to invalidate the monetary limits and public-funding recommendations of the Commission.

63.     As described below, all that the SAM Party of New York seeks here is to enjoin enforcement of the requirement that it obtain the greater of 130,000 votes or 2% of the total votes cast in <u>Presidential</u> elections, in which it will not be running a candidate because to do so would be antithetical to its current goals, mission, and priorities, and to enjoin the Defendants from stripping the SAM Party of New York of its recognized "party" status for failing to meet that requirement.

**Nominating a Presidential Candidate This Year**
**<u>Will Irreparably Harm the SAM Party of New York</u>**

64.     The SAM Party of New York does not intend to nominate a candidate for President in 2020.  While there may someday be a candidate for President from one of the two major parties who embodies the four pillars that the SAM Party of New York espouses, there is not one today.  The purpose of the SAM Party of New York is, for now and the foreseeable future, to act in New York.  Moreover, it would be forced to spend money supporting the candidate <u>as a SAM candidate</u> in order to have any hope of achieving the required vote minimums for the candidate <u>on the SAM line</u>.

65.     The Presidential-election requirement leaves the SAM Party of New York with a choice among three bad options.

66.     First, the SAM Party of New York could forego this year's Presidential election and, as a result, necessarily lose its status as a recognized "party" by failing to garner the threshold percentage of the vote.

67.     Second, the SAM Party of New York could run what the ballot-access case law recognizes as a "frivolous" candidacy, hoping that its candidate somehow lucks into the greater of 130,000 votes or 2% of the total votes cast.  That candidate, of course, would have no chance of actually becoming President; he or she would not be running in any other state.

68.     Third, the SAM Party of New York could seek to nominate the winner of the Democratic or Republican Presidential primaries under fusion voting, and then hope that candidate (if he or she were willing to accept the nomination) got the threshold number of votes on the SAM Party of New York ballot line rather than the Democratic or Republican ballot line.  But in doing so, it would be perceived as having adopted as its own all of the political positions that its candidate otherwise holds, on issues from abortion to school choice to Social Security to global warming—exactly the issue-and-viewpoint identification that the SAM Party of New York seeks to avoid in hewing to its core mission.

**The SAM Party of New York Will Lose Its**
**"Party" Status After This Year's Election**

69.     Among those unpalatable options, the SAM Party of New York has made its choice: It does not intend to nominate a candidate for President.  As a result, absent relief from this Court or a change in the law, the Board of Elections, the PCFB, and Defendants Kosinski, Kellner, Spano, Valentine, and Brehm will strip the SAM Party of New York of its recognized "party" status under New York law, and all of the benefits attendant to that status, after the November Presidential elections.  The SAM Party of New York earned those benefits in 2018.  It would earn them again—or, at least, it would seek to earn them again—in the 2022 Gubernatorial election.  But it will lose them two

years before that, simply because it chose not to run a candidate in an election in which it did not wish to participate.

**The SAM Party of New York Will Seek**
**<u>Preliminary and Permanent Injunctive Relief</u>**

70.　　Now that the electoral-law changes purportedly effected by the Commission (the subject of the initial Complaint here) have been invalidated and the new electoral-law changes enacted, Plaintiffs' counsel will confer with Defendants' counsel to agree on a schedule for a preliminary injunction motion or expedited proceeding on the merits of Plaintiffs' claims.

**COUNT I**

**Violation of the First and Fourteenth Amendments and 28 U.S.C. § 1983 –**
**<u>Freedom of Association</u>**

71.　　Plaintiffs repeat and reallege as though fully set forth herein the allegations of Paragraphs 1 through 70 of the Amended Complaint as Paragraph 71 of Count I.

72.　　The Supreme Court recognizes "the constitutional right of citizens to create and develop new political parties." *Norman* v. *Reed*, 502 U.S. 279, 288 (1992). "The right derives from the First and Fourteenth Amendments and advances the constitutional interest of like-minded voters to gather in pursuit of common political ends, thus enlarging the opportunities of all voters to express their own political preferences." *Id.* "This First Amendment freedom to gather in association for the purpose of advancing shared beliefs is protected by the Fourteenth Amendment from infringement by any State." *Democratic Party of U.S.* v. *Wisconsin ex rel. La Follette*, 450 U.S. 107, 121 (1981). And because "ballot access restrictions" can "'limit the field of candidates from which voters might choose,'" *Anderson* v. *Celebrezze*, 460 U.S. 780,

786 (1983), courts subject to strict scrutiny those ballot access restrictions that impose a
severe or heavy burden on a party or its members.

73.    Requiring the SAM Party of New York to nominate a candidate for
President or else lose "party" status imposes a severe burden on the SAM Party of New
York and its members and voters, including Plaintiff Volpe.

74.    The SAM Party of New York's opposition to nominating a candidate for
President is a political one:  The SAM Party of New York is still establishing itself and
its brand, and nominating a Presidential candidate, other than a frivolous candidate,
would cause the public to tag the party with the political views of its candidate even
though it does not share or want to be associated with those views and even if that
candidate does not share SAM's emphasis on transparency, accountability, electoral
reform, and problem solving.  "A burden that falls unequally on new or small political
parties or on independent candidates impinges, by its very nature, on associational
choices protected by the First Amendment."  *Anderson*, 460 U.S. at 793.  And where the
SAM Party of New York's "political goals" are to act in New York elections, barring it
from the ballot because it will not nominate a candidate for President imposes a severe
burden based on those goals.  *Timmons* v. *Twin Cities Area New Party*, 520 U.S. 351, 357
(1997).  Even if the SAM Party of New York wanted to run a candidate for President, the
short timeframe of the new law would disproportionately harm SAM as a small political
party, affording insufficient time to build the momentum and recognition needed to
garner 2% of the vote (or 130,000 votes) for President in November of this year.

75.    The budget bill contains extensive legislative findings regarding the need
for and value of a public campaign finance system.  Conspicuously absent, however, is

any mention or justification of the Presidential-election requirement.  The Commission, whose recommendations have since been invalidated, suggested that the Presidential election requirement was necessary to ensure that public-finance dollars do not go to marginal candidates and thus drive up the cost of the public-finance system.

76.     That is wrong.  First, the public-finance provisions do not apply to candidates for federal office; there will be no matching of funds for Presidential candidates.

77.     Second, the public-finance provisions do not apply to candidates in either the 2020 or 2022 election cycles, so stripping the SAM Party of New York from the ballots in those elections will not affect public financing at all.

78.     Third, a political party can be a serious participant in New York politics and worthy of public-fund matching without having to participate in the Presidential election.  Including a Presidential-vote requirement is a means to drive political parties off of subsequent New York ballots, but is not a means to drive off only fringe or marginal parties.

79.     Fourth, there is no necessary or logical connection between <u>candidate</u> eligibility for public finance and whether the candidate is the nominee of a recognized political "party" under New York law.

80.     Fifth, the requirement under preexisting law that a "party" obtain 50,000 votes in a Gubernatorial election already separated out the minor purported "parties."  As the Second Circuit has already explained, any party that can place a statewide candidate on the ballot has "demonstrated a 'modicum of support' sufficient to overcome the state's broad latitude in controlling frivolous party registration of tiny fractional interests."

*Green Party of N.Y. State*, 389 F.3d at 422 (quoting *Baer* v. *Meyer*, 728 F.2d 471, 476 (10th Cir. 1984)).  The Presidential-election requirement is thus not appropriately tailored to the State's asserted interest.

81.     The SAM Party of New York will have to meet the requalification requirements during the 2022 Gubernatorial election.  Those qualifications have been increased to the greater of 130,000 votes or 2% of the vote.  There is no valid justification for requiring the SAM Party of New York to participate in and garner the same number of votes in the Presidential race.

82.     In imposing that requirement, the new ballot-access laws violate the First and Fourteenth Amendments as applied to the SAM Party of New York and its members, including Plaintiff Volpe.

83.     By reason of the foregoing, Defendants, acting under color of state law, have deprived and will continue to deprive Plaintiffs of the rights, privileges, and immunities secured to them by the First and Fourteenth Amendments of the United States Constitution, in violation of 28 U.S.C. § 1983.

## COUNT II

### Violation of the First and Fourteenth Amendments and 28 U.S.C. § 1983 – <u>Compelled Speech</u>

84.     Plaintiffs repeat and reallege as though fully set forth herein the allegations of Paragraphs 1 through 83 of the Amended Complaint as Paragraph 84 of Count II.

85.     "Freedom of association means not only that an individual voter has the right to associate with the political party of her choice, but also that a political party has a right to 'identify the people who constitute the association.'"  *Eu* v. *San Francisco Cty.*

*Democratic Cent. Comm.*, 489 U.S. 214, 224 (1989) (quoting *Tashjian* v. *Republican Party of Conn.*, 479 U.S. 208, 214 (1986)) (internal citations omitted).  That right includes the ability "to select 'a standard-bearer who best represents the party's ideologies and preferences.'"  *Id.* (quoting *Ripon Soc'y, Inc.* v. *Nat'l Republican Party*, 525 F.2d 567, 601 (D.C. Cir. 1975)).

86.     As the Supreme Court recognized nearly 20 years ago, "a corollary of the right to associate is the right not to associate."  *Cal. Democratic Party* v. *Jones*, 530 U.S. 567, 574 (2000).  The SAM Party of New York does not want to nominate anyone for President.  Were it to nominate the Republican or Democratic nominee—the only way to have a realistic chance at garnering the greater of 2% of the vote or 130,000 votes—the SAM Party of New York would be seen as endorsing the political views of that candidate on issues on which it otherwise would express no policy position.  And, to achieve the required vote thresholds, it would be required to spend money supporting a candidate it does not wish to support, financially or otherwise.  "In no area is the political association's right to exclude more important than in the process of selecting its nominee."  *Id.* at 575.  "That process often determines the party's positions on the most significant public policy issues of the day, and even when those positions are predetermined it is the nominee who becomes the party's ambassador to the general electorate in winning it over to the party's views."  *Id.*

87.     The body politic views a party's nomination of its candidate as the party's "select[ion of] a standard bearer who best represents the party's ideologies and preferences."  *Eu*, 489 U.S. at 224.  Being "saddled with an unwanted, and possibly

antithetical, nominee" could at the very least "severely transform it." *Cal. Democratic Party*, 530 U.S. at 579.

88.     Requiring a one-state political party to participate in a national election in order to secure ballot access for state-wide and local elections also implicates principles of federalism and states' rights.  The Constitution forbids a State from compelling a political party to participate in a national election and address nationwide issues in order to speak to statewide issues.

89.     By compelling the SAM Party of New York to speak as to who should be the President in order to qualify to nominate candidates for statewide and local office, the new ballot-access laws impose a severe burden on the SAM Party of New York and its members, including Plaintiff Volpe.

90.     The FY 2021 Budget offered no justification at all for this requirement. The new ballot-access laws contained therein violate the SAM Party of New York's and Plaintiff Volpe's rights under the First and Fourteenth Amendments.

91.     By reason of the foregoing, Defendants, acting under color of state law, have deprived and will continue to deprive Plaintiffs of the rights, privileges, and immunities secured to them by the First and Fourteenth Amendments of the United States Constitution, in violation of 28 U.S.C. § 1983.

**COUNT III**

**Violation of the Fourteenth Amendment and 28 U.S.C. § 1983 –
<u>Due Process and Equal Protection</u>**

92.     Plaintiffs repeat and reallege as though fully set forth herein the allegations of Paragraphs 1 through 91 of the Amended Complaint as Paragraph 92 of Count III.

93.     Ballot-access laws can affect smaller political parties differently than larger ones.  The Constitution recognizes that "[n]ew parties struggling for their place must have the time and opportunity to organize in order to meet reasonable requirements for ballot position, just as the old parties have had in the past." *Williams* v. *Rhodes*, 393 U.S. 23, 32 (1968).

94.     By requiring a political organization to nominate candidates for both President and Governor, to secure the greater of 2% of the vote or 130,000 votes for each such candidate on that organization's ballot line in order to be a recognized "party" under state law, and to secure that level of support in a Presidential election that will be held in only a few short months, the new ballot-access laws disproportionately impact and prejudice smaller and nascent political parties.

95.     The burden on the SAM Party of New York of the Presidential-vote requirement is severe, and utterly unjustified.

96.     By reason of the foregoing, Defendants, acting under color of state law, have deprived and will continue to deprive Plaintiffs of the rights, privileges, and immunities secured to them by the Fourteenth Amendment of the United States Constitution, in violation of 28 U.S.C. § 1983.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court issue declaratory and injunctive relief against Defendants as follows:

A.     Declaring that the requirement that a political organization nominate a candidate in a Presidential election in order to retain "party" status under New York's Election Law, and imposing that requirement in the 2020 Presidential election,

violates the First and Fourteenth Amendments as applied to the SAM Party of New York and its members, including Plaintiff Volpe;

        B.      Declaring that the requirement that a political organization nominate a candidate in the 2020 Presidential election, and secure substantial support for that Presidential candidate over only a few short months in order to retain "party" status under New York's Election Law, disproportionately affects and prejudices minority parties and violates the Fourteenth Amendment as applied to the SAM Party of New York and its members, including Plaintiff Volpe;

        C.      Preliminarily and permanently enjoining Defendants from declaring that the SAM Party of New York does not have "party" status under New York's Election Law if it chooses not to nominate a candidate in a Presidential election and thereby does not garner the greater of 2% of the vote or 130,000 votes in that election;

        D.      Preliminarily and permanently enjoining Defendants from removing the SAM Party of New York from the statewide ballots in subsequent elections solely because the SAM Party of New York chose not to nominate a candidate in the 2020 Presidential election and thereby did not garner the greater of 2% of the vote or 130,000 votes in that election;

        E.      Awarding Plaintiffs their reasonable attorneys' fees and costs incurred in this action; and

        F.      Awarding such other legal and equitable relief that the Court deems proper.

April 16, 2020

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP


By: /s/ Eric Alan Stone
                      Eric Alan Stone



Eric Alan Stone
Robert A. Atkins
Brette Tannenbaum
Crystal Parker

1285 Avenue of the Americas
New York, NY 10019-6064
(212) 373-3326
estone@paulweiss.com

Kannon Shanmugam
2001 K Street, N.W.
Washington, DC 20006-1047
(202) 223-7325
kshanmugam@paulweiss.com

*Attorneys for Plaintiffs*