UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SAM PARTY OF NEW YORK and MICHAEL J. VOLPE,<br><br>                                             Plaintiffs,<br><br>                    v.<br><br>PETER S. KOSINSKI, as the Co-Chair of the New York State Board of Elections; DOUGLAS A. KELLNER, as the Co-Chair of the New York State Board of Elections; ANDREW J. SPANO, as a Commissioner of the New York State Board of Elections; TODD D. VALENTINE, as Co-Executive Director of the New York State Board of Elections; and ROBERT A. BREHM, as Co-Executive Director of the New York State Board of Elections,<br><br>                                             Defendants. | 1:20-cv-00323-JGK |

**DECLARATION OF RICHARD WINGER IN SUPPORT OF
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

I, Richard Winger, declare as follows:

1.      I am the publisher and editor of *Ballot Access News*, a monthly newsletter covering state and federal ballot access laws that I have published since 1985.  I am also a member of the Editorial Board of the *Election Law Journal: Rules, Politics, and Policy*, a peer-reviewed journal addressing issues in election law.  Although I am not a lawyer, I have been an expert witness in several lawsuits challenging ballot-access laws.

2.      I understand that in this lawsuit the SAM Party of New York ("SAM") challenges the constitutionality of New York's new requirement that a political organization secure a certain threshold of support for a Presidential candidate in order to obtain or retain status as a political "party."  I understand that in assessing the constitutionality of that

requirement, the Court will assess the severity of the burden the law imposes on the rights of SAM and its members, the governmental purpose that the law is intended to serve, and whether there are other, less restrictive means of achieving that purpose.

3.     I submit this declaration to place New York's new Presidential-election requirement in the context of other States' ballot access laws and to examine that requirement in the context of New York's own electoral history.

**Summary of My Opinions**

4.     In early April, New York amended its election laws to create a system by which public funds will be used to support political candidates, thus in theory reducing the need for private money in politics.  As part of those election law changes, New York also made it much more difficult for an organization to qualify as a political "party."  Among these increased requirements was a change from requiring an organization to secure 50,000 votes for its Gubernatorial candidate to obtain or retain "party" status, to requiring such an organization to secure the greater of 2% of the votes cast or 130,000 votes in the Gubernatorial election and also in the Presidential election.  The stated justification for making it harder to qualify as a political party was to prevent minor party candidates from increasing the cost of providing public funds to political candidates.

5.     New York's Presidential-election requirement places New York at the extreme of the ballot-access requirements of the 50 states.  Requiring a political "party" to participate in a Presidential election is extremely rare:  Only four states require this, other than, now, New York.  New York's combination of applying a high threshold of the greater of 2% of the votes cast or 130,000 votes to both Presidential and Gubernatorial elections is among the most severe, if not the most severe, burden placed on political

organizations in this country. Additionally, New York is one of only 11 states in which an organization cannot become a "party" between general elections, further increasing the significance of New York's heightened ballot-access thresholds.

6. The historical context within New York suggests no need for the new Presidential-election requirement and increased vote threshold. New York has a vibrant history of political organizations forming, seeking "party" status, and either failing to obtain the requisite 50,000 votes in a Gubernatorial election or narrowly surpassing that threshold only to fail in the next election. In just the last three Gubernatorial elections alone, New York has seen the Taxpayers, Libertarian, Reform, Rent is Too Damn High, Freedom, Anti-Prohibition, Sapient, Women's Equality, and Stop-Common-Core parties fail to secure the requisite 50,000 votes. If the new threshold of the greater of 2% or 130,000 votes had applied, nearly all minor parties would have failed to re-qualify, leaving New York very close to a two-party State.

7. New York's history also shows that not all political parties within the State have chosen to run candidates for President. That history confirms the burdens that a Presidential-election requirement imposes on minor parties.

8. The State had less restrictive means available to keep the cost of public finance below $100 million in any year other than seeking to reduce the number of minor party candidates. The Second Circuit held in *Green Party of Connecticut* v. *Garfield*, 616 F.3d 213, 231 (2d Cir. 2010), that a public finance system essentially need not include minor parties at all. And the only analysts to have considered the issue conclude that the impact on the New York public finance system from minor-party candidates will be trivial.

9.      Finally, there is a separate harm worked by the timing of the laws.  Imposing a Presidential-election requirement less than 12 months before a Presidential election disproportionately harms minor political parties, and brand new political parties in particular, because they do not have the resources (both human and monetary) to change their strategies or goals in such a short period of time.

**Expert Disclosure**

10.     I am being compensated at my standard consulting rate of $100 per hour.  My compensation is not contingent on the outcome of the case.

11.     My curriculum vitae is attached as **Exhibit A**, and it contains a list of all publications I have authored in the last 10 years as well as the list of cases in which I have given testimony as an expert witness at trial or by deposition in the last four years.

12.     In forming these opinions—other than, and in addition to my background knowledge gained from more than 35 years of studying ballot access laws—I considered the documents cited in this declaration.

**My Background**

13.     I graduated from the University of California, Berkeley in 1966 with a Bachelor's Degree in Political Science and then did further graduate study at UCLA.  I have spent more than 35 years studying ballot access laws, across the 50 states and throughout much of American history.  The rights of minor political parties are a particular area of interest for me.

14.     I have written a number of book chapters and some additional articles in various periodicals, in addition to my own newsletter, *Ballot Access News*.  I am on the Editorial Board of *Election Law Journal*.  I have been interviewed on major television networks

about ballot access issues and minor parties. I have testified by affidavit or deposition about ballot access issues in the courts of over 30 states.

**New York's New Party-Threshold Requirements Are Extreme**

15.     Minor political parties are an important part of the American political landscape. New York's new requirements for an organization to obtain and retain "party" status are among the most severe of such burdens imposed by any State.

16.     First, New York's new requirement that an organization secure the greater of 2% of the vote or 130,000 votes to obtain or retain "party" status would be a significant threshold even if it applied only to the Gubernatorial election. Twenty-one states do not require any vote threshold at all to maintain party qualification.[1] Of the 29 states that do condition "party" status on obtaining a percentage of the vote for a specified office, 5 states require 1% or less of the vote.[2] While there are certainly outlier states that require a party to obtain as much as 10% or 20% of the vote in a given election, by requiring the greater of 2% of the vote or 130,000 votes for "party" status, New York's party

---

[1] They are **Alaska** (*see* Alaska Stat. § 15.80.010(27)); **Arizona** (*see* Ariz Rev. Stat. Ann. § 16-804); **California** (*see* Cal. Elec. Code § 5100 (West)); **Colorado** (*see* Colo. Rev. Stat. § 1-4-1303); **Connecticut** (*see* Conn. Gen. Stat. § 9-372(6)); **Delaware** (*see* Del. Code Ann. tit. 15, § 3001); **Florida** (*see* Fla. Stat. § 97.021(19)); **Hawaii** (*see* Hi. Rev. Stat. § 11-62(d)); **Idaho** (*see* Idaho Code § 34-501(1)(a)); **Louisiana** (*see* La. Stat. Ann. § 18:441); **Maine** (*see* Me. Stat. tit. 21-a § 301); **Maryland** (*see* Md. Code Ann., Elec. Law § 4-103 (West)); **Massachusetts** (*see* Mass. Gen. Laws ch. 50, § 1); **Mississippi** (*see* Miss. Code Ann. § 23-15-1061); **Nebraska** (*see* Neb. Rev. Stat. § 32-610); **Nevada** (*see* Nev. Rev. Stat. § 293.1715(2)); **North Carolina** (*see* N.C. Gen. Stat. § 163-96); **North Dakota** (*see* N.D. Cent. Code § 16.1-03-21); **Oregon** (*see* Or. Rev. Stat. § 248.008(2)); **South Carolina** (S.C. Code Ann. § 7-9-10); and **Vermont** (*see* Vt. Stat. Ann., tit. 17, § 2103(23)).

[2] They are **Kansas** (*see* Kan. Stat. Ann. § 25-302b); **Michigan** (*see* Mich. Comp. Laws § 168.685(6)); **New Mexico** (*see* N.M. Stat. Ann. § 1-7-2(c)); **West Virginia** (*see* W. Va. Code § 3-1-8); and **Wisconsin** (*see* Wis. Stat. § 5.62(b)(1)).

qualification requirement nevertheless places New York at the higher end of the spectrum. Moreover, while one could compare percentage-of-the-vote requirements across states, one also has to view the 130,000-vote minimum threshold in the context of New York State alone. Public data suggest that of the minor parties in New York, only the Conservative Party regularly gets more than 130,000 votes, with the Green Party exceeding that threshold only once, the Working Families Party getting between 112,000 and 148,000 votes since 2010, and no other minor party even approaching that threshold.[3]

17.     Second, New York is also an extreme outlier in requiring that those votes be earned in both Presidential and Gubernatorial elections. Thirty-two states have no Presidential-election requirements for party qualifications at all.[4] Another 13 states

---

[3] N.Y. State Bd. of Elec., Certified Results from the November 6, 2018 General Election for Governor and Lt. Governor, https://www.elections.ny.gov/NYSBOE/elections/2018/general/2018Governor.pdf; N.Y. State Bd. of Elec., NYS Board of Elections Governor/Lt. Governor Election Returns November 4, 2014, https://www.elections.ny.gov/NYSBOE/elections/2014/general/2014Governor.pdf; N.Y. State. Bd. of Elec., NYS Board of Elections Governor/Lt. Governor Election Returns November 2, 2010, https://www.elections.ny.gov/NYSBOE/elections/2010/general/2010GovernorRecertified09122012.pdf.

[4] They are **Alabama** (*see* Ala. Code § 17-13-40); **Alaska** (*see* Alaska Stat. § 15.80.010(27)); **California** (*see* Cal. Elec. Code § 5100 (West)); **Colorado** (*see* Colo. Rev. Stat. § 1-4-1303); **Connecticut** (*see* Conn. Gen. Stat. § 9-372(6)); **Delaware** (*see* Del. Code Ann. tit. 15, § 3001); **Florida** (*see* Fla. Stat. § 97.021(19)); **Hawaii** (*see* Hi. Rev. Stat. § 11-62(d)); **Illinois** (*see* 10 Ill. Comp. Stat. 5/10-2); **Indiana** (*see* Ind. Code § 3-5-2-30); **Kansas** (*see* Kan. Stat. Ann. § 25-302b); **Maine** (*see* Me. Stat. tit. 21-a § 301); **Massachusetts** (*see* Mass. Gen. Laws ch. 50, § 1); **Michigan** (*see* Mich. Comp. Laws § 168.685(6)); **Mississippi** (*see* Miss. Code Ann. § 23-15-1061); **Missouri** (*see* Mo. Rev. Stat. § 115.317); **Montana** (*see* Mont. Code Ann. § 13-10-601(1)); **Nebraska** (*see* Neb. Rev. Stat. § 32-610); **Nevada** (*see* Nev. Rev. Stat. § 293.1715(2)(a)); **New Hampshire** (*see* N.H. Rev. Stat. Ann. § 652:11); **New Jersey** (*see* N.J. Stat. Ann. § 19:5-1); **Oklahoma** (*see* Okla. Stat. tit. 26, § 1-109(A)); **Pennsylvania** (*see* 25 Pa. Cons. Stat. § 2831); **South Carolina** (*see* S.C. Code Ann. § 7-9-10); **South Dakota** (*see* S.D.

permit an organization to qualify as a party by obtaining a specified percentage of the Presidential vote, but offer other routes to qualification as well.[5] Two of those states, New Mexico and Rhode Island, explicitly exempt from Presidential-election thresholds those organizations that did not run a candidate for President.[6] Only four states (other than, now, New York)—Arkansas, Iowa, Kentucky, and Washington—condition "party" status on a specified percentage of the vote in Presidential elections.[7]

18.     Third, New York is also an outlier in that it permits organizations to become "parties" only in and through an election.  Thus, to become a "party" in New York and the other ten states that impose this requirement, a political organization must place a candidate on the ballot by petitioning, and then cannot support that candidate through the fundraising advantages afforded to "party" candidates.  In contrast, the other 39 states allow organizations to become "parties" before any particular election, in a manner other

---

Codified Laws § 12-1-3(12)); **Tennessee** (*see* Tenn. Code Ann. § 2-1-104(30)); **Texas** (*see* Tex. Elec. Code Ann. § 181.005); **Utah** (*see* Utah Code Ann. § 20A-8-101(4)(a)); **Vermont** (*see* Vt. Stat. Ann., tit. 17, § 2103(23)); **Virginia** (*see* Va. Code Ann. § 24.2-101); **West Virginia** (*see* W. Va. Code § 3-1-8); and **Wyoming** (*see* Wyo. Stat. Ann. § 22-1-102).

[5] They are **Arizona** (*see* Ariz Rev. Stat. Ann. §§ 16-801(A), 16-804); **Georgia** (*see* Ga. Code Ann. §§ 21-2-2(25), 21-2-180); **Idaho** (*see* Idaho Code § 34-501(1)); **Louisiana** (*see* La. Stat. Ann. § 18:441); **Maryland** (*see* Md. Code Ann., Elec. Law § 4-103); **Minnesota** (*see* Minn. Stat. § 200.02 (subd. 7)); **New Mexico** (*see* N.M. Stat. Ann. § 1-7-2(C)); **North Carolina** (*see* N.C. Gen. Stat. § 163-96); **North Dakota** (*see* N.D. Cent. Code § 16.1-03-21); **Ohio** (*see* Ohio Rev. Code Ann. § 3517.01); **Oregon** (*see* Or. Rev. Stat. § 248.008); **Rhode Island** (*see* 17 R.I. Gen. Laws § 17-1-2(9)); and **Wisconsin** (*see* Wis. Stat. § 5.62(b)(1)).

[6] **New Mexico** (*see* N.M. Stat. Ann. § 1-7-2(C)); **Rhode Island** (*see* 17 R.I. Gen. Laws § 17-1-2(9)).

[7] **Arkansas** (*see* Ark. Code Ann. §§ 7-1-101(27), 7-7-205(c)(4)); **Iowa** (*see* Iowa Code § 43.2(1)(b)); **Kentucky** (*See* Ky. Rev. Stat. Ann. § 118.015); **Washington** (*see* Wash. Rev. Code § 29A.04.086).

than through obtaining votes, so that they can then act as "parties" in connection with the election itself.[8]

19.     The combination of requiring organizations to become "parties" only through elections, requiring an organization to secure the greater of 2% of the vote or 130,000 votes, and requiring it to do so in both Presidential and Gubernatorial elections means that it is now more difficult to qualify as a political "party" in New York than it is elsewhere across the country, and far more difficult than it has been before in New York.

**New York's Prior Party-Threshold of 50,000 Gubernatorial Votes Sufficiently Weeded Out Parties Without Sufficient Support**

20.     New York has a long history of minor party participation in its elections.  Jimmy McMillan famously ran for Governor twice on the Rent Is Too Damn High Party platform.  New York has thriving Green, Conservative, Independence, Libertarian, and Working Families Parties.  And New York has long seen new parties try to establish a foothold.  Some, like SAM, succeed.  Most fail.  The process, however, allows more New Yorkers to be heard.

21.     Nearly 20 years ago, the Second Circuit held that a party that obtained 50,000 votes in a Gubernatorial election demonstrated the "'modicum of support' sufficient to overcome the state's broad latitude in controlling frivolous party registration of tiny fractional interests." *Green Party of New York State* v. *New York State Bd. of Elections*,

---

[8] The eleven states that do not are **Connecticut** (*see* Conn. Gen. Stat. § 9-372(5)); **Illinois** (*see* 10 Ill. Comp. Stat. § 5/10-2); **Indiana** (*see* Ind. Code § 3-5-2-30); **Iowa** (*see* Iowa Code §43.2(1)(b); Iowa Admin. Code r.721-21-10(43)); **Kentucky** (*see* Ky. Rev. Stat. Ann. § 118.015), **New Jersey** (*see* N.J. Stat. Ann. §§ 19:1-1, 19:5-1); **New York** (*see* N.Y. Elec. Law § 1-104(3) (McKinney 2020)); **Pennsylvania** (*see* 25 Pa. Const. Stat. § 2831); **Virginia** (*see* Va. Code Ann. § 24.2-101); **Washington** (*see* Wash. Rev. Code § 29A.04.086); and **West Virginia** (*see* W. Va. Code § 3-1-8).

389 F.3d 411, 419-422 (2d Cir. 2004). The empirical data in subsequent elections confirm this conclusion. The sheer number of parties on the ballot, and the change from election to election, demonstrates that it was both possible yet difficult to become and remain a political "party" in New York.

22.     In 2018, ten parties ran candidates for Governor in New York. Governor Cuomo was the candidate for the Democratic, Working Families, Independence, and Women's Equality parties, and Marc Molinaro was the candidate for the Republican, Conservative, and Reform parties. Howie Hawkins was the Green Party candidate, Larry Sharpe was the Libertarian Party candidate, and Stephanie Miner was the SAM Party candidate.[9] In 2014, a different group of ten parties ran candidates for Governor, including the Sapient Party and the Stop-Common-Core Party.[10] In 2010, twelve parties ran candidates for Governor, including the Rent Is Too Damn High Party, the Freedom Party, and the Anti-Prohibition Party.[11]

---

[9] N.Y. State Bd. of Elec., Certified Results from the November 6, 2018 General Election for Governor and Lt. Governor, https://www.elections.ny.gov/NYSBOE/elections/2018/general/2018Governor.pdf.

[10] Governor Cuomo was the candidate for the Democratic, Working Families, Independence, and Women's Equality parties, and Rob Astorino was the candidate for the Republican, Conservative, and Stop-Common-Core parties. Howie Hawkins was the Green Party candidate, Michael McDermott was the Libertarian Party candidate, and Steven Cohn was the Sapient Party candidate. *See* N.Y. State Bd. of Elec., NYS Board of Elections Governor/Lt. Governor Election Returns November 4, 2014, https://www.elections.ny.gov/NYSBOE/elections/2014/general/2014Governor.pdf.

[11] Governor Cuomo was the candidate for the Democratic, Working Families, and Independence parties, and Carl Paladino was the candidate for the Republican, Conservative, and Taxpayers parties. Howie Hawkins was the Green Party candidate, Warren Redlich was the Libertarian Party candidate, Jimmy McMillan was the Rent Is Too Damn High Party candidate, Charles Barron was the Freedom Party candidate, and Kristin Davis was the Anti-Prohibition Party candidate. *See* N.Y. State Bd. of Elec.,

23.     In each of these three elections, parties failed to meet the then-existing 50,000-vote threshold to requalify as a "party."  In 2010, each of the Taxpayers, Libertarian, Rent is Too Damn High, Freedom, and Anti-Prohibition parties secured fewer than 50,000 votes.[12]  Of them, only the Libertarian Party competed in the 2014 election.  In that election, in turn, the Libertarian and Sapient parties secured fewer than 50,000 votes while the Women's Equality and Stop-Common-Core parties narrowly surmounted that threshold.[13]  The Sapient Party did not appear on the ballot in 2018.  The Stop-Common-Core Party re-branded as the Reform Party, ran a candidate in the 2018 election and fell short of the 50,000 vote threshold, as did the Women's Equality Party.[14]

24.     It is worth revisiting the data from these recent elections to see how much more the new threshold—the greater of 2% of the vote or 130,000 votes—would have culled the group of parties had it been in effect in prior elections.  The results are stark.  In the 2018 Gubernatorial election, only the Democratic, Republican, and Conservative parties' candidates received the greater of 130,000 votes or 2% of the vote, and the Conservative Party nominated the same person as the Republican Party.[15]  Put another way, had the

---

NYS Board of Elections Governor/Lt. Governor Election Returns November 2, 2010, https://www.elections.ny.gov/NYSBOE/elections/2010/general/2010GovernorRecertified09122012.pdf.

[12] *Id.*

[13] N.Y. State Bd. of Elec., NYS Board of Elections Governor/Lt. Governor Election Returns November 4, 2014, https://www.elections.ny.gov/NYSBOE/elections/2014/general/2014Governor.pdf.

[14] N.Y. State Bd. of Elec., Certified Results from the November 6, 2018 General Election for Governor and Lt. Governor, https://www.elections.ny.gov/NYSBOE/elections/2018/general/2018Governor.pdf.

[15] *Id.*

new rules applied in 2018, they would have disqualified 7 out of the 8 minor parties. Likewise, had those rules applied in the 2014 Gubernatorial election, they would have disqualified 6 out of the 8 minor parties, leaving only the Conservative and Green Parties as qualified "parties."[16]

25.    Thus, New York's new ballot-access rules are not only among the most severe in the nation, historical data from New York shows that they would all but eradicate minor parties from New York politics.

**The Historical Record Confirms the Severe Burden the Presidential-Election Requirement Places on Minor Parties**

26.    Even in New York, with its robust history of minor political parties, not all of those parties choose to run a candidate for President.  The Reform Party, for example, did not run a Presidential candidate in New York in 2016, because the party was then in internal turmoil, even though the National Reform Party ran Rocky de la Fuente for President.[17]  In 2012, the Independence Party did not run a Presidential candidate, even though it had done so in 2008 (nominating John McCain) and had qualified as a "party" in the 2010 Gubernatorial election (by nominating Governor Cuomo under fusion

---

[16] N.Y. State Bd. of Elec., NYS Board of Elections Governor/Lt. Governor Election Returns November 4, 2014. https://www.elections.ny.gov/NYSBOE/elections/2014/general/2014Governor.pdf.

[17] Wikipedia, Reform Party of New York State, at https://en.wikipedia.org/wiki/Reform_Party_of_New_York_State (last visited May 13, 2020); N.Y. State Bd. of Elec., NYS Board of Elections President and Vice-President Election Returns Nov. 8, 2016, https://www.elections.ny.gov/NYSBOE/elections/2016/General/2016President.pdf.

voting).[18]  In 1984, the Right to Life Party did not run a Presidential candidate, even though it had obtained more than 50,000 votes in the 1982 Gubernatorial election and had nominated a Presidential candidate in 1980.[19]  In 1964, the Conservative Party did not run a candidate for President.  And in 1932, the Law Preservation Party—a Prohibition-focused party—also did not run a candidate for President.

27. The 1964 experience of the Conservative Party reveals a peril that minor parties in New York face.  That year, the Conservative Party wanted to nominate Barry M. Goldwater for President.  The Republican Party convinced Goldwater not to accept the Conservative Party's nomination, to ensure that he received more votes as a Republican.  These types of pressures on minor parties are only exacerbated by requiring—as New York now does—minor parties to compete in Presidential elections.

**The Presidential-Election Requirement is Not the Least Restrictive Means of Controlling Access to Public Campaign Funds**

28. Although I am not a lawyer, I regularly read federal court decisions that assess the constitutionality of ballot-access laws.  I understand that, in general, a law that severely burdens the rights of minor parties is unconstitutional unless it is narrowly tailored to

---

[18] N.Y. State Bd. of Elec., NYS Board of Elections President and Vice-President Election Returns Nov. 6, 2012, https://www.elections.ny.gov/NYSBOE/elections/2012/General/President_07292013.pdf; N.Y. State Bd. of Elec., NYS Board of Elections Governor/Lt, Governor Election Returns November 2, 2010, https://www.elections.ny.gov/NYSBOE/elections/2010/general/2010GovernorRecertified09122012.pdf; N.Y. State Bd. of Elec., NYS Board of Elections President and Vice-President Election Returns Nov. 4, 2008, https://www.elections.ny.gov/NYSBOE/elections/2008/General/PresidentVicePresident08.pdf.

[19] Wikipedia, New York State Right to Life Party, at https://en.wikipedia.org/wiki/New_York_State_Right_to_Life_Party (last visited May 13, 2020).

serve a compelling State interest, and that laws that impose less-than-severe (though more than trivial) burdens on minor parties' rights must be justified by balancing the interests at stake.

29.     To that end, I would note that, as I read *Green Party of Connecticut v. Garfield*, the Second Circuit held that a public finance program need not include all political parties and can exclude minor-party candidates.  While that is not the outcome of that case that I would have preferred, it does mean that New York could have taken steps to reduce the cost of minor party candidates' participation in public finance that were less restrictive than making it harder to become a minor "party" in the first place.

30.     In fact, New York did so.  First, New York's public finance system will require candidates to raise substantial private funds from a large number of donors before qualifying for matching funds.  Gubernatorial candidates will need to raise $500,000 from at least 5,000 in-State donors, Assembly candidates will need to raise some $4,000 to $6,000 entirely from in-district donations from at least 75 donors, and Senate candidates will need to raise some $8,000 to $12,000 entirely from in-district donations from at least 150 donors.  (*See* N.Y. Elec. Law § 14-203(1)(a).)  Analyses of fundraising by candidates in prior elections concluded that no minor party candidates would have met these thresholds.  (*See* **Exhibit B**, January 15, 2020 Report of the Brennan Center for Justice at 5); (**Exhibit C**, Malbin & Glavin, Small Donor Public Finance in New York State: Major Innovations – With a Catch (The Campaign Finance Institute January 2020) at 32; Ex. B at 6.)

31.     Second, New York capped matching funds at $5,000 for a primary election for any candidate whose party has less than 1,000 voters registered to vote in that primary.

(*See* N.Y. Elec. Law § 14-204(5).)  Candidates from smaller parties are thus vastly limited in how much public finance funding they can access.  (Ex. B at 6.)

32. As a result of both of these inherent limitations on minor party candidates—the requirement to first raise substantial private funds from a large number of donors, and then the cap of $5,000 on primary matching funds in districts where the party has less than 1,000 registered votes—I expect that minor parties will not make a meaningful impact on the New York State public financing program.  In fact, CFI calculated that the additional cost of minor-party-candidate participation in the public finance program would be "close to zero," and well within the $100 million annual budget.  (Ex. C at 2, 33; Ex. B at 5.)

**The Timing of the Presidential-Election Requirement Disproportionately Harms Minor Parties**

33. The burden the Presidential-election requirement imposes on minor parties is significant and will disproportionately harm minor parties which lack the resources of major political parties.  This impact will be especially severe on minor parties that have never before run a Presidential candidate, and have been given less than one year to attempt to do so to meet the new Presidential-election requirement.

34. A minor party that did not previously intend to run a candidate for President must now first attempt to identify a candidate to run on its party line for that election.  Finding and vetting a candidate for any office—let alone the office of President—can be an extensive and time consuming process.  And, as discussed above with respect to Barry Goldwater's 1964 candidacy, minor parties may by stymied by major parties' reluctance to let their candidates run on minor party lines.

35. If a minor party could identify a candidate, the resources—both human and monetary—required to allow that candidate to run a full-fledged campaign will be significant. The burden of marshalling these resources is amplified by the fact that minor parties were given less than 12 months' notice of their need to run a Presidential campaign to maintain "party" status. Minor political parties, deprived of the ability to plan ahead, will be left to scramble to locate additional resources to support a Presidential campaign or, more likely, be forced to divert resources they would have used to support other candidates to attempt to support a candidate for President.

I declare under penalty of perjury that the foregoing is true and correct.

DATED this 13 day of May 2020.

_Richard Winger_
Richard Winger