**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
―――――――――――――――――――――――――――――

**SAM PARTY ET AL.,**

                         **Plaintiffs,**

             **- against –**                    **20-cv-323 (JGK)**

**KOSINSKI ET AL.,**
                         **Defendants.**
―――――――――――――――――――――――――――――    **OPINION AND ORDER**
**HURLEY ET AL.,**

                         **Plaintiffs,**

             **- against –**                    **20-cv-4148 (JGK)**

**KOSINSKI ET AL.,**

                         **Defendants.**
―――――――――――――――――――――――――――――

**JOHN G. KOELTL, District Judge:**

        The plaintiffs, recognized New York State political parties
and their supporters, challenge recent amendments to the
requirements to be recognized as a "party" under the New York
Election Law.  The plaintiffs allege that these amendments
violate their First Amendment and Fourteenth Amendment rights.
The New York Election Law provision at issue was amended by the
New York State Legislature to increase the overall number of
votes required for a political organization to qualify as a
"party" (hereafter, "Party Qualification Threshold") and the
frequency with which parties must requalify ("Party
Qualification Method").  As amended, a political organization

1

must receive the greater of 130,000 votes or 2 percent of votes cast in the previous presidential or gubernatorial election, whichever is more recent.  As a result, party status is now to be reviewed biennially, based on the votes received by a political organization's candidate in the previous gubernatorial or presidential election, beginning with the presidential election in November 2020.

The SAM Party of New York, an abbreviation for the "Serve America Movement" Party, and its Chairman, Michael A. Volpe, (together, the "SAM Party" or "SAM Party plaintiffs") challenge the inclusion of a political organization's performance in presidential elections as part of the Party Qualification Method, arguing that such a requirement, as applied to the SAM Party, violates the First Amendment rights to freedom of speech and association, and the equal protection and due process protections of the Fourteenth Amendment of the SAM Party and its supporters.

Linda Hurley, Rev. Rex Stewart, Robert Jackson, Richard N. Gottfried, Yuh-line Niou, Anita Thayer, Jonathan Westin, the New York State Committee of the Working Families Party, the Executive Board of the New York State Committee of the Working Families Party, and the Working Families Party of New York State, (together, the "WFP" or "WFP plaintiffs") challenge both the Party Qualification Method and Party Qualification

Threshold, both facially and as applied to the WFP, as a violation of their right to freedom of association and the equal protection and due process protections of the Fourteenth Amendment.[1]

Both the SAM Party and the WFP have brought suit, pursuant to 42 U.S.C. § 1983, against Todd D. Valentine and Robert A. Brehm, the Co-Execute Directors of the New York State Board of Elections, and Peter S. Kosinski, Douglas A. Kellner, and Andrew J. Spano, the Commissioners of the New York State Board of Elections (the "Board"), each in their official capacities. Both the SAM Party and the WFP have moved for a preliminary injunction to enjoin the application of the party qualification requirements.

Because the SAM Party and the WFP plaintiffs have failed to demonstrate that allowing the amended party qualification

---

[1] At oral argument, counsel for the WFP claimed their challenge to the New York Election Law amendments included a challenge to the increase in the number of votes required for independent nominating petitions. See Tr. at 44-50. Such a challenge was not raised in their complaint or motion for a preliminary injunction and would not be a basis for a preliminary injunction because, as a recognized party, the WFP does not need to pursue independent nominating petitions as a means of ballot access for the 2020 election. Cf. Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1548 (2016)(noting that to support standing a plaintiff must show that he or she suffered an injury that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical")(quoting Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992)).

requirements to take effect would violate their Constitutional rights, otherwise cause irreparable harm to the plaintiffs, or be against the public interest, their motions are **denied**.

## I.

### a.

Under the New York Election Law, a political organization that supports candidates for public office can be designated either as a "party" or an "independent body."  N.Y. Elec. Law §§ 1-104(3), (12).  Pursuant to amendments to the New York Election Law that became effective on April 3, 2020, to qualify as a party, a political organization's candidate for governor or president must have received the greater of 130,000 votes, or 2 percent of the total votes cast, in the most recent presidential or gubernatorial election. N.Y. Elec. Law § 1-104(3).  Because New York gubernatorial elections occur off-cycle from presidential elections, this definition requires existing parties to requalify biennially.  A political organization that fails to satisfy such requirements is an "independent organization." N.Y. Elec. Law § 1-104(12).

Parties, under the New York Election Law, are entitled to certain benefits, and are subject to certain requirements, which independent organizations are not.  First, a party receives a "berthing" on general election ballots for president, governor, and other statewide elections, and for special elections and

4

state supreme court elections, without the need to submit voter signatures.  N.Y. Elec. Law §§ 6-102, 6-104, 6-106, 6-114.  Such secured ballot access is often referred to as "automatic" ballot access. Brehm Decl. ¶ 5. This "berthing" is reserved for the winner of the party's nomination process, and the requirements for obtaining a party's nomination vary with the office sought. N.Y. Elec. Law §§ 6-104, 6-114, 6-136, 7-104(5); Brehm Decl. ¶¶ 6-7.  For those races in which a candidate must participate in a party primary, New York conducts primary elections to assist parties with selecting their nominees for certain offices, including Congressional and state legislature positions. Brehm ¶ 7.

By contrast, independent bodies nominate candidates directly onto the general election ballot, through submitting independent nominating petitions, which must include a specified number of signatures from registered voters, with different requirements depending on the public office sought.  N. Y. Elec. Law § 6-142.  The New York Election Law also supplies a third path for would-be public officeholders through write-in votes on the ballot.[2]

---

[2] However, write-in candidates for president or vice-president are required to make certain filings with the New York State Board of Elections before the third Tuesday before the general election. N.Y. Elec. Law § 6-153.

Parties enjoy other practical benefits under the New York Election Law.  For example, parties are permitted to maintain a segregated account, often called a "housekeeping account," to pay for the maintenance of its headquarters and party staff, to which ordinary contributions limits do not apply. Brehm Decl. ¶ 12; N.Y. Elec. Law § 14-124(3).  Registered parties also appear on voter-registration forms so that voters can register as party members, N.Y. Elec. Law § 5-300, enabling parties greater ease in connecting with potential supporters.

Parties are also subject to certain regulatory requirements.  For example, parties must establish certain committees, have certain officers, and submit certain filings with the Board.  See, e.g., N.Y. Elec. Law §§ 2-102, 2-104, 2-106, 2-112, 2-114.

New York has a relatively high number of parties, which may be attributable to New York's embrace of fusion voting. Mulroy Decl. ¶ 43. Fusion voting allows candidates nominated by more than one party or independent body to appear on a ballot multiple times, and as affiliated with each of the candidate's nominating organizations.  N.Y. Elec. Law § 7-104.[3]  While a

---

[3] Candidates nominated by multiple parties appear next to each parties' ballot line; more complicated rules apply for candidates nominated by a party and an independent body.  See N.Y. Elec. Law § 7-104(4); Gonsalves v. New York State Bd. of Elections, 974 F. Supp. 2d 191, 195 (E.D.N.Y. 2013) (upholding the constitutionality of Section 7-104's treatment of candidates

cross-nominated candidate's votes are "fused" across party or independent organization lines for purposes of the election, votes cast for the candidate count as votes for the party or independent organization on whose ballot line the voter selected, including for purposes of party requalification.  Some have asserted that fusion voting enables minor parties to secure more votes in elections and enjoy greater influence.  See, e.g., Mulroy Decl. ¶ 44. Both the SAM Party and the WFP have taken advantage of New York's fusion voting to cross-nominate candidates who are members of and have been nominated by different parties. Volpe Decl. ¶ 24; Nnaemeka, Decl. ¶ 10.

Prior to 2020, the New York party qualification requirements mandated an existing party to requalify every four years, by receiving over 50,000 votes in the gubernatorial election.  Brehm Decl. ¶¶ 25-26.  The party qualification threshold had remained at 50,000 votes for 85 years, despite the New York electorate experienced over a 2.5-fold increase over the period, increasing from close to 5 million in 1935 to nearly 13 million registered voters as of February 2020. Mulroy Decl. ¶ 12.

---

nominated by one or more parties and one or more independent bodies).

b.

The amended party qualification requirements that the plaintiffs challenge developed from the recommendations of a special commission, established to design a public campaign finance system for New York State and recommend electoral reforms.  Part XXX of the Fiscal Year 2020 Enacted Budget created the New York State Campaign Finance Review Commission (the "Commission") as a "public campaign financing and election commission to examine, evaluate and make recommendations for new laws." 2019 N.Y. Sess. Laws, Ch. 59, Part XXX, § 1. Part XXX instructed the Commission to make its recommendations "in furtherance of the goals of incentivizing candidates to solicit small contributions, reducing the pressure on candidates to spend inordinate amounts of time raising large contributions for their campaigns, and encouraging qualified candidates to run for office." Id. The Commission was instructed to provide recommendations for a variety of aspects relating to the administration of a voluntary public campaign finance system, including contribution limits, appropriate ratios for contribution matching, regulatory compliance requirements, and penalties for violations of public financing rules.  2019 N.Y. Sess. Laws Ch. 59, Part XXX § 2.

The Commission was also instructed specifically to "determine and identify new election laws" relating to, among

other things, "rules and definitions governing: candidates'
eligibility for public financing; party qualifications; multiple
party candidate nominations and/or designations . . . " 2019
N.Y. Sess. Laws Ch. 59, Part XXX § 2(j).  The Commission was
also instructed that the public campaign finance system must be
able to be administered with costs under $100 million annually.
2019 N.Y. Sess. Laws Ch. 59, Part XXX § 3. Part XXX required the
Commission to submit its report by December 1, 2019 and stated
that its recommendation "shall have the full effect of law
unless modified or abrogated by statute prior to December 22,
2019. 2019 N.Y. Sess. Laws Ch. 59, Part XXX § 1.

       To arrive at a series of findings and recommendations, the
Commission held public meetings, took public testimony, received
written submissions, and conducted its own research.  The
Commission's Report to the Governor and the Legislature
(hereafter, the "Report") included a series of recommendations
to establish a voluntary public campaign finance system with
matching of small-dollar donations up to certain caps for
candidates for state office in primary and general elections
that achieve certain donation thresholds, to lower campaign-
contributions limits, and to found a Public Campaign Finance
Board within the State Board of Elections to administer the
public campaign finance system.

At issue here, the Commission also recommended changing the party qualification threshold to 2 percent of the total votes cast for a party's candidate in the previous gubernatorial or presidential race, or 130,000 votes, whichever is greater.[4]  The Commission explained that it made this recommendation because, among other reasons, the "ability of a party to demonstrate bona fide interest from the electorate is paramount in ensuring the success of a public campaign finance system," and that "setting a rational threshold for party ballot access, based on a demonstration of credible levels of support from voters in this state, helps to ensure that the political parties whose candidates will draw down on public funds under the public matching program reflect the novel and distinct ideological identities of the electorate of New Yorkers who ultimately fund this public campaign finance system."  Report at 14.  The Commission noted its belief that raising the party ballot access to a level that "retained a measure of proportionality" would "actually increase voter participation and voter choice, since voters will now be less confused by complicated ballots with multiple lines for parties that may not have any unique

---

[4] The Report also recommended increasing the number of signatures required for "independent nominating petitions," used by a candidate supported by independent bodies or otherwise unaffiliated with a party to access the general election ballot. Report at 15.

ideological standards," and that the higher thresholds will enable voters to "make more resolute choices between candidates" as they can "rely upon the knowledge that such parties have sufficient popular support from the electorate of this state." Id. at 14-15.  The Commission also noted the changes to the Party Qualification Threshold and Party Qualification Method were also important for "craft[ing] a public campaign finance system that remains within the enabling statute's limitation of $100 million annual cost." Id. at 14.

The Commission detailed in its Report that in seeking to arrive at a "rational" threshold, it considered New York's historical experience, as well as the party qualification criteria and thresholds from other states.  Report at 41-47. The Commission considered the frequency with which other states required parties to requalify, the number of votes required to requalify, whether qualification thresholds were made in reference to presidential and/or gubernatorial elections, whether states had public campaign finance systems, and whether states permitted fusion voting.  Id.  Minutes from the Commissions' meetings and statements from the individual Commissioners, included as part of the Report, reveal that a proposal of a 3 percent Party Qualification Threshold was originally considered and rejected, that the appropriate threshold was actively debated, and that the final 2 percent

11

threshold was a compromise based upon the information considered and competing policy views. See, e.g., Report at 48 (Statement of Commissioner Kimberly A. Galvin), 52 (Statement of Commissioner Denora Getachew), 62-64 (Statement of Commissioner Jay Jacobs), 67 (Statement of Commissioner John M. Nonna), 81 (Statement of Commissioner David C. Previte), and 133 (Minutes from November 25 Meeting at Westchester Community College).

The Commission issued its Report on December 1, 2019. Because the New York State Legislature did not pass any statutes modifying or abrogating the Commission's recommendations, such recommendations putatively acquired the "full effect of law" by December 22, 2019, and the relevant amendments to the party qualification requirements took effect on January 1, 2020.  In an unrelated proceeding, a group of plaintiffs including several the WFP plaintiffs, challenged the Commission and its Report in New York state court.  On March 12, 2020, the Honorable Ralph A. Boniello, III, of the New York State Supreme Court ruled that the New York State legislature improperly delegated legislative authority to the Commission, and as a result the Commission's recommendations did not have the force of law. SAM Party Am. Compl., Ex. B.

In response, Part ZZZ was added to the Fiscal Year 2021 Bill, which the New York State Legislature passed, and Governor Cuomo signed into law on April 3, 2020. Part ZZZ amended the New

York Election Law to enact the recommendations of the Commission, including an amendment to Section 1-104(3) to modify the definition of "party" to include the new Party Qualification Threshold and Party Qualification Method. 2020 N.Y. Sess. Laws Ch. 58, Part ZZZ.

**c.**

The SAM Party is a party in New York having successfully obtained over 50,000 votes for its gubernatorial candidates in the 2018 election. SAM Party Am. Compl. ¶¶ 2, 4.  Michael Volpe is the Chairman and a registered SAM Party member, as well as a registered voter in New York.  He also previously was the SAM Party's candidate for Lieutenant Governor in 2018.  SAM Party Am. Compl. ¶ 5.  In order to nominate Stephanie Minor and Michael Volpe, as its candidates for governor and lieutenant governor, respectively, in the 2018 gubernatorial election, the SAM Party and its supporters submitted an independent nominating petition; and, Minor and Volpe, as the SAM Party candidates, received more than the 50,000 votes for governor.  See SAM Party Am. Comp. ¶ 31; Volpe Decl. ¶¶ 7, 15-22.

The SAM Party professes to be a "new kind of candidate-focused, process-driven" political party, one focused on "four pillars of good government": accountability, transparency, electoral reform, and problem solving. Volpe Decl. ¶¶ 2, 8-12. The SAM Party claims that it intends to "forego espousing

substantive positions" to "avoid getting prematurely embroiled in, or associated with, one side or the other of the ideological divide." Volpe Decl. ¶ 13.  Related to this aversion to being perceived as adopting substantive positions, the SAM Party claims that it "will not run a candidate for president" in 2020 and thus "will lose" its party status after November 2020, as a result of the amended law.  SAM Party Am. Compl. ¶ 5.

The WFP is also a party in New York.  Founded in 1998, the WFP achieved party status in the year it was formed by receiving more than 50,000 votes in the 1998 gubernatorial election and has maintained party status since. Nnaemeka Decl. ¶ 4.  Over its 22 years as a party, the WFP has run thousands of candidates for federal, state, and local office, Nnaemeka Decl. ¶ 6.  The WFP has run candidates for president in each of the last five presidential elections, including Hilary Clinton in 2016, Brehm Decl. Ex. A; Hallak Decl. G.  Many of the WFP's candidates, such as the plaintiffs, State Assemblymember Yuh-Line Niou and State Senator Robert Jackson, are members of other political parties and have been cross-nominated, allowing the WFP to use New York's fusion voting laws to form coalitions with other parties and enabling such cross-nominated candidates to signal their commitment to the WFP's "progressive policy agenda." Niou Decl. ¶ 2-3; Jackson Decl. ¶ 3-4; Nnaemeka Decl. ¶ 10.

The SAM Party filed its original complaint on January 14, 2020, alleging the Commission's recommendations violated SAM Party's First and Fourteenth Amendment rights to freedom of association, freedom of speech, equal protection, and due process of law, and sought declaratory and injunctive relief. Following the invalidation and subsequent reenactment of the challenged the New York Election Law amendments, the SAM Party filed an amended complaint, challenging the New York Election Law amendments on the same grounds as those in the original complaint, on May 11, 2020, and moved for a preliminary injunction on May 18, 2020. Both the SAM Party's amended complaint and motion for a preliminary injunction challenge the use of a presidential election as a reference for the Party Qualification Method, but do not contest the reference to gubernatorial election votes or the quantum of the Party Qualification Threshold.[5]

On May 29, 2020, the WFP plaintiffs filed a complaint and moved for a preliminary injunction.  In their complaint, the WFP plaintiffs assert that the Party Qualification Method and Party Qualification Threshold not only violated the First and

---

[5] At oral argument, Counsel for the SAM Party plaintiffs noted that the <u>Person</u> case holds that a "gubernatorial requirement, per se, is constitutional." Tr. at 18. <u>See</u> <u>Person v. New York State Bd. of Elections</u>, 467 F.3d 141, 144 (2d Cir. 2006) (per curiam).

Fourteenth Amendments as applied to the WFP, its candidates, and
its supporters, but are also "invalid in all their applications"
and "facially invalid." WFP Compl. ¶ 58.  The WFP also sought
declaratory relief that "the Constitution and Laws of the State
of New York guarantee the right of fusion voting." WFP Comp.
¶ 68.  The WFP also filed a motion for a preliminary injunction
on May 29, seeking to "restore the party qualification
requirements to their pre-April 2020 levels and uphold the
remainder of the Election Law as amended by Part ZZZ" of Fiscal
Year 2021 Bill. WFP Prelim. Inj. Mem. at 30.

A preliminary injunction is "one of the most drastic tools
in the arsenal of judicial remedies," Grand River Enter. Six
Nations, Ltd. v. Pryor, 481 F.3d 60, 66 (2d Cir. 2007) (per
curiam) (citation omitted), and "never awarded as of right."
Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008).
When seeking a "preliminary injunction against government action
taken in the public interest pursuant to a statutory scheme,

The defendants filed their opposition to the motions for a
preliminary injunction on July 2, 2020, and this Court heard
oral argument on the motions on August 13, 2020.

This Court has subject matter jurisdiction over this action
pursuant to 28 U.S.C. §§ 1331 and 1343; personal jurisdiction is
not contested; and venue is proper.

**II.**

A preliminary injunction is "one of the most drastic tools
in the arsenal of judicial remedies," Grand River Enter. Six
Nations, Ltd. v. Pryor, 481 F.3d 60, 66 (2d Cir. 2007) (per
curiam) (citation omitted), and "never awarded as of right."
Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008).
When seeking a "preliminary injunction against government action
taken in the public interest pursuant to a statutory scheme,

[moving parties] must demonstrate that (1) [they are] likely to succeed on the merits of the underlying claim, (2) [they] will suffer irreparable harm absent injunctive relief, and (3) the public interest weighs in favor of granting the injunction." Pope v. Cty. of Albany, 687 F.3d 565, 570 (2d Cir. 2012); Upstate Jobs Party v. Kosinski, 741 F. App'x 838, 839 (2d Cir. 2018).[6] A showing of irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction." Faiveley Transp. Malmo AB v. Wabtec Corp., 559 F.3d 110, 118 (2d Cir. 2009) (citation omitted).  The moving party must also demonstrate that the "balance of equities tips in [their] favor." Winter, 555 U.S. at 20.

---

[6] In the Second Circuit, when seeking an injunction that is "mandatory" (one that changes the status quo) a moving party is held to a heightened standard, requiring a demonstration of a "clear" or "substantial" likelihood of success on the merits and a "strong showing" of irreparable harm. See New York ex rel. Schneiderman v. Actavis PLC, 787 F.3d 638, 650 (2d Cir. 2015). Here, the SAM Party and WFP plaintiffs challenge statutory provisions that have already been enacted and taken effect. However, the consequences of the amended laws will not attach to the plaintiffs, as a matter of law, until after the November 2020 election.  Thus, much depends on how the status quo is characterized. Cf. Tom Doherty Assocs., Inc. v. Saban Entm't, Inc., 60 F.3d 27, 34 (2d Cir. 1995) ("Confusion . . . as to whether an injunction is mandatory or prohibitory may stem from the meaning of 'status quo.'"). It is unnecessary to decide whether the heightened standard applies, because the plaintiffs have failed to satisfy even the regular standard.

As explained below, the plaintiffs have failed to demonstrate that they are likely to succeed on the merits of any of their claims, that they will suffer irreparable harm without an injunction, or that the public interest or balance of equities weigh in their favor.

**a.**

The United States Constitution "grants States broad power to prescribe the 'Times, Places and Manner of holding Elections for Senators and Representatives,' Art. I, § 4, cl. 1, which power is matched by state control over the election process for state offices." Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 451 (2008) (quoting Clingman v. Beaver, 544 U.S. 581, 586 (2005)).  While the "First Amendment protects the rights of citizens to associate and form political parties for the advancement of common political goals and ideas," the Supreme Court and courts in this Circuit have recognized that "States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder." Timmons v. Twin Cities Area New Party, 520 U.S. 351, 358 (1997); Storer v. Brown, 415 U.S. 724, 730 (1974)("As a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes."); Person, 467 F.3d at 144; Prestia v.

18

O'Connor, 178 F.3d 86, 88 (2d Cir. 1999) (per curiam). Since "each provision of [election law], whether it governs the registration and qualifications of voters, the selection and eligibility of candidates, or the voting process itself, inevitably affects—at least to some degree—the individual's right to vote and his right to associate with others for political ends," Burdick v. Takushi, 504 U.S. 428, 433 (1992), courts do not subject each election law or regulation to "strict scrutiny" nor "require that [each] regulation be narrowly tailored to advance a compelling state interest." Id.  To do so would "tie the hands" of state governments, Id., "hamper the ability of States to run efficient and equitable elections, and compel federal courts to rewrite state electoral codes." Clingman, 544 U.S. at 593.

Instead, when faced with a challenge to a state election law, federal courts are instructed to "weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights." Burdick, 504 U.S. at 434 (quoting Anderson v. Celebrezze, 460 U.S. 780, 789 (1983)).  While voting and ballot "[r]egulations imposing

severe burdens on plaintiffs' rights must be narrowly tailored and advance a compelling state interest," lesser burdens "trigger less exacting review." Timmons, 520 U.S. at 358. "When a state electoral provision places no heavy burden on associational rights, 'a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions.'" Clingman, 544 U.S. at 593 (quoting Timmons, 520 U.S. at 358 (internal quotations omitted)).

While restrictions placed on a political party implicate the First Amendment rights of its supporters, Anderson, 460 U.S. at 786, political parties themselves "have no constitutional right to appear on a ballot." Person, 467 F.3d at 144 (citing Prestia, 178 F.3d at 88-89). Parties do not have a specific "right to use the ballot itself to send a particularized message." Timmons, 520 U.S. at 363 ("Ballots serve primarily to elect candidates, not as forums for political expression."). Courts have long understood that "States may condition access to the general election ballot by a minor-party or independent candidate upon a showing of a modicum of support among the potential voters for the office." Munro v. Social Workers Party, 479 U.S. 189, 193 (1986). See also Prestia, 178 F.3d at 88 (noting states' "important interest in requiring some preliminary showing of a significant modicum of support" before

permitting candidates to appear on a general election
ballot)(quoting Jenness v. Fortson, 403 U.S. 431, 442 (1971)).

In this case, the burdens placed on the rights of the SAM
Party, the WFP, and their supporters, while not trivial, are not
severe.  The amendments enacted by the New York State
Legislature to the party qualification requirements were adopted
in the pursuit of valid, important regulatory interests, and
such interests are of sufficient weight to warrant the
limitations placed upon the plaintiffs. Taken together, the
Party Qualification Threshold and Party Qualification Method are
reasonable, nondiscriminatory policy choices to advance valid
regulatory interests, within the boundaries that the First and
Fourteenth Amendments prescribe. Accordingly, the SAM Party and
the WFP have failed to demonstrate that they are likely to
succeed on the merits, such that a preliminary injunction
is warranted.

1.

The SAM Party and the WFP plaintiffs argue that the Party
Qualification Threshold and Party Qualification Method place
"severe" burdens upon their First and Fourteenth Amendment
rights, warranting strict scrutiny.  The SAM Party claims that
"[r]equiring the [SAM Party] to nominate a candidate for
President or else lose 'party' status imposes a severe burden"
on the SAM Party and its supporters, SAM. Am. Compl. ¶ 73.  The

21

SAM Party further claims that, because the SAM Party "will not nominate a candidate for President," the Party Qualification Threshold will "bar[] [SAM Party] from the ballot." SAM. Am. Compl. ¶ 74.  The WFP plaintiffs claim that "[r]equiring ANY [sic] Political Party to nominate a candidate for President and to obtain 2% of 130,000 votes or else lose 'party' status imposes a severe burden." SAM Party Compl. ¶ 56.

When assessing whether a challenged provision places a "severe burden" upon a plaintiff's First and Fourteenth Amendment rights, courts in this Circuit are instructed to "consider the alleged burden imposed by the challenged provision in light of the state's overall election scheme." Schulz v. Williams, 44 F.3d 48, 56 (2d Cir. 1994) (finding a signature threshold requirement was not a "severe burden").  "The hallmark of a severe burden is exclusion or virtual exclusion from the ballot." Libertarian Party of Connecticut v. Merrill, No. 3:20-CV-0467, 2020 WL 3526922, at *8 (D. Conn. June 27, 2020) (quoting Libertarian Party of Kentucky v. Grimes, 835 F.3d 570, 574 (6th Cir. 2016)).  As such, state election laws are less likely to impose impermissibly severe burdens, if minor party candidates have other channels to seize upon the "availability of political opportunity." Munro, 479 U.S. at 199 (upholding a Washington State 'blanket' primary, in which minor-party candidates needed to secure more than 1 percent of votes cast in

order to be placed on the general election ballot as an acceptable "vehicle by which minor-party candidates must demonstrate voter support")(internal quotations omitted) .

Here, based on precedent from similar election laws and the other avenues available to the SAM Party and the WFP for supporting candidates for public office, the burdens imposed by the Party Qualification Threshold and Party Qualification Method to demonstrate a modicum of voter support are not severe.

First, the WFP's claim that the Party Qualification Threshold (of 130,000 votes or 2 percent of the votes cast) is a "severe burden" is unpersuasive, in light of precedent upholding ballot access provisions requiring demonstrations of a much higher "modicum of support" than the quantum Party Qualification Threshold requires. For example, in Jenness v. Fortson, the Supreme Court upheld a Georgia election law that required a political organization's candidate to receive 20 percent or more of the votes in the most recent gubernatorial or presidential election to be a recognized "political party," and required all other political organizations to secure the signatures of 5 percent of the voters in the state to get their candidates on the ballot. 403 U.S. 431, 434 (1971). The Jenness court examined the totality of opportunities available for political candidates under Georgia's Election Laws and emphasized that the availability of nominating petitions and write-in votes left

sufficient channels to avoid "freez[ing] the status quo" and to "recognize[] the potential fluidity of American political life." Id. at 439.  Other ballot access provisions requiring demonstrations of support from higher percentages of votes cast in a previous election or of registered voters (a more challenging denominator) have similarly been upheld. See, e.g., Prestia, 178 F.3d at 88 (noting that states' "important interest in requiring some preliminary showing of a significant modicum" meant that "a requirement that ballot access petitions be signed by at least 5% of the relevant voter pool is generally valid, despite any burden on voter choice that results when such a petition is unable to meet the requirement"); Hewes v. Abrams, 718 F.Supp. 163, 167 (S.D.N.Y. 1989) ("[U]nder Jenness a standardized 5% signature requirement would be constitutional ...."), aff'd, 884 F.2d 74, 75 (2d Cir. 1989) ("affirm[ing] substantially for the reasons stated by" the district court); Rainbow Coal. of Okla. v. Okla. State Election Bd., 844 F.2d 740, 743 (10th Cir. 1988) (relying on Jenness and stating that a requirement for minor parties to obtain a number of voter signatures equal to 5 percent of the votes cast in the last presidential or gubernatorial election is "undeniably constitutional"). In short, the WFP has failed to demonstrate the quantum of the Party Qualification Threshold is such a "severe burden" such that strict scrutiny should be applied.

24

Next, both sets of plaintiffs argue that the Party
Qualification Method, which requires a biennial qualification
and thereby requires qualification in both gubernatorial and
presidential elections, places severe burdens upon them and
their supporters, warranting strict scrutiny.[7]  The SAM Party
argues that the Party Qualification Threshold forces the SAM
Party to run a presidential candidate or lose party status.  The
SAM Party claims that running a presidential candidate would be
against to its chosen strategy, requiring the SAM Party to make
a "180-degree shift" and "to speak to national issues—such as
abortion, immigration, and military spending—on which SAM does
not have and does not want a formal position." Volpe Decl. ¶ 33.
However, the SAM Party's record belies its claims that running a
presidential candidate would be as severe a burden as the SAM
Party plaintiffs insist.  The SAM Party claims it has devised a
special selection methodology, a "scorecard," to nominate
candidates from across the political spectrum, that match the

_____

[7]  The WFP's claim that this restriction is a "severe burden" is
undercut by the fact that the WFP has run presidential
candidates in each of the last five elections.  The certified
election results supplied in Brehm Decl. Ex. A, appear to show
that WFP presidential candidates have received over 130,000
votes on the WFP ballot line in the 2004, 2008, 2012, and 2016
Presidential elections, and would have also satisfied the 2
percent threshold in at least two such elections.  See also
Brehm Decl. ¶ 24 ("Since 2006, WFP achieved more than 2% of the
vote in 4 out of 11 general elections for president or
governor.").

SAM Party's commitment for transparency, accountability,
electoral reform, and problem-solving. Yet, the SAM Party has
failed to articulate a convincing explanation why it could not
apply such a scorecard to nominate, or cross-nominate, a
candidate for president.[8]  The SAM Party has already selected and
run its own gubernatorial candidate, and a gubernatorial
candidate must take positions on difficult, substantive issues.
The SAM Party's claim not to want to take positions on issues
that are "national in scope" seems at odds with the fact that
the SAM Party has already nominated candidates for federal
offices, Tr. at 23, that similarly will be forced to take
positions on national, substantive issues. The SAM Party has
failed to demonstrate why running a presidential candidate would
be so categorically different or harmful.

In any event, the Party Qualification Method does not
require the SAM Party to run a presidential candidate of its own
or to cross-designate a candidate of one of the other parties.
The SAM Party is left with a choice – which includes the
continued opportunity to seek paths to the ballot other than a

---

[8] The SAM Party's affiliated national SAM website, on a page that
claims a 2019 copyright, exclaims that the SAM Party intends to
run candidates "[i]n all 50 states, from dog catcher to
president. See Hallak Decl. Ex. E; https://joinsam.org/our-
party/how-we-win/. At oral argument, counsel for the SAM Party
stated that the reference to "president" was intended to have
been deleted after the SAM Party decided to change its strategy
and that the web designers "missed" a reference. Tr. At 24.

party "berthing." The SAM Party plaintiffs have pointed to no
authority to support their contention that the "choice" they
are faced with is a severe burden, given that the SAM Party
will still have means for accessing the state general
election ballots for its candidates, even if it loses party
status. Tr. at 31-32.

The reasoning of the Second Circuit Court of Appeals in
Person v. New York State Board of Elections undermines the SAM
Party's argument. 467 F.3d at 141, 144. In Person, the plaintiff
argued that the New York Election Law's reference to votes
received in gubernatorial elections, as a requirement for party
status, was impermissible, because it forced parties "to
nominate and place their emphasis upon obtaining votes for their
gubernatorial candidate instead of a different statewide
candidate they might have preferred to nominate and support."
Id. at 144.  The Person court, found that "it does not appear
that the state is forcing [the plaintiff's] party to divert its
resources in any particular way, nor that it is impermissibly
interfering with the internal management of parties' affairs,
because parties are free to choose not to seek official status."
Id.  Therefore, the requirement that linked party status to
receiving a minimum number of votes in the gubernatorial
election did not violate either the plaintiff's or "to the
extent they exist, his party's rights."  Id.  The SAM Party is

27

free to choose whether it intends to endorse a candidate for president or not.  That the SAM Party's chosen political strategy could lead to practical consequences through its loss of party status is not sufficient to demonstrate the Party Qualification Method places a "severe burden" warranting strict scrutiny. See Green Party of Arkansas v. Martin, 649 F.3d 675, 683 (8th Cir. 2011) (upholding a similar ballot access restriction which required parties to receive 3 percent of the votes cast in the previous gubernatorial or presidential election, over objections that it interfered with the Green Party's "strategy").

Both sets of plaintiffs seek to rely upon a single sentence in the opinion of the Sixth Circuit Court of Appeals in Libertarian Party of Kentucky v. Grimes, a case in which the Court of Appeals actually upheld a law requiring that a party demonstrate its candidate had received 2 percent or more of the vote in the last presidential election to gain automatic ballot access. 835 F.3d 570, 576 (6th Cir. 2016). In the sentence in which the plaintiffs seek comfort, the Grimes Court declined to consider a hypothetical case, offered by the appellants, of a party who had not previously run a presidential candidate needing to do so for the first time in order to achieve automatic ballot access. Grimes, 835 F.3d at 576 (noting that "while that argument may have some force, . . . the hypothetical

burden of Kentucky's regulation on a hypothetical party has no
bearing on appellants, and we do not decide how severe, if at
all, such a burden would be").  A hypothetical case that the
Court of Appeals did not decide offers no support for the
plaintiffs' argument here.  The plaintiffs ignore the <u>Grimes</u>
court's holding and reasoning – that the party qualification
restriction at issue "cannot constitute exclusion or virtual
exclusion" because the "alternative option of filing petitions
for each candidate's candidacy remain[s] . . . a reasonable
means of ballot access.  835 F.3d at 575-76.  Like the
plaintiffs in <u>Grimes</u>, the SAM Party and the WFP still have
available such an alternative option for ballot access, by
having their candidates secure their place on the ballot through
independent nominating petitions.  Candidates accessing the
ballot through independent nominating petitions similarly have
access to the public campaign finance system for the general
election, provided they can satisfy the other eligibility
criteria and thresholds. <u>See</u> N.Y. Elec. Law § 14-203(1)(b). That
New York, unlike Kentucky, allows for fusion voting, further
underscores that the Party Qualification Method leaves open to
the SAM Party and the WFP a sufficient number of channels for
political opportunity.

Finally, both sets of plaintiffs point to language in three
cases in which the Supreme Court found regulations of party

primaries to be "severe" burdens because such regulations interfered with political parties' selection of their nominee. Cal. Dem. Party v. Jones, 530 U.S. 567, 581 (2000) (holding California's "blanket" primary process, in which each voter's primary ballot listed every candidate, regardless of party affiliation, and allowed voters to choose freely among them, was a "severe" burden); Eu v. S.F. County Dem. Cent. Comm., 489 U.S. 214, 223-24 (1989) (finding California Elections Code provisions that, among other things, banned party governing bodies from endorsing their preferred primary candidates, violated the First and Fourteenth Amendments); Tashjian v. Republican Party of Connecticut, 479 U.S. 208, 215-16 (1986)(finding a Connecticut law that only permitted registered party members to vote in primary elections to violate the rights of a party which sought to permit unaffiliated voters participate in its primary). Simply put, these cases are inapposite.  The Party Qualification Method does not infringe on the internal processes of political parties.  The Party Qualification Method does not, in any way, "adulterate" the plaintiffs' primary process, by, for example "opening it up to persons wholly unaffiliated with the party," Jones, 530 U.S. at 581, or by preventing the governing bodies of the SAM Party or the WFP from endorsing or opposing a candidate in an election, Eu, 489 U.S. at 223-24, or by placing limits upon the "group of registered voters whom the [plaintiffs] may

invite to participate in the basic function of selecting the
[SAM Party or the WFP] candidates." Tashjian, 479 U.S. at 215-16
(quotation marks and citation omitted). See also Green Party of
Arkansas v. Martin, 649 F.3d 675, 682 (8th Cir. 2011) (rejecting
similar arguments based on Jones, Eu, and Tashjian, advanced by
plaintiffs opposing a party qualification requirement that
required a threshold of performance in past gubernatorial or
presidential elections). Instead, the SAM Party and the WFP
remain free "to canvass the electorate, enroll or exclude
potential members, nominate the candidate of its choice, and
engage in the same electoral activities as every other party,"
or aspiring party, in New York.  Clingman, 544 U.S. at 587.  The
SAM Party and the WFP each still have "great latitude in [their]
ability to communicate ideas to voters and candidates," because
the election laws at issue here do not restrict the plaintiffs'
ability to "endorse, support, or vote for anyone they like," do
not "directly limit the party's access to the ballot," and are
"silent on the parties' internal structure, governance, and
policymaking." Timmons, 520 U.S. at 363.

Therefore, neither the Party Qualification Threshold nor
the Party Qualification Method rises to the level of being a
"severe burden" on the SAM Party, the WFP, or their supporters'
First or Fourteenth Amendment rights.

2.

Because neither the Party Qualification Threshold nor the Party Qualification Method place "severe" burdens upon the First Amendment rights of the SAM Party or the WFP, New York's asserted regulatory interests "need only be sufficiently weighty to justify the limitation imposed on the [plaintiffs'] rights." Timmons, 520 U.S. at 364 (internal quotation marks and citation omitted). See also Burdick, 504 U.S. 428, 434 (1992) (quoting Anderson, 460 U.S. at 788). Because the interests offered by New York are valid and "sufficiently weighty," and the amendments to the Party Qualification Threshold and the Party Qualification Method are reasonable, nondiscriminatory measures, designed to further such interests, the SAM Party and the WFP plaintiffs have failed to show they are likely to prevail on the merits.

The State of New York has offered several important regulatory interests to justify the Party Qualification Threshold and Party Qualification Method.  The amended party qualification requirements help ensure that candidates appearing on the ballots enjoy a "modicum" of support, thereby assisting in maintaining an organized, uncluttered ballot; preventing voter confusion and frustration; avoiding fraudulent and frivolous candidacies; and assisting the maintenance of an efficient public finance system. See Mulroy Decl. ¶¶ 34-36 (discussing ballot confusion); Brehm Decl. ¶¶ 31-42 (discussing

32

ballot complexity and voter confusion), ¶¶ 45-47 (discussing how
the amended party qualifications help to ensure public campaign
funding does not go towards frivolous intra-party primary
campaigns). See Munro, 479 U.S. at 193-94 (affirming the
validity of states' interest in avoiding frivolous candidates
and ensuring candidates on ballots enjoy a "modicum" of
support); Storer, 415 U.S. at 732 (affirming the validity of
states' interest in preventing overcrowded ballots and voter
confusion); Green Party of Connecticut v. Garfield, 616 F.3d
213, 232 (2d Cir. 2010) (affirming the validity of a state's
interest in not funding "hopeless" candidates through a public
campaign funding system)(citation omitted). As noted in the
Commission's Report, the Commission believed "setting a rational
threshold for party ballot access, based on a demonstration of
credible levels of support from voters in this state, helps to
ensure that the political parties whose candidates will draw
down on public funds under the public matching program reflect
the novel and distinct ideological identities of the electorate
of New Yorkers who ultimately fund this public campaign finance
system."  Report at 14-15.  The Commission's Report makes clear
that its recommendations, which the New York State Legislature
enacted, were in furtherance of these valid interests, and that
the Commission sought to tailor its recommendations in
reasonable, nondiscriminatory furtherance of such valid

interests.  Timmons, 520 U.S. at 364 (noting the Burdick-Anderson balancing test does not "require elaborate, empirical verification of the weightiness of the State's asserted justifications"); Munro, 479 U.S. at 194-95 ("We have never required a State to make a particularized showing of the existence of voter confusion, ballot overcrowding, or the presence of frivolous candidacies prior to the imposition of reasonable restrictions on ballot access.").

The party qualification standards, encompassing both the Party Qualification Threshold and the Party Qualification Method, are well within the election law requirements upheld in other cases and further the reasonable goals of avoiding overcrowded ballots and voter confusion and ensuring that candidates who appear on the ballot enjoy a "modicum of support."  See, e.g., Jenness, 403 U.S. at 440-41 (upholding a Georgia statute that required organizations have candidates receive 20 percent of the votes in a specified election to qualify for party access, and 5 percent for ballot access); Prestia, 178 F.3d at 88 (noting that ballot access petitions requiring demonstrations of support of "at least 5% of the relevant voter pool is generally valid, despite any burden on voter choice that results when such a petition is unable to meet the requirement"). See also Martin, 649 F.3d at 683 (upholding a requirement for a political party to obtain 3 percent of the

vote in the next general election); Libertarian Party of Ill. v.
Rednour, 108 F.3d 768, 775 (7th Cir. 1997) (relying on Jenness
and upholding a signature requirement based on 5 percent of the
vote in the past gubernatorial election); McGlaughlin v. N.C.
Bd. Of Elections, 65 F.3d 1215, 1222 (4th Cir. 1995) (upholding
North Carolina election laws requiring a petition containing
signatures of 2 percent of votes cast in the past gubernatorial
election for a party to gain access to ballot and requiring
party's candidate for president or governor to receive 10
percent of votes in the general election for the party to remain
on the ballot); Rainbow Coalition, 844 F.2d at 744 (upholding a
requirement of 5 percent of the votes cast in the last general
election to become a party and concluding that "the five percent
requirement itself is undeniably constitutional"); Aruntunoff v.
Okla. State Election Board, 687 F.2d 1375, 1378-80 (10th Cir.
1982)(upholding an Oklahoma law requiring that a party receive
10 percent of the vote in the last gubernatorial or presidential
election to maintain its party status).

The WFP alleges that the new Party Qualification Threshold
will eliminate "nearly all parties that are currently
qualified," and points to the 2018 gubernatorial election in
which of the "eight minor parties" (those other than the
Republican and Democratic parties) only one would have satisfied
the new Party Qualification Threshold. Winger Decl. ¶ 6.

35

However, the Commission looked at past gubernatorial and presidential elections, and it appears that more parties would be able to achieve the threshold.  See, e.g., Brehm Decl. Ex. A. In any event, the Supreme Court has made clear that states have valid, and "sufficiently weighty," reasons to limit ballot access to parties with a "modicum" of support. See Timmons, 520 U.S. at 364; Jenness, 403 U.S. at 442.  New York is not required to predict what the specific effects of reasonable ballot restrictions will be or the number of political organizations that will be able to maintain party status, by achieving that sufficient "modicum" of support.

The SAM Party and the WFP both argue that the changes made to the Party Qualification Method, requiring that parties requalify biennially based on their performance in alternating presidential or gubernatorial elections, even if not found to be severe, cannot survive a lower level of scrutiny. But, the Party Qualification Method of looking to statewide races, every two years, is a reasonable method for measuring whether parties continue to enjoy a sufficient "modicum" of support.  Courts have regularly found the use of popular vote totals in previous elections to be an appropriate measure of public support. See, e.g., Jenness, 403 U.S. at 439-440; Green Party of Connecticut, 616 F.3d at 232 (noting that "popular vote totals in the last election are a proper measure of public support") (quoting

Buckley v. Valeo, 424 U.S. 96, 99 (1976)).  Many states other
than New York link party status to votes received in specified
elections. Mulroy ¶ 14. (noting at least 21 states require
parties to demonstrate that they have a requisite amount of
support by receiving votes in specified elections either to
become or to remain a party).  While states vary in how
frequently they require parties to requalify, at least 18 other
states require parties to meet certain state requirements to
remain a party at least annually.  Mulroy ¶ 13.  Further, as the
Committee noted in its report, "[o]f the [15] states that
require qualification every two years or at every general
election, twelve have thresholds at 2 [percent] or higher."
Report at 45.

     Both the WFP and the SAM Party plaintiffs seek to analogize
the use of the alternating reference to presidential and
gubernatorial elections to the decision by the Court of Appeals
for the Seventh Circuit in Libertarian Party of Ill. V. Scholz.
872 F.3d 518 (7th Cir. 2017).  In that case, the Court of
Appeals invalidated an Illinois ballot access statute that
required parties to run a "full slate" of candidates for "each
race in the relevant political subdivision" in order to maintain
party status. Id. at 521.  Scholz is inapposite.  The party
qualification requirement in Scholz is far more burdensome for
parties—nascent or otherwise—than the New York qualification

37

criteria at issue here.  New York parties need only focus on one race to requalify, and New York (unlike Illinois) permits fusion voting. Mulroy Decl. ¶ 49.  Moreover, the Seventh Circuit Court of Appeals found that the "full slate" requirement was not sufficiently related to the justifications offered by Illinois (relating to demonstrating a modicum of support and seriousness of the candidates), because merely running candidates for a race did not in any way guarantee their seriousness or level of support. Scholz, 872 F.3d at 525-26. By contrast, the New York Party Qualification Method focuses exclusively on a party's ability to build support for a candidate on a statewide basis. The criterion – number of votes in a statewide election – is directly linked to the goals advanced by New York. Further, New York's fusion voting reduces the burden such a restriction places upon minor parties.

The Commission, upon whose recommendations the New York State Legislature acted, considered a variety of measures to ensure that parties automatically appearing on the ballot and enjoying access to the public campaign finance system for their primary would enjoy a "modicum" of support, and sought to reach a reasonable, nondiscriminatory compromise in furtherance of valid interests.[9] The Party Qualification Threshold ultimately

---

[9] Brehm Decl. ¶ 44-45.  The plaintiffs have filed exhibits suggesting that, because the access to the public campaign

enacted is not so high and burdensome that it outweighs the
state's valid regulatory interests. Munro, 479 U.S. at 198
("States are not burdened with a constitutional imperative to
reduce voter apathy or to 'handicap' an unpopular candidate to
increase the likelihood that the candidate will gain access to
the general election ballot.")  The Party Qualification
Threshold (of 130,000 votes, or 2 percent of the total votes

---

finance system requires both a minimum qualifying threshold of
funds raised from a minimum number of donors, and is also
subject to certain caps, including a $5,000 cap for primary race
candidates in smaller party primaries (specifically party
primaries with fewer than 1,000 eligible primary voters), New
York's cost-focused justifications, relating to minor party
primaries, are not compelling. See N.Y. Elec. Law §§ 14-203(a),
14-204(5).  While these arguments suggest it may not have been
necessary to consider potential expense when raising the Party
Qualification Threshold and requiring a more frequent Party
Qualification Method, or that alternative policy options
existed, these arguments do not show that it was impermissible
to consider such potential costs. First, limiting access to
public money, even if the amount is "only" $5,000, "serves the
important public interest against providing artificial
incentives to splintered parties and unrestrained factionalism."
Green Party of Connecticut, 616 F.3d at 231 (quoting Buckley,
424 U.S. at 96).  Further, it was reasonable for the New York
State Legislature and the Commission to have been concerned that
a public campaign finance system may modify behavior, making
running for office more attractive, at some expense to the
public campaign finance system. Munro, 479 U.S. at 195-96
("Legislatures ... should be permitted to respond to potential
deficiencies in the electoral process with foresight rather than
reactively, provided that the response is reasonable and does
not significantly impinge on constitutionally protected
rights"). In any event, the remaining reasons for the
restrictions on continued ballot access for parties were
sufficiently weighty to justify such restrictions, even without
considering any benefits relating to the public campaign finance
system.

cast), while not set at a level the WFP would prefer, is not so disproportionate or unreasonable as to be unconstitutional. Similarly, the Party Qualification Method of measuring a party's performance in a statewide race biennially is a reasonable, proportionate policy choice to ensure parties continue to enjoy a sufficient "modicum" of support.  Accordingly, the SAM Party and the WFP plaintiffs have failed to show that the adoption of either the Party Qualification Threshold or the Party Qualification Method warrants the strong judicial remedy of overturning a validly enacted act of the New York State Legislature.

For the reasons state above explaining why the WFP plaintiffs have failed to demonstrate the likelihood of success on the merits of their claims that the New York Election Law provisions at issue are unconstitutional as applied to them, the WFP plaintiffs have failed to make the much higher showing required to demonstrate a likelihood of success on the merits of their facial challenge. Wash. State Grange, 552 U.S. at 449 (upholding an election law restriction and noting "a plaintiff can only succeed in a facial challenge by "establish[ing] that no set of circumstances exists under which the Act would be valid," i.e., that the law is unconstitutional in all of its applications") (quoting United States v. Salerno, 481 U.S. 739, 745 (1987)).

**b.**

The plaintiffs have also failed to establish that absent a preliminary injunction they will likely suffer "an injury that is neither remote nor speculative, but actual and imminent and one that cannot be remedied if a court waits until the end of trial to resolve the harm." Freedom Holdings, Inc. v. Spitzer, 408 F.3d 112, 114 (2d Cir. 2005) (internal quotations omitted). For purposes of a preliminary injunction, the plaintiffs must show that the probability that harm would occur without an injunction is more than a "possibility." JSG Trading Corp. v. Tray-Wrap, Inc., 917 F.2d 75, 79 (2d Cir. 1990).  For cases where the alleged injury relates to violations of First Amendment rights on the merits of the action, the presence of irreparable injury "turns on whether the plaintiff has shown a clear likelihood of success on the merits." Beal v. Stern, 184 F.3d 117, 123-24 (2d Cir. 1999). Here, the plaintiffs have failed to demonstrate that they will suffer injuries which justify the extraordinary remedy of a preliminary injunction, especially because the plaintiffs have failed to demonstrate their likelihood of success on the merits of their claims.

The WFP plaintiffs' primary theory for irreparable harm seems to be concern that they will fail to secure enough votes

in the November election to maintain party status.[10]  Such an
injury is too speculative to warrant a preliminary injunction
and is not "irreparable" without relief granted at this time.
It is far from certain that the WFP will fail to achieve the
required number of votes. But, even if the WFP did fail to meet
that threshold, the WFP could pursue relief at that time.

The SAM Party has advanced a more unusual theory of harm,
which is similarly unpersuasive.  For the reasons explained
above, the SAM Party's claimed injuries suffered from alleged
violations of the First and Fourteenth Amendment rights of the
SAM Party and its supporters are without merit. As such, the
possibility that the Party Qualification Method may interfere
with the SAM Party of New York's chosen strategy for the 2020
elections is not sufficient to demonstrate irreparable harm
warranting a preliminary injunction. Further, if the SAM Party
chooses not to nominate or cross-nominate a presidential
candidate and forfeits requalification as a party, the SAM Party
would still have other ways to access the ballot and
communicate with voters.  The SAM Party could also seek relief
at that point.

---

[10] The WFP has failed to provide an explanation for how the Party
Qualification Threshold or the Party Qualification Method affect
their behavior.  Unlike the SAM Party, the WFP has already run a
presidential candidate in each election after the WFP was
established.

**c.**

When considering whether the preliminary injunction is
warranted, federal courts must "balance the competing claims of
injury and must consider the effect on each party of the
granting or withholding of the requested relief," as well as
"the public consequences in employing the extraordinary remedy
of injunction." Yang v. Kosinski, 960 F.3d 119, 135–36 (2d Cir.
2020) (quoting Winter, 555 U.S. at 24). While the Party
Qualification Threshold and Party Qualification Method may
result in burdens and practical difficulties for both sets of
plaintiffs, these burdens are outweighed by New York State's
important regulatory interests. Further, with respect to the
timing of possible relief, the SAM Party and the WFP plaintiffs
have failed to demonstrate harm they would incur absent a
preliminary injunction. By contrast, New York has a strong
interest in beginning to develop and implement the important
electoral reforms contained within Part ZZZ, without the delay
of further proceedings. Based on these considerations, the
balance of equities and the public interest do not favor a
preliminary injunction.

## CONCLUSION

The Court has considered all of the arguments raised by the
parties. To the extent not specifically addressed, the

43

arguments are either moot or without merit.  The SAM Party
plaintiffs' and the WFP plaintiffs' motions for preliminary
injunctions are **denied**.  The Clerk is directed to close all
pending motions.


**SO ORDERED.**


**Dated:     New York, New York**
            **September 1, 2020**         _____/s/ John G. Koeltl_____
                                            **John G. Koeltl**

                                    **United States District Judge**