**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
――――――――――――――――――――――――

**SAM PARTY OF NEW YORK, ET AL.,**                 <u>**OPINION AND ORDER**</u>

                        **Plaintiffs,**

            **- against -**                        **20-cv-323 (JGK)**

**KOSINSKI, ET AL.,**

                        **Defendants.**
――――――――――――――――――――――――

**HURLEY, ET AL.,**

                        **Plaintiffs,**

            **- against -**                        **20-cv-4148 (JGK)**

**KOSINSKI, ET AL.,**

                        **Defendants.**
――――――――――――――――――――――――

**LIBERTARIAN PARTY OF NEW YORK, ET**
**AL.,**

                        **Plaintiffs,**

            **- against -**                        **20-cv-5820 (JGK)**

**NEW YORK BOARD OF ELECTIONS, ET AL.,**

                        **Defendants.**
――――――――――――――――――――――――

**JOHN G. KOELTL, District Judge:**

     The plaintiffs, New York State political organizations and
their supporters, brought these actions to challenge recent
amendments to the New York Election Law. The challenged
amendments heightened the requirements that a political
organization must meet in order to be recognized as a "party"
under the Election Law. Specifically, the amendments at issue:

1

increased the overall number of votes required for a political organization to qualify as a party (the "Party Qualification Threshold"), increased the frequency with which parties must requalify to retain their party status (the "Party Qualification Method"), and increased the number of signatures required for a non-party candidate to gain access to the ballot via an independent nominating petition (the "Petition Requirement").

The plaintiffs in the SAM Party action are the SAM (Serve America Movement) Party of New York and Michael J. Volpe, the Chairman of the SAM Party of New York (together, the "SAM Party" or "SAM Party plaintiffs"). The SAM Party plaintiffs specifically challenge the amended Party Qualification Method's reliance on presidential-election returns (as opposed to only gubernatorial-election returns). The SAM Party plaintiffs argue that the amended Party Qualification Method, as applied to them, violates their First Amendment rights to freedom of speech and association, as well as the Fourteenth Amendment equal protection and due process rights of the SAM Party and its supporters.

The plaintiffs in the Hurley action are Linda Hurley, Rev. Rex Stewart, Robert Jackson, Richard N. Gottfried, Ryuh-Line Niou, Anita Thayer, Jonathan Westin, the New York State Committee of the Working Families Party, the Executive Board of the New York State Committee of the Working Families Party, and

the Working Families Party of New York State (together, the "WFP" or "WFP plaintiffs"). The WFP plaintiffs bring freedom of association, equal protection, and due process challenges to the Party Qualification Method and the Party Qualification Threshold, facially and as applied to WFP. The WFP plaintiffs further allege that the amendments to the Election Law violate the New York State Constitution because they interfere with the right to "fusion voting."[1]

The plaintiffs in the Libertarian Party action are the Libertarian Party of New York ("LPNY"), the Green Party of New York ("GPNY"), and individual members of both parties (together, the "LPNY plaintiffs"). The LPNY plaintiffs bring First and Fourteenth Amendment challenges to the Party Qualification Method, the Party Qualification Threshold, and the Petition Requirement. The LPNY plaintiffs allege that the amendments are unconstitutional on their face and as applied to the LPNY plaintiffs. The LPNY plaintiffs also allege that the amendments to the New York Election Law violate Article VII, Section 6 of

---

[1] Under a fusion voting system, "the same candidate for office can be listed on each of several parties' designated ballot lines and earns the total votes cast on all his or her ballot lines." <u>SAM Party of N.Y. v. Kosinski</u>, 987 F.3d 267, 272 (2d Cir. 2021) (citing N.Y. Elec. Law § 7-104). The WFP plaintiffs argue that the "Constitution and laws of [New York] State guarantee the right of fusion voting." WFP Compl. ¶ 68.
   Unless otherwise noted, this Opinion and Order omits all alterations, citations, footnotes, and internal quotation marks in quoted text.

the New York State Constitution because the amendments became law as provisions of a budget bill.

All the plaintiffs brought suit pursuant to 42 U.S.C. § 1983 against the New York State Board of Elections (the "Board"), as well as the Board's chairs, commissioners, and executive directors in their official capacities.

The defendants now move for summary judgment in each of the three referenced actions. For the reasons explained below, the defendants' motion is **granted.**

## I.

Although the cases are now in a different procedural posture, the questions at issue in this motion are similar to those that were posed by the plaintiffs' previous preliminary injunction motions. In those motions, the plaintiffs sought to enjoin the application of the same amendments to the New York Election Law that are at issue here. In addition, the LPNY plaintiffs sought an injunction requiring the Board to reinstate the Libertarian and Green Parties as recognized parties for the 2022 gubernatorial election. The Court denied the preliminary injunction motions by the SAM Party plaintiffs and the WFP plaintiffs in an Opinion and Order dated September 1, 2020. See SAM Party v. Kosinski, 483 F. Supp. 3d 245 (S.D.N.Y. 2020) ("SAM Party I"). The Second Circuit Court of Appeals affirmed that judgment on February 10, 2021, concluding that the SAM Party

plaintiffs had not shown a likelihood of success on the merits of their claims. See SAM Party of N.Y. v. Kosinski, 987 F.3d 267 (2d Cir. 2021) ("SAM Party II"). This Court denied the LPNY plaintiffs' preliminary injunction motion in an Opinion and Order dated May 13, 2021. See Libertarian Party of N.Y. v. N.Y. Bd. of Elections, No. 20-cv-5820, 2021 WL 1931058 (S.D.N.Y. May 13, 2021). An appeal of that decision is pending. See LPNY Docket No. 81.

In SAM Party I, the Court concluded that the SAM and WFP plaintiffs had not shown a likelihood of success on the merits of their First and Fourteenth Amendment claims under the two-step Anderson-Burdick framework.[2] At the first step, the plaintiffs failed to demonstrate that the amendments to the Election Law caused them severe burdens. See SAM Party I, 483 F. Supp. 3d at 261. At the second step, the Court found that the interests offered by New York in support of the amendments were valid and sufficiently important to justify any burdens that the amendments imposed on the plaintiffs. See id. In SAM Party II, the Second Circuit Court of Appeals reached the same conclusions

---

[2] See Anderson v. Celebrezze, 460 U.S. 780 (1983); Burdick v. Takushi, 504 U.S. 428 (1992). "'Under this standard, the rigorousness of [the] inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights.' First, if the restrictions on those rights are 'severe,' then strict scrutiny applies. 'But when a state election law provision imposes only reasonable, nondiscriminatory restrictions upon the First and Fourteenth Amendment rights of voters, the State's important regulatory interests are generally sufficient to justify the restrictions.'" SAM Party II, 987 F.3d at 274 (quoting Burdick, 504 U.S. at 434).

with respect to the SAM Party plaintiffs' claims. See 987 F.3d at 276, 278.[3] In Libertarian Party of N.Y., this Court reached the same conclusions with respect to the LPNY plaintiffs' claims, exploring in more detail the plaintiffs' challenge to the Petition Requirement. See 2021 WL 1931058, at *8-11, *13.

## II.

The factual background to these cases remains substantially unchanged from the background at the preliminary injunction stage. While the pertinent facts are set out again here, a more comprehensive discussion of the parties' backgrounds and the history of the New York Election Law can be found in this Court's preliminary injunction opinions. See id. at *1-5; SAM Party I, 483 F. Supp. 3d at 250-54.

Under the New York Election Law, a political organization that supports candidates for public office can be designated either as a "party" or an "independent body." N.Y. Elec. Law § 1-104(3), (12). Because party status carries important privileges,[4] a political organization that supports candidates

---

[3] The WFP plaintiffs did not appeal from the denial of their motion for a preliminary injunction.

[4] "One of the principal privileges of party status is a designated ballot line or 'berth.' [N.Y. Elec. Law] § 7-104(4). For several major offices, the winner of a party's nomination process is automatically included on the ballot. But independent bodies seeking to place candidates on the ballot must gather the requisite number of signatures for each candidate. Id. §§ 6-102, 6-104, 6-106, 6-114, 6-142. Parties also enjoy access to primaries administered by the government, automatic membership enrollment from voter-registration forms, and permission to maintain a financial account, exempt from ordinary contribution limits, to pay for office space and staff. Id. §§ 5-300, 14-124(3)." SAM Party II, 987 F.3d at 271-72.

for public office would generally prefer to be a party rather than an independent body. The amendments to the Election Law at issue, which were enacted in Sections 9 and 10 of Part ZZZ of the 2020-2021 Fiscal Year New York State Budget Bill, make it more difficult for political organizations to obtain and retain party status.

For 85 years, New York conferred party status on any political organization whose candidate in the prior gubernatorial election received at least 50,000 votes. Mulroy Decl., SAM Party Docket No. 84, Ex. 24 ¶ 12. This meant that political organizations had to qualify or requalify as parties every four years. The challenged amendments to the Election Law changed the frequency of party qualification and the number of votes needed to qualify. In order for a political organization to gain or retain party status under the amended law, its chosen candidate must receive the greater of 130,000 votes or 2% of votes cast in the previous presidential or gubernatorial election, whichever is more recent. N.Y. Elec. Law § 1-104(3). Thus, political organizations must now quality or requalify as parties every two years, and they need more votes to do so.

Independent bodies (political organizations that are not parties) are not provided with a guaranteed ballot berth. Rather, independent bodies must nominate candidates for public office through independent nominating petitions. Independent

nominating petitions must include signatures of a specified
number of registered voters, depending on the office for which
the candidate is being nominated. N.Y. Elec. Law § 6-142. Before
the challenged amendments, the signature requirement for an
independent nominating petition for statewide office was 15,000
signatures. Brehm Decl., SAM Party Docket No. 113 ¶ 57. Under
the amended law, nominating petitions for statewide office must
be signed by the lesser of 45,000 registered voters or 1% of the
votes cast in the last gubernatorial election. N.Y. Elec. Law §
6-142(1).[5]

The challenged amendments were based on recommendations of
the New York State Campaign Finance Review Commission (the
"Commission"), which was established by the New York legislature
to "examine, evaluate and make recommendations for new laws with
respect to how the State should implement . . . a system of
voluntary public campaign financing for state legislative and
statewide public offices, and what the parameters of such a
program should be." 2019 N.Y. Sess. Laws, Ch. 59, Part XXX §
1(a). The legislature instructed the Commission to make its

---

[5] The signatures must be from registered voters who have not yet signed a
different petition for the same office. N.Y. Elec. Law § 6-138(1). In
addition, at least 500 of the signatures (or 1% of enrolled voters, whichever
is less) must be from signatories residing in each of one-half of the State's
27 congressional districts. Id. § 6-142(1). Finally, the petition can only be
circulated during a specific, prescribed 6-week period. Id. § 6-138(4).
Nominating petitions for offices that are not statewide require fewer
signatures. See id. § 6-142(2).

recommendations "in furtherance of the goals of incentivizing candidates to solicit small contributions, reducing the pressure on candidates to spend inordinate amounts of time raising large contributions for their campaigns, and encouraging qualified candidates to run for office." Id. The Commission was also instructed to "determine and identify new election laws" relating to, among other things, "rules and definitions governing: candidates' eligibility for public financing; party qualifications; multiple party candidate nominations and/or designations." Id. § 2(j). In addition, the Commission was directed to design the public campaign finance system such that it could be administered with costs under $100 million annually. Id. § 3. The Commission was directed to submit its report by December 1, 2019. Id. § 1(a).

Initially, Part XXX provided that the Commission's recommendations "shall have the full effect of law unless modified or abrogated by statute prior to December 22, 2019." Id. However, the New York State Supreme Court, Niagara County, held that this was an impermissible delegation of lawmaking authority. See Hurley v. Pub. Campaign Fin. & Election Comm'n, 129 N.Y.S.3d 243, 261 (Sup. Ct. 2020). The legislature proceeded to enact the Commission's recommendations into law in Sections 9 and 10 of Part ZZZ of the 2020-2021 Fiscal Year New York State Budget Bill.

The Commission's Report to the Governor (the "Report")
recommended, among other things, the challenged amendments to
the Party Qualification Threshold, Party Qualification Method,
and Petition Requirement. In explaining its recommendation to
increase the frequency of party certification and the number of
votes required for certification, the Commission stated: the
"ability of a party to demonstrate bona fide interest from the
electorate is paramount in ensuring the success of a public
campaign finance system," and "setting a rational threshold for
party ballot access, based on a demonstration of credible levels
of support from voters in this state, helps to ensure that the
political parties whose candidates will draw down on public
funds under the public matching program reflect the novel and
distinct ideological identities of the electorate of New Yorkers
who ultimately fund this public campaign finance program."
Report, Hallak Decl., LPNY Docket No. 70, Ex. A, at 14.

The Commission believed that increasing the party ballot
access threshold and the frequency of party certification would
further New York's "longstanding policy" of maintaining
"proportionality between the number of voters in New York State
and the ability of political parties that assert a bona fide
representative status for those voters." Id. The Commission
concluded that these changes would "increase voter participation
and voter choice, since voters will now be less confused by

complicated ballots with multiple lines for parties that may not
have any unique ideological stances," and that the higher
thresholds would enable voters to "make more resolute choices
between candidates" because they could "rely upon the knowledge
that [the represented] parties have sufficient popular support
from the electorate of this state." Id. at 14–15. The Commission
also noted that its "primary motivation for . . . addressing
party ballot access [was] to craft a public campaign finance
system that remains within the enabling statute's limitation of
a $100 million annual cost." Id. at 14.

In selecting a "rational" vote qualification threshold, the
Commission considered New York's historical experience as well
as other states' party qualification criteria and nominating
petition thresholds. See id. at 41–47. The Commission considered
the frequency with which other states require parties to
requalify, the number of votes required to requalify, whether
qualification thresholds are made in reference to presidential
and/or gubernatorial elections, whether states have public
campaign finance systems, and whether states permit fusion
voting. See id.

The Commission ultimately recommended requiring party
certification every two years, and increasing the party ballot
access threshold to 2% of the total votes cast for governor or
president, or 130,000 votes, whichever is greater. The 2% vote

threshold was a compromise based upon the information considered and competing policy views, and the Commission initially considered, but ultimately rejected, a 3% threshold. See id. at 51 (Statement of Commissioner Kimberly A. Galvin), 67 (Statement of Commissioner John M. Nonna), 133 (Minutes from November 25 Meeting at Westchester Community College). One commissioner noted "widespread agreement" that the previous 50,000-vote threshold (which was set in 1935) was too low, and cited a statement from Dan Cantor, then-Director of the Working Families Party, that raising the threshold will "require minor parties to show substantial popular support and will reduce ballot clutter." Id. at 62 (Statement of Commissioner Jay S. Jacobs).

As a "corollary" to increasing the party ballot access threshold, the Commission also recommended increasing the number of signatures required for independent nominating petitions. Id. at 15 (Commission's findings). The Commission noted the "historical gap in updating this number," id. at 133 (Minutes from November 25 Meeting): since 1922, when the signature requirement was set at 15,000, New York's electorate has experienced nearly a four-fold increase. Brehm Decl. ¶ 58. The Commission voted 8-1 to increase the signature requirement for statewide nominating petitions to 45,000. Report at 135 (Minutes from November 25 Meeting).

III.

The minor party plaintiffs have had mixed success in attaining party status under the New York Election Law and in nominating candidates through independent nominating petitions.

The SAM Party attained party status under the Election Law in 2018, after its gubernatorial ticket received over 50,000 votes. Defendants' Statement of Material Facts ("DSMF"), SAM Party Docket No. 115-1 ¶ 34. As of November 2020, the SAM Party had 649 enrolled members, representing 0.0048% of New York's 13.56 million registered voters. Id. ¶ 35. Because the SAM Party chose not to run a candidate in the 2020 presidential election, SAM lost its party status and became an independent body following the certification of the results of that election. Id. ¶ 41. Michael J. Volpe, the Chairman of the SAM Party of New York, states that SAM focuses on local elections and seeks to "avoid getting prematurely embroiled in, or associated with, one side or the other of the ideological divide." Volpe Decl., SAM Party Docket No. 124 ¶ 10. Therefore, Volpe states that SAM will not endorse a candidate for president as a matter of principle, because doing so would be "inimical to SAM's core messaging." Id.

WFP gained party status in 1998 after qualifying in the 1998 gubernatorial election. DSMF ¶ 42. As of February 2021, WFP had 48,207 enrolled members, representing 0.36% of New York's

13

registered voters. Id. ¶ 44. In four of the last seven elections, WFP achieved the greater of 130,000 votes or 2% of the vote for president or governor, id. ¶ 43, meaning that WFP would have qualified as a party following those elections even under the amended Election Law. Indeed, in the 2020 presidential election, in which WFP cross-nominated the Democratic Party's nominees for president and vice president—Joseph R. Biden and Kamala D. Harris—WFP received 386,010 votes on its ballot line and retained its party status under the amended law. Id. ¶¶ 48–50.

LPNY is the New York State affiliate of the national Libertarian Party, which LPNY alleges is the third-largest political party in the United States. LPNY Compl. ¶ 7. As of November 2020, LPNY had 21,551 enrolled members, or 0.16% of New York's registered voters. DSMF ¶ 57. LPNY operated as an independent body in New York between 1974 and 2018, submitting independent nominating petitions in each presidential and gubernatorial election except the 1986 gubernatorial election. Id. ¶ 53. LPNY obtained party status in New York for the first time in 2018, when its gubernatorial ticket received 95,033 votes. Id. ¶ 55. However, LPNY failed to retain party status under the amended vote threshold following the 2020 presidential election because its presidential ticket received 60,234 votes, or 0.70% of the total votes cast. Id. ¶¶ 58–59.

14

GPNY is the New York State affiliate of the national Green Party. Id. ¶ 61. As of November 2020, GPNY had 28,501 enrolled members, or 0.21% of New York's registered voters. Id. ¶ 68. GPNY nominated a candidate in each presidential and gubernatorial election since 1996, except for the 2004 presidential election. Id. ¶ 62. GPNY obtained party status based on its performance in the 1998 gubernatorial election, but lost that status four years later when its 2002 gubernatorial ticket received only 41,797 votes. Id. ¶¶ 63-65. GPNY again obtained party status in 2010, but lost its party status following the 2020 presidential election when its ticket received 32,753 votes, or 0.38% of the total votes cast, failing to meet the updated voter threshold. Id. ¶¶ 67-70.

### IV.

The defendants have moved for summary judgment. The standard for granting summary judgment is well established. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is

15

confined at this point to issue-finding; it does not extend to issue-resolution." Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994). The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Gallo, 22 F.3d at 1223. "If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994). If the moving party meets its burden under Rule 56, the nonmoving party must produce evidence in the record and "may not rely simply on conclusory statements or on contentions that the affidavits

supporting the motion are not credible." Ying Jing Gan v. City of N.Y., 996 F.2d 522, 532 (2d Cir. 1993).

**V.**

"The Constitution provides that States may prescribe 'the Times, Places and Manner of holding Elections for Senators and Representatives,'" and courts have recognized "that States retain the power to regulate their own elections." Burdick, 504 U.S. at 433 (quoting U.S. Const. Art. I, § 4, cl. 1). "States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder." Timmons v. Twin Cities Area New Party, 520 U.S. 351, 358 (1997). Because every election law "inevitably affects" individual voters' rights to vote and to associate with others for political ends, courts do not subject every election law or regulation to "strict scrutiny" or "require that [each] regulation be narrowly tailored to advance a compelling state interest." Burdick, 504 U.S. at 433.

Instead, courts evaluate challenges to state action restricting ballot access under the Anderson-Burdick framework, and vary the level of scrutiny to be applied depending on the burden that the state law imposes on First and Fourteenth Amendment rights. SAM Party II, 987 F.3d at 274; Libertarian Party of Conn. v. Lamont, 977 F.3d 173, 177 (2d Cir. 2020); see supra n.2. When a challenged state election regulation imposes

17

"severe restrictions" on First or Fourteenth Amendment rights, it "must be narrowly drawn to advance a state interest of compelling importance." Burdick, 504 U.S. at 434 (quoting Norman v. Reed, 502 U.S. 279, 289 (1992)). However, "when a state election law provision imposes only reasonable, nondiscriminatory restrictions upon the First and Fourteenth Amendment rights of voters, the State's important regulatory interests are generally sufficient to justify the restrictions." Id. In this latter category of cases, a court "must weigh the State's justification against the burden imposed," but such review is "quite deferential" and does not require "elaborate, empirical verification of the weightiness of the State's asserted justifications." Libertarian Party of Conn., 977 F.3d at 177; see also Timmons, 520 U.S. at 364.

The Court has previously concluded that the challenged amendments to the New York Election Law do not impose severe burdens on the plaintiffs, and that the State's proffered interests are sufficient to justify the amendments. The Second Circuit Court of Appeals agreed with those conclusions with respect to the SAM Party plaintiffs' challenges. See SAM Party II, 987 F.3d at 276, 278. The factual record remains substantially unchanged from the time of the Court's preliminary injunction decisions. Accordingly, for the reasons explained

18

below, the Court reaches the same conclusions under the
Anderson-Burdick framework.[6]

**A.**

To determine whether a challenged provision places a
"severe burden" on a plaintiff's First or Fourteenth Amendment
rights, courts "consider the alleged burden imposed by the
challenged provision in light of the state's overall election
scheme." Schulz v. Williams, 44 F.3d 48, 56 (2d Cir. 1994).
"Courts have identified three types of severe burdens on the
right of individuals to associate as a political party. First
are regulations meddling in a political party's internal
affairs. Second are regulations restricting the 'core
associational activities' of the party or its members. Third are
regulations that 'make it virtually impossible' for minor
parties to qualify for the ballot." SAM Party II, 987 F.3d at
275 (quoting Timmons, 520 U.S. at 360, and Williams v. Rhodes,
393 U.S. 23, 25 (1968)).

---

[6] The defendants argue that the law-of-the-case doctrine may apply to preclude
relitigation of the plaintiffs' federal constitutional challenges in light of
the decision by the Second Circuit Court of Appeals in SAM Party II. However,
the law-of-the-case doctrine is "discretionary and does not limit a court's
power to reconsider its own decision prior to final judgment." Cangemi v.
United States, 13 F.4th 115, 140 (2d Cir. 2021) (quoting Virgin Atl. Airways,
Ltd. v. Nat'l Mediation Bd., 956 F.2d 1245, 1255 (2d Cir. 1992)). Moreover,
"[a] preliminary determination of likelihood of success on the merits in a
ruling on a motion for preliminary injunction is ordinarily tentative,
pending a trial or motion for summary judgment." Goodheart Clothing Co., Inc.
v. Laura Goodman Enters., Inc., 962 F.2d 268, 274 (2d Cir. 1992). In any
event, there is no need to resort to the law-of-the-case doctrine in deciding
the defendants' motion: the Court will apply the Anderson-Burdick framework—
as recently applied by the court of appeals—along with the standard for
summary judgment, to the current factual record.

The plaintiffs primarily argue that the challenged amendments make it virtually impossible for minor parties to qualify for the ballot. See Libertarian Party of Conn., 977 F.3d at 177 ("[T]he hallmark of a severe burden is exclusion or virtual exclusion from the ballot." (quoting Libertarian Party of Ky. v. Grimes, 835 F.3d 570, 574 (6th Cir. 2016))). In this analysis, "[w]hat is ultimately important is not the absolute or relative number of signatures required but whether a reasonably diligent candidate could be expected to be able to meet the requirements and gain a place on the ballot." Id. at 177-78. The concern is to ensure that such reasonably diligent candidates retain means for seizing upon the "availability of political opportunity." Munro v. Socialist Workers Party, 479 U.S. 189, 199 (1986).

New York's ballot access restrictions do not virtually exclude minor parties from the ballot. In fact, two minor parties, including WFP, retained party status under the revised law based on their performances in the 2020 presidential election.[7] Moreover, it is well established that "States may condition access to the general election ballot by a minor-party

---

[7] Based on the results of the 2020 presidential election, four of the seven statutory parties that ran a presidential ticket requalified as parties under the amended law for the next two-year election cycle: the Democratic Party, the Republican Party, WFP, and the Conservative Party. DSMF ¶ 73. SAM was also a statutory party prior to the 2020 presidential election, but failed to retain its party status under the amended law because it did not run a presidential ticket. Id. ¶ 75.

or independent candidate upon a showing of a modicum of support among the potential voters for the office." Munro, 479 U.S. at 193; see also SAM Party II, 987 F.3d at 277; Prestia v. O'Connor, 178 F.3d 86, 88 (2d Cir. 1999). As the Second Circuit Court of Appeals recently found, New York's amended 2% vote threshold is "middle of the pack among the three-dozen states that require parties to obtain a certain level of support in a statewide race. Several federal courts of appeals have approved of thresholds as high and higher."[8] SAM Party II, 987 F.3d at 275–76; see, e.g., Libertarian Party of Ky., 835 F.3d at 575 (upholding 2% presidential-election requirement); Green Party of Ark. v. Martin, 649 F.3d 675, 686–87 (8th Cir. 2011) (upholding 3% presidential-election requirement); McLaughlin v. N.C. Bd. of Elections, 65 F.3d 1215, 1226 (4th Cir. 1995) (upholding 10% presidential-election requirement to requalify as a party); Arutunoff v. Okla. State Election Bd., 687 F.2d 1375, 1379 (10th

---

[8] The three-dozen number is subject to some dispute. The defendants state that "New York is one of 21 states that require political organizations to demonstrate a minimum threshold of votes in a specific election in order to qualify for or retain party status." DSMF ¶ 106. The plaintiffs dispute the defendants' figure on the grounds that "[m]any of these [21] states afford other routes to acquire or maintain party status." SAM Party Docket No. 122 ¶ 106; see also WFP Docket No. 74 ¶ 106. Presumably the plaintiffs highlight this distinction to demonstrate that some of the states to which New York is being compared have less stringent party qualification requirements because they offer alternative avenues for party qualification. It is undisputed, however, that: (1) New York is one of many states that certify parties based only on their performances in a specific election, (2) two New York minor parties retained party status under the amended law based on their performances in the 2020 presidential election, and (3) courts have upheld vote thresholds that are equivalent to or more demanding than the one at issue here.

Cir. 1982) (same). Eighteen[9] states other than New York require parties to meet specific requirements to retain party status at least biennially, and some states require that political organizations obtain 3, 4, 5, 10, or even 20% of the vote in a specific election to qualify as parties. DSMF ¶¶ 107-08.

There is also no "severe burden" on the plaintiffs because political organizations that do not qualify as parties can place candidates on the ballot by independent nominating petitions. See SAM Party II, 987 F.3d at 276. The plaintiffs argue that the recently increased petition thresholds, like the party qualification thresholds, are so high that they are impossible for minor parties to meet. This argument fails. The Supreme Court has held that a petition threshold as high as 5% of the state electorate is permissible and does not "abridge[] the rights of free speech and association secured by the First and Fourteenth Amendments." Jenness v. Fortson, 403 U.S. 431, 440 (1971). Federal appellate courts have followed suit. See, e.g., SAM Party II, 987 F.3d at 276 (indicating that New York's amended petition thresholds are permissible); Prestia, 178 F.3d

---

[9] This number is also subject to some dispute. The plaintiffs assert that only seventeen other states require parties to meet specific requirements to retain party status at least biennially. SAM Party Docket No. 122 ¶ 108. This factual dispute, like many others raised by the parties, goes only to where in the middle of the pack New York's party and ballot access thresholds lie. Such disputes are not germane to the analysis of whether New York's scheme virtually excludes minor parties from the ballot such that it would present a "severe burden" under Anderson-Burdick step one.

at 88 ("[A] requirement that ballot access petitions be signed
by at least 5% of the relevant voter pool is generally valid,
despite any burden on voter choice that results when such a
petition is unable to meet the requirement."); Libertarian Party
of Ill. v. Rednour, 108 F.3d 768, 775 (7th Cir. 1997) (citing
Jenness and upholding a 5% petition threshold); Rainbow
Coalition of Okla. v. Okla. State Election Bd., 844 F.2d 740,
744 (10th Cir. 1988) (5% petition threshold "undeniably
constitutional"). Under New York's amended petition thresholds,
independent nominating petitions for statewide office must be
signed by the lesser of 45,000 registered voters or 1% of the
votes cast in the last gubernatorial election (nominating
petitions for non-statewide office require fewer signatures).
N.Y. Elec. Law § 6-142. These petition thresholds, like the
amended party status threshold, are in line with other states'
requirements. New York, the fourth most populous state, ranks
seventh in terms of absolute number of signatures required for
nominating petitions for statewide office. SAM Party Docket No.
122 ¶ 110. When compared by population of eligible signatories,
there are seventeen[10] states with independent nominating petition
requirements stricter than New York. DSMF ¶ 112. "[A] reasonably
diligent organization could be expected to satisfy New York's

_____

[10] The plaintiffs state that this number is sixteen. SAM Party Docket No. 122
¶ 112. This dispute is not material.

signature requirement." SAM Party II, 987 F.3d at 276 (quoting Libertarian Party of Conn., 977 F.3d at 179). Accordingly, the "combined effect of New York's ballot-access restrictions" does not virtually exclude minor parties from the ballot. Id. at 275 (quoting Libertarian Party of Ky., 835 F.3d at 575).[11]

The LPNY plaintiffs argue that other requirements New York imposes on independent nominating petitions combine to impose a severe burden on minor parties. This argument also fails, for substantially the same reasons explained in the Court's previous opinion in Libertarian Party of N.Y., 2021 WL 1931058, at *9-10. New York imposes a 42-day collection period for signatures. N.Y. Elec. Law § 6-138(4). Gathering 45,000 signatures (or 0.33% of registered voters) in 42 days would require a candidate to gather 1,072 signatures per day. Seventy-seven canvassers could gather the required signatures at a rate of 14 signatures per day, over 42 days. In Am. Party of Tex. v. White, 415 U.S. 767 (1974), the Supreme Court rejected a challenge to a Texas law requiring nominating petitions to contain signatures from 1% of voters in the last gubernatorial election obtained over a 55-day period. The Court noted that 100 canvassers could obtain the required signatures at a rate of 4 signatures per day, and that

---

[11] The LPNY plaintiffs argue that the petition threshold "was not directly at issue" in SAM Party II. LPNY Docket No. 84, at 23. However, it is plain that the Second Circuit Court of Appeals considered the amended petition threshold in determining whether the "combined effect of New York's ballot-access restrictions" imposes a severe burden on minor parties. See 987 F.3d at 276.

"[h]ard work and sacrifice by dedicated volunteers are the lifeblood of any political organization." Id. at 786-87.

Similarly, in Storer v. Brown, 415 U.S. 724, 740 (1974), the Court rejected a facial challenge to a California law requiring presidential candidates to gather 325,000 signatures, or 5% of the votes cast in the prior general election, in 24 days. The law at issue also required that the signatures come from voters who had not voted in the presidential primary election, shrinking the pool of eligible signatories. The Storer Court noted that, although the law required gathering signatures at a rate of 13,542 per day, such a threshold could be accomplished with 1,000 canvassers gathering 14 signatures per day, which "would not appear to require an impractical undertaking for one who desires to be a candidate for President." Id. The Court did remand for a determination of whether this requirement posed a severe burden as applied to independent candidates, but specifically cited the additional burden imposed by the disqualification of people who voted in the primary election. See id. New York's law does not impose this requirement; it only requires that nominating petitions be signed by registered voters who have not already signed another petition for the same office. N.Y. Elec. Law § 6-138(1). Moreover, the New York law requires far fewer signatures on nominating petitions for offices representing smaller political

25

subdivisions within the State. See id. § 6-142(2). Accordingly, while the 42-day signature period may present a burden, especially for political organizations seeking to nominate candidates for statewide office, this requirement does not make it virtually impossible to nominate candidates by petition— either on its own or in conjunction with the rest of New York's ballot access restrictions.[12]

The SAM Party plaintiffs articulate a narrower challenge to the Party Qualification Method, specifically challenging the requirement that political organizations receive a requisite number of votes in presidential elections, as opposed to only gubernatorial elections, to qualify as parties. SAM argues that the presidential-election requirement imposes a severe burden because "SAM was forced to choose between abandoning its core

---

[12] The LPNY plaintiffs again take issue with the requirement that nominating petition signatures must be witnessed by a New York voter. As they did at the preliminary injunction stage, the LPNY plaintiffs only cite a vacated district court decision in support of this argument. LPNY Docket No. 84, at 10 (citing Free Libertarian Party, Inc. v. Spano, 314 F. Supp. 3d 444 (E.D.N.Y. 2018), vacated sub nom., Redpath v. Spano, No. 18-2089, 2020 WL 2747256 (2d Cir. May 7, 2020)). The witness residency requirement has been upheld in a case that remains good law. See Germalic v. Comm'rs State Bd. of Elections, N.Y., No. 10-cv-1317, 2011 WL 1303644, at *3 (N.D.N.Y. Apr. 1, 2011), aff'd on other grounds sub nom., Germalic v. N.Y. Bd. of Elections Comm'rs, 466 F. App'x 54 (2d Cir. 2012) (concluding that the witness residency requirement "is narrowly tailored to serve the state's compelling interest of protecting the integrity of the electoral process and guarding against fraud"). The LPNY plaintiffs do not explain why the witness residency requirement is unconstitutional or why it imposes a severe burden on ballot access. Accordingly, for the same reasons explained in the Court's preliminary injunction opinion, the witness residency requirement is not unconstitutional, either by itself or in conjunction with the rest of New York's ballot access restrictions. See Libertarian Party of N.Y., 2021 WL 1931058, at *11 n.11.

message and competing in a Presidential election inimical to its values and strategy, or being excluded from the ballot and stripped of 'party' status." SAM Party Docket No. 121, at 13. But the Second Circuit Court of Appeals has already rejected this argument, concluding that the presidential-election requirement does not compel political organizations to speak. See SAM Party II, 987 F.3d at 275 ("A law that ties party status to a political organization's demonstrated support in a designated race does not 'force' the organization 'to divert its resources in any particular way.'" (quoting Person v. N.Y. State Bd. of Elections, 467 F.3d 141, 144 (2d Cir. 2006))). Political organizations remain free to not seek official party status and to continue to participate in the political process by running candidates as independent bodies.[13] Political organizations do not have "a right to use the ballot itself to send a particularized message" because "[b]allots serve primarily to elect candidates, not as forums for political expression." Timmons, 520 U.S. at 363. Accordingly, the presidential-election requirement does not compel political speech, and the SAM Party plaintiffs fare no better than the other plaintiffs in arguing

---

[13] The presidential-election requirement does not "threaten[] SAM's ability to exist," SAM Party Docket No. 121, at 13, because "[a]n independent body may still operate in the political arena and run candidates," SAM Party II, 987 F.3d at 275. Regardless of whether SAM loses party status because of principle or because of an inability to attract sufficient support from the New York electorate, SAM can continue operating as an independent body and is not virtually excluded from the ballot.

that New York's ballot access restrictions impose a severe
burden under Anderson-Burdick step one.

Viewing the alleged burdens imposed by the challenged
amendments "in light of the state's overall election scheme,"
Schulz, 44 F.3d at 56, it is plain that the challenged
amendments do not impose a "severe burden" on the plaintiffs, as
that phrase has been interpreted by courts applying the
Anderson-Burdick framework.

**B.**

Because the challenged amendments do not place severe
burdens on the First or Fourteenth Amendment rights of the
plaintiffs, New York's asserted regulatory interests "need only
be sufficiently weighty to justify the limitation imposed on the
[plaintiffs'] rights." Timmons, 520 U.S. at 364; see also
Burdick, 504 U.S. at 434. "The balancing test at the second
stage of the Anderson–Burdick framework is 'quite deferential.'"
SAM Party II, 987 F.3d at 276 (quoting Price v. N.Y. State Bd.
of Elections, 540 F.3d 101, 109 (2d Cir. 2008)). "A State's
important regulatory interests will usually be enough to justify
reasonable, nondiscriminatory restrictions." Id. (quoting
Timmons, 520 U.S. at 358).

New York has offered several important, non-discriminatory
regulatory interests to justify the challenged amendments.
First, the State contends that the amendments help gauge whether

28

a political organization enjoys a sufficient "modicum of support" such that it deserves automatic ballot access. See id. at 277. This interest was emphasized in light of New York's new public campaign finance system and the need to keep that system operating within the $100 million annual limit set by the legislature:

> [T]he ability of a party to demonstrate bona fide interest from the electorate is paramount in ensuring the success of a public campaign finance system. . . . [S]etting a rational threshold for party ballot access, based on a demonstration of credible levels of support from voters in this state, helps to ensure that the political parties whose candidates will draw down on public funds under the public matching program reflect the novel and distinct ideological identities of the electorate of New Yorkers who ultimately fund this public campaign finance program.

Report at 14.

The State's interest in requiring a modicum of support for ballot access has been endorsed by the Supreme Court and by the Second Circuit Court of Appeals. See SAM Party II, 987 F.3d at 277 ("There is surely an important state interest in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot—the interest, if no other, in avoiding confusion, deception, and even frustration of the democratic process at the general election." (quoting Jenness, 403 U.S. at 442)). In SAM Party II, the court of appeals also explicitly endorsed New York's interest in preserving the public fisc. See id. ("The

government's 'interest in not funding hopeless candidacies with
large sums of public money necessarily justifies the withholding
of public assistance from candidates without significant public
support.'" (quoting Buckley v. Valeo, 424 U.S. 1, 96 (1976))).
Finally, the State also made clear that the challenged
amendments represent an effort to maintain organized,
uncluttered ballots; prevent voter confusion; and preserve
proportionality between the thresholds required for ballot
access and the number of registered voters in the State. See
Report at 14-15.

        The plaintiffs do not question the importance of the
interests proffered by the State. Rather, the plaintiffs
challenge whether the proffered interests are genuine and
whether there are empirically verifiable problems.[14] But where,
as here, the challenged law does not impose a severe burden, the
State need not offer "elaborate, empirical verification" of its
justifications. SAM Party II, 987 F.3d at 277 (quoting Timmons,
520 U.S. at 364); see also Munro, 479 U.S. at 194-95 ("We have
never required a State to make a particularized showing of the

---

[14] See, e.g., SAM Party Docket No. 121, at 15 (arguing that the defendants
"have adduced no evidence that [ballot overcrowding] actually is a problem in
New York"); id. at 21 ("Defendants have not adduced any evidence that the
public-finance program will be any less expensive if there are fewer minor
parties[.]"); WFP Docket No. 73, at 20 ("Defendants have not offered any
evidence for how the Election Voting Law lessens (or removes) voter
confusion."); id. ("Defendants have not cited any evidence demonstrating that
ballot overcrowding is a problem.").

existence of voter confusion, ballot overcrowding, or the presence of frivolous candidacies prior to the imposition of reasonable restrictions on ballot access."). The plaintiffs also argue that the challenged amendments were not the most effective or least restrictive means of pursuing the State's proffered goals.[15] But the State "may pursue multiple avenues" to achieve its stated goals, SAM Party II, 987 F.3d at 277, and the State need not pursue the least restrictive means available. "To subject every voting regulation to strict scrutiny and to require that the regulation be narrowly tailored to advance a compelling state interest would tie the hands of States seeking to assure that elections are operated equitably and efficiently." Id. at 274 (quoting Burdick, 504 U.S. at 433).

The State has sufficiently demonstrated that its proffered interests are furthered by the challenged amendments, and that those interests require any incidental burdens on the plaintiffs. See id. Increasing the party qualification and

---

[15] See, e.g., SAM Party Docket No. 121, at 16 ("To the extent that Defendants imply that there would be no easier, cleaner, or less-confusing way to write the ballots . . . , that is disputed too."); id. ("The State has submitted no evidence showing that it attempted to cure its allegedly overcrowded ballots through a widely used redesign, rather than by forcing minor parties to run candidates for President."); WFP Docket No. 73, at 18 ("Nor is there any evidence the State considered any alternative options [to preserve the public campaign finance system]."); id. at 21 ("Defendants also fail to explain why voter confusion and ballot overcrowding could not be eliminated by better ballot design, which would impose no burden on the WFP or any other parties (independent or recognized)."); LPNY Docket No. 84, at 27-28 ("If Defendants or the Legislature eliminated [the requirement for a full-face paper ballot], all the confusion and overcrowding concerns that Defendants express can be solved.").

nominating petition thresholds are reasonable steps to take to prevent ballot overcrowding and assure that political organizations appearing on the ballot enjoy a sufficient modicum of support from the electorate. Moreover, increasing the ballot access requirements is a reasonable way to ensure that only candidates with a reasonable amount of support benefit from the State's public campaign finance program. The State has also adduced evidence that granting party status to political organizations that lack significant support from the electorate results in administrative burdens and waste. See Brehm Decl. ¶¶ 44-49 (describing a 2020 SAM Party primary election in a county in which there were no enrolled SAM voters). These interests outweigh any burdens imposed on the plaintiffs.

The plaintiffs cite Green Party of N.Y. State v. N.Y. State Bd. of Elections, 389 F.3d 411, 422 (2d Cir. 2004) for the proposition that "the ability to meet the requirements for placing a candidate on the statewide ballot is enough of an indication of support to overcome the state's interest in preventing voter confusion." But states are permitted to increase those requirements over time in response to large population increases. See Timmons, 520 U.S. at 358 ("States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder."). In New York, the previous party status and

nominating petition thresholds were set in 1935 and 1922, respectively; the State's population has seen nearly a four-fold increase since 1922. See Brehm Decl. ¶¶ 19, 57-58. Moreover, courts have repeatedly held that "popular vote totals in the last election are a proper measure of public support." SAM Party II, 987 F.3d at 277 (quoting Green Party of Conn. v. Garfield, 616 F.3d 213, 231 (2d Cir. 2010)). There is no authority to support the proposition that a state's ballot access requirements must remain frozen over time.

"The State has set forth a coherent account" of why the challenged amendments will "help to guard against disorder and waste." Id. at 278. Accordingly, the burdens imposed on the plaintiffs by the challenged amendments are justified under the "quite deferential" review at Anderson-Burdick step two. Id.

**VI.**

The SAM and WFP plaintiffs resist summary judgment by arguing that they "cannot present facts essential to justify [their] opposition." Fed. R. Civ. P. 56(d).[16] The plaintiffs correctly note that "[c]ourts in the Second Circuit routinely deny or defer motions for summary judgment when the non-movant has not had an opportunity to conduct discovery and submits an affidavit or declaration that meets the requirements set forth

---

[16] The LPNY plaintiffs do not raise a Rule 56(d) argument because fact discovery in that action has closed. See LPNY Docket No. 55.

in Rule 56(d)." Walden v. Sanitation Salvage Corp., Nos. 14-cv-112, 14-cv-7759, 2015 WL 1433353, at *5 (S.D.N.Y. Mar. 30, 2015). But the plaintiffs have had ample opportunity to conduct discovery in these cases.

The SAM Party plaintiffs served extensive document demands on the defendants at the preliminary injunction stage. The SAM Party plaintiffs sought, among other things, "[a]ll documents and things" relating to the challenged amendments, including "documents sufficient to show the basis for the decision to amend" the New York Election Law. SAM Party Docket No. 133, Ex. O, at 4. The defendants produced 1,334 pages of responsive documents. SAM Party Docket No. 133 ¶ 7. This discovery was contemporaneously produced to the WFP plaintiffs, who chose not to serve their own discovery demands on the defendants. Id. ¶¶ 9-10.

Parties opposing summary judgment on the grounds that additional discovery is required bear a heavy burden. See Stryker v. HSBC Sec. (USA), No. 16-cv-9424, 2020 WL 5127461, at *19 (S.D.N.Y. Aug. 31, 2020); Eastern Sav. Bank, FSB v. Rabito, No. 11-cv-2501, 2012 WL 3544755, at *6 (E.D.N.Y. Aug. 16, 2012). Moreover, "a plaintiff cannot defeat a motion for summary judgment by merely restating the conclusory allegations contained in his complaint, and amplifying them only with speculation about what discovery might uncover." Contemp.

34

Mission, Inc. v. U.S. Postal Serv., 648 F.2d 97, 107 (2d Cir.
1981). Parties resisting summary judgment under Rule 56(d) "must
submit an affidavit showing (1) what facts are sought to resist
the motion and how they are to be obtained, (2) how those facts
are reasonably expected to create a genuine issue of material
fact, (3) what effort [the] affiant has made to obtain them, and
(4) why the affiant was unsuccessful in those efforts." Stryker,
2020 WL 5127461, at *19 (quoting Gurary v. Winehouse, 190 F.3d
37, 43 (2d Cir. 1999)); see also Ortiz v. Case, 782 F. App'x 65,
66 (2d Cir. 2019).

      The plaintiffs have not met this burden. The plaintiffs
fail to explain how additional discovery would create a genuine
issue of material fact or why they have been unable to obtain
such discovery to date. Indeed, the plaintiffs have not shown
that the additional discovery they seek is even relevant to the
Anderson-Burdick analysis.

      Some of the plaintiffs' requests for additional discovery
simply rehash their arguments that the challenged amendments
pose a severe burden. See Stone Decl., SAM Party Docket No. 123
¶ 22. Other requests seek "elaborate, empirical verification" of
the State's proffered justifications, or explanations for why
the State did not pursue its goals by other, assertedly less-
intrusive means—neither of which the law requires. See SAM Party
II, 987 F.3d at 277; Stone Decl. ¶¶ 27, 32, 37, 42, 46; Guirguis

                                 35

Decl., WFP Docket No. 75 ¶¶ 34-35. Because these categories of discovery are not germane to the <u>Anderson-Burdick</u> analysis, the additional facts the plaintiffs seek are not "essential to justify [their] opposition," Fed. R. Civ. P. 56(d), and their argument under Rule 56(d) fails.

## VII.

The WFP and LPNY plaintiffs also argue that the challenged amendments violate the New York State Constitution. However, "[t]he Eleventh Amendment [to the Federal Constitution] bars federal suits against state officials on the basis of state law." <u>Allen v. Cuomo</u>, 100 F.3d 253, 260 (2d Cir. 1996); <u>see also</u> <u>Pennhurst State Sch. & Hosp. v. Halderman</u>, 465 U.S. 89, 106 (1984) ("[I]t is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law."); <u>Boyland v. Wing</u>, 487 F. Supp. 2d 161, 182 (E.D.N.Y. 2007). This bar applies to federal suits against state governments as well as state officials. <u>See</u> <u>id.</u> at 180-82. Accordingly, the plaintiffs' claims under the New York State Constitution also fail.

**CONCLUSION**

The Court has considered all of the arguments raised by the parties. To the extent not specifically addressed above, the arguments are either moot or without merit.

For the reasons explained above, the defendants' motion for summary judgment is **granted**.[17] The Clerk is directed to enter judgment dismissing these cases. The Clerk is also directed to close all pending motions and to close these cases.

**SO ORDERED.**

Dated:    New York, New York
          December 22, 2021

                                    _____
                                         John G. Koeltl
                                    United States District Judge

---

[17] The LPNY plaintiffs state that the defendants failed to move for summary judgment with respect to those plaintiffs' third and fourth causes of action. LPNY Docket No. 84, at 6. That is incorrect. The LPNY plaintiffs' third and fourth causes of action both assert due process and First Amendment challenges. LPNY Compl. at 42-43. These challenges, like all the plaintiffs' federal constitutional challenges to the amended New York Election Law, are governed by the Anderson-Burdick framework. See Acevedo v. Cook Cnty. Officers Electoral Bd., 925 F.3d 944, 948 (7th Cir. 2019) ("[The Anderson-Burdick] test applies to all First and Fourteenth Amendment challenges to state election laws." (citing Burdick, 504 U.S. at 432-34)). Moreover, the defendants' motion for summary judgment specifically refers to these claims. See SAM Party Docket No. 115, at 8-10. Accordingly, summary judgment is granted with respect to all the plaintiffs' claims, including the LPNY plaintiffs' third and fourth causes of action.